UNITED STATES COURT OF INTERNATIONAL TRADE

Before: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| | ) | |
| ATLAS POWER LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 23-00084 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION**

J. Kevin Horgan
Merisa A. Horgan
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth Street, N.W.
Suite 1101
Washington, D.C. 20005
Tel: (202) 783-6900
email:  khorgan@dhlaw.com
*Counsel to Atlas Power LLC*

Dated: November 13, 2024

# TABLE OF CONTENTS

I.    STATEMENT OF ISSUE ................................................................................. 1

II.   SUMMARY OF ARGUMENT ....................................................................... 2

    a.   The Subject Merchandise is Classified in HTSUS 8473.30.1180 ........................... 2

    b.   The Subject Merchandise Consists of Unfinished Logic Boards ............................... 2

    c.   The Subject Merchandise Consists of Excluded GPU Modules................................. 3

    d.   The Subject Merchandise Consists of Excluded Accelerator Modules ...................... 4

III.  STATEMENT OF FACTS ............................................................................... 6

    a.   Atlas Power ................................................................................................. 6

    b.   The Importations ......................................................................................... 6

    c.   The Atlas Data Center Servers ................................................................... 8

    d.   The Subject Merchandise ............................................................................ 9

IV.   RELEVANT LEGAL PROVISIONS ............................................................ 11

V.    ARGUMENT ................................................................................................ 15

    A.   Jurisdiction and Standard of Review ........................................................ 15

    B.   The Subject Merchandise is Classified Under HTSUS 8473.30.1180 ..................... 16

    C.   The Subject Merchandise Is Excluded from Assessments of 301 Tariffs ................ 16

        a.   The Subject Merchandise Consists of Printed Circuit Board
           Assemblies Constituting Unfinished Logic Boards ..................................... 16

        b.   The Subject Merchandise Consists of Excluded GPUs ................................. 21

        c.   The Subject Merchandise Consists of Accelerator Modules ......................... 24

CONCLUSION ............................................................................................ 28

i

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc.,
  477 23-84 16 U.S. 242 (1986) ........................................................................... 15, 16

Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,
  731 F.2d 831 (Fed. Cir. 1984) ................................................................................. 16

Baxter Healthcare Corp. of P.R. v. United States,
  182 F.3d 1333 (Fed. Cir. 1999) ............................................................................... 17

Carl Zeiss, Inc. v. United States,
  195 F.3d 1375 (Fed. Cir. 1999) ......................................................................... 15, 17

Clarendon Marketing, Inc. v. United States,
  144 F.3d 1464 (Fed. Cir. 1998) ............................................................................... 17

Goodman Manufacturing, L.P. v. United States,
  69 F.3d 505 (Fed. Cir. 1995) ................................................................................... 15

Hanser v. McDonough,
  56 F.4th 967 (Fed. Cir. 2022) ............................................................................... 4, 22

Hayes-Sammons Co. v. United States,
  55 C.C.P.A. 69 (1968) ........................................................................................ 17, 22

Novacor Chems., Inc. v. United States,
  171 F.3d 1376 (Fed. Cir. 1999) ................................................................................. 4

Processed Plastics Co. v. United States,
  473 F.3d 1164 (Fed. Cir. 2006) ............................................................................... 16

Rohm & Haas Co. v. United States,
  727 F.2d 1095 (Fed. Cir. 1984) ............................................................................... 17

Shamrock Bldg. Materials, Inc. v. United States,
  2024 U.S. App. LEXIS 26748 (Fed. Cir. October 23, 2024) ................................... 15

Simod Am. Corp. v. United States,
  872 F.2d 1572 (Fed. Cir. 1989) ............................................................................... 17

Starkist Co. v. United States,
  29 F.4th 1359 (Fed. Cir 2022) ................................................................................. 15

**Statutes**

19 U.S.C. §1515...........................................................................................................15

28 U.S.C. § 1581(a).....................................................................................................15

28 U.S.C. § 2639(a)(1)................................................................................................15

28 U.S.C. § 2640(a)(1)................................................................................................15

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  STEPHEN A. VADEN, JUDGE

---

| | | |
|---|---|---|
| ATLAS POWER LLC, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Court No. 23-00084 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This civil action contests the denial of Plaintiff's protest regarding the assessment of Section 301 tariffs on NVIDIA CMP 170 HX graphics processing units ("GPUs") ("the subject merchandise") imported by Plaintiff, Atlas Power LLC (Atlas) in 2021.  Pursuant to Rules 1, 7 and 56 of the Rules of the United States Court of International Trade (USCIT), Atlas hereby moves for summary judgment.

## I.    STATEMENT OF ISSUE

The issue presented by this motion for summary judgment is whether facts as to which there is no material dispute show that the subject merchandise is excluded from assessments of Section 301 tariffs as a matter of law by virtue of one of the following three exclusions:

> (108) Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules") (described in statistical reporting number 8473.30.1180)

> (109) Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules") (described in statistical reporting number 8473.30.1180)

(110) Printed circuit assemblies, constituting unfinished logic boards
(described in statistical reporting number 8473.30.1180)

## II.    SUMMARY OF ARGUMENT

### a.    The Subject Merchandise is Classified in HTSUS 8473.30.1180

When Atlas entered the subject merchandise into the commerce of the United States,

Atlas classified the merchandise under subheading 8473.30.1180 of the Harmonized Tariff

Schedule of the United States ("HTSUS"), which covers, among other things, parts and

accessories of automated data processing ("ADP") machines.   United States Customs &

Border Protection ("CBP") did not alter this HTSUS classification at the time of liquidation or

in response to Atlas's protest against the assessments of Section 301 tariffs on the subject

merchandise. In Defendant's October 23, 2024 answer to Plaintiff's Third Amended

Complaint, the United States did not assert an alternative HTSUS classification for the subject

merchandise, but instead asked that the Court sustain CBP's determination that the subject

merchandise was classified under HTSUS 8473.30.1180 but not excluded from assessments of

Section 301 tariffs.  Therefore, the Court should summarily sustain the classification of the

subject merchandise under HTSUS 8473.30.1180.

### b.    The Subject Merchandise Consists of Unfinished Logic Boards

A logic board is defined as: "An assembly of decision-making circuits on a printed-

circuit mounting board."  *IEEE 100 The Authoritative Dictionary of IEEE Standards Terms*

(Seventh Edition).  The subject merchandise consists of logic boards because each unit of the

merchandise is an assembly of decision-making circuits on a printed circuit board which is

mounted inside a chassis.  GPU modules and accelerator modules are types of logic boards

because they each consist of assemblies of decision-making circuits on a printed circuit board

mounted inside a chassis.

2

The subject merchandise consists of "unfinished" logic boards because the subject merchandise was imported in a condition that required further processing in order to make the merchandise operational at all and to make it function as intended by the user, Atlas. The subject merchandise was imported without software drivers and without functioning video basic input/output ("VBIOS") software. Software drivers and a functioning VBIOS had to be installed after importation to enable the imported merchandise to function at all and to function as intended by the user. CBP has uniformly ruled that electronic devices are unfinished if they are imported without the functioning software components needed for them to operate as intended by the user.

CBPs treatment of electronic articles without essential software as unfinished is consistent with the electronic industry's treatment of software as a component of an electronic device. Both CBP and the electronics industry regard software as a component of an electronic device. Thus, the imported CMP 170HX GPUs were unfinished because, at the time of importation, the subject merchandise lacked an essential component, *i.e.*, functioning software drivers and the VBIOS, needed for the devices to work.

### c. The Subject Merchandise Consists of Excluded GPU Modules

The language excluding GPU form assessments of 301 Tariffs covers "Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules")… ." The undisputed facts show that the subject merchandise consists of GPU modules, which are excluded from assessments of 301 Tariffs.

In marketing literature, the manufacturer of the subject merchandise, NVIDIA, described the merchandise as CMP 170HX GPUs. Witnesses for Atlas, NVIDIA and the

Defendant all testified under oath that the subject merchandise consists of GPUs.  Defendant has admitted that the subject merchandise consists of GPUs.

The parenthetical reference to "graphics processing modules" in the exclusionary language leads to the conclusion that the exclusion covers all GPUs.    In Hanser v. McDonough, 56 F.4th 967 (Fed. Cir. 2022), the Court of Appeals for the Federal Circuit described the correct approach to interpreting statutory language that includes parenthetical language.  The Court said:

> There is no general rule or presumption that a parenthetical is always definitional. Instead, as in many areas of law (and life), context is crucial. Hence, to determine whether a particular parenthetical provides a definition or is "merely an illustrative example," Novacor Chems., Inc. v. United States, 171 F.3d 1376,1381 (Fed. Cir. 1999), we must consider the specific language at issue in the statutory or regulatory context in which it appears and then draw the most sensible conclusion about its meaning. …

56 F.4th at 971 (citations omitted).   Whether it is definitional or an illustrative example, the parenthetical reference to "graphics processing modules" makes it clear that the provision excludes all GPU modules from 301 Tariffs, regardless of their actual use and regardless of whether they are finished or unfinished.

Additionally, one of the intended uses of the subject merchandise was for rendering images.  The subject merchandise is capable of accelerating the processing of graphic image files and transmitting those image files through the PCIe connector to the motherboard.  The central processing unit ("CPU") on the motherboard is, in turn, able to use its built-in graphics display capabilities to display those image files on a computer screen.  Thus, the subject merchandise consists of printed circuit assemblies that can be used to accelerate the process of rendering images onto computer screens.

### d.  The Subject Merchandise Consists of Excluded Accelerator Modules

The accelerator module exclusion covers: "Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules")." The undisputed evidence shows that the subject merchandise must be used with an ADP machine.  The undisputed evidence also shows that the subject merchandise can be used to accelerate many different kinds of computations, including high performance computing applications such as scientific computing and visualization applications. Significant speed-ups have been achieved by applying GPUs to data parallel computational problems, including radar signal processing, reinforcement learning (a type of artificial intelligence algorithm), EDA software acceleration, wireless communication, gene sequencing, sensor tracking, hash functions, cryptography, graphics rendering, cloud computing, and the Internet of Things ("IOT")).   PSUMF ¶¶ 3, 29, 30.

The subject merchandise is capable of accelerating the processing of graphic image files and transmitting those image files through the PCIe connector to the motherboard.  The central processing unit ("CPU") of the ADP system is, in turn, able to use its built-in graphics display capabilities to display those image.  The subject merchandise consists of printed circuit assemblies that can be used to accelerate the process of rendering images, thus enhancing the graphics performance of an ADP machine. Therefore, the subject merchandise falls within the scope of the 301 Tariff exclusion for accelerators.

The language of the accelerator exclusion includes a parenthetical reference to a particular product, *i.e.*, "accelerator modules."  In keeping with the principles for interpreting parenthetical references in statutory language, the accelerator exclusion covers all forms of accelerator modules, regardless of their actual use.

### III.     STATEMENT OF FACTS

#### a.  Atlas Power

Atlas Power is a United States company that owns and operates data centers located in the Butte, Montana and Williston, North Dakota. PSUMF[1] ¶1. In 2021, Atlas was the largest GPU-based cryptocurrency miner in North America. PSUMF ¶2.  Atlas uses its data centers to mine crypto currency for its own account. PSUMF ¶2.  Atlas also provides colocation services allowing unaffiliated clients to rent rack space in Atlas data centers and install their own computer servers to use as they choose, with Atlas charging a fee for power, internet connectivity, maintenance services, *etc*. PSUMF ¶2.

In 2021, Atlas prepared an investment brochure describing it plans to use its data center servers, including those containing the subject merchandise, to engage in cryptocurrency mining as well as other data processing tasks such as high performance computing applications (artificial intelligence, graphics rendering, cloud computing, Internet of Things ("IOT")). PSUMF ¶3.

#### b.  The Importations

In 2021, Atlas entered four shipments of Chinese-origin NVIDIA CMP 170HX GPUs ("the subject merchandise") from a Foreign Trade Zone ("FTZ") into the commerce of the United States through the port of Cleveland, Ohio, under cover of the following FTZ consumption entry summaries: 8GF-2000360-5; 8GF-2000378-7; 8GF-2000380-3; and 8GF-2000384-5. PSUMF ¶4.

---

[1] "PSUMF ¶ …" is a reference to Plaintiff's Statement of Undisputed Material Facts which is being submitted with this Motion for Summary Judgment.  Each paragraph of the PSUMF contains citations to the evidentiary documents establishing the material facts as to which there is no genuine dispute.

Atlas classified the merchandise under Harmonized Tariff Schedule of the United States ("HTSUS") subheading 8473.30.1180, which provides for: "Parts and accessories (other than covers, carrying cases and the like) suitable for use solely or principally with machines of headings 8470 to 8472: Parts and accessories of the machines of heading 8471[*i.e.*, automatic data processing ("ADP") machines. PSUMF ¶5. At the time of entry, Chinese-origin merchandise classified under HTSUS subheading 8473.30.1180 was generally subject to 301 tariffs of 25% *ad valorem*. PSUMF ¶6.

In March 2022, prior to liquidation of the Atlas entries, the Office of the United States Trade Representative ("USTR") retroactively reinstated certain exclusions from 301 tariffs. The list of excluded products set forth in HTSUS 9903.88.56 included:

> (108) Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules") (described in statistical reporting number 8473.30.1180);
>
> (109) Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules") (described in statistical reporting number 8473.30.1180); and
>
> (110)Printed circuit assemblies, constituting unfinished logic boards (described in statistical reporting number 8473.30.1180).

See *Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 17380 (March 28, 2022). PSUMF ¶6. Following reinstatement of these exclusions, Atlas's brokers attempted to file amended entries (*i.e.*, post summary corrections ("PSCs") asserting that the subject merchandise was excluded from assessments of 301 tariffs. United States Customs and Border Protection ("CBP") rejected the PSCs filed by Atlas's customs brokers. PSUMF ¶7.

Upon liquidation of the entries of the subject merchandise, CBP did not alter the classification of the subject merchandise under HTSUS 8473.30.1180.  PSUMF ¶8.  CBP did, however, determine that the subject merchandise was subject to 301 tariffs.  Plaintiff timely filed a protest against the decision of CBP to assess 301 tariffs on the subject merchandise. Plaintiff did not protest the classification of the subject merchandise under HTSUS 8473.30.1180.  PSUMF ¶9.

In its decision on the protest, CBP did not alter the classification of the subject merchandise under HTSUS 8473.30.1180. CBP did, however, reaffirm its decision that the subject merchandise was not excluded from assessments of 301 tariffs pursuant to HTSUS 9903.88.56, stating that "the Product NVIDIA CMP 170HX with GA100-105F does not operate like ADP GPU specifically for graphics/video." PSUMF ¶10.

### c.  The Atlas Data Center Servers

In its data centers, Atlas uses data center servers that incorporate among other components, a motherboard on which an Intel Celeron central processing unit ("CPU") is mounted; a random access memory ("RAM") board, a solid state hard drive and a power supply unit.  All of these components are mounted on a chassis.  PSUMF ¶62.   The CPUs installed in the Atlas servers had on board graphics capability. PSUMF ¶19.  The assembled components of the Atlas servers constitute an automatic data processing machine.  PSUMF ¶¶38-41, 62.

The Atlas servers are capable of mining cryptocurrency without using a GPU. PSUMF ¶60.

Custom-designed Linux-based operating system ("OS") software developed by ElioVP for Atlas was installed on each server used with the subject merchandise.  PSUMF ¶68.  The ELIOVP OS was based on a popular Linux distribution called Ubuntu. PSUMF ¶77.

In addition to running cryptocurrency mining software, the Linux OS installed on the Atlas servers was capable of running other software applications such as email, word processing, internet browsing, video games, spreadsheets, graphical interface, *etc*. PSUMF ¶70.  Atlas planned to augment the software to enable the servers' ability to switch between mining Ethereum and providing general-purpose compute. PSUMF ¶68. (Ex. 3 at Appx 84.)

The Atlas servers equipped with subject merchandise were capable of being programmed to perform other automatic data processing functions by modifying the LINUX OS through the addition of LINUX/UBUNTU distributions containing such applications as word processing, gaming, email, internet search programs, *etc*. PSUMF ¶42.

Eight to ten of the imported NVIDIA CMP 170HX GPUs were installed on each Atlas server. PSUMF ¶66.

### d.  The Subject Merchandise

 The subject merchandise consists of printed circuit board assemblies ("PCBAs"). PSUMF ¶13.  The subject merchandise incorporates a GA100-105F-A1 graphics processor. PSUMF ¶34.  Customers for the GA 100 GPU use the card for artificial intelligence deep learning, among other computational tasks.  PSUMF ¶35.   The subject merchandise does not incorporate a central processing unit ("CPU"). PSUMF ¶36.  The subject merchandise does not have video outputs.   PSUMF ¶17.

The subject merchandise must be connected to an automatic data processing ("ADP") device or system containing a CPU in order to function.  PSUMF ¶37.  Connecting the subject

9

merchandise to an ADP device does not preclude the ADP device from running data processing applications other than cryptocurrency mining.  PSUMF ¶45.

The subject merchandise consists of logic boards. PSUMF ¶15, 24.  GPUs and computer accelerators are kinds of logic boards. PSUMF ¶¶23, 51.

 The subject merchandise was imported into the United States without the software drivers needed for their operation. PSUMF ¶¶54, 56.   After importation of the subject merchandise, Atlas downloaded from a private partner portal on an NVIDIA website the drivers needed to use the subject merchandise and installed the drivers on the Atlas servers. PSUMF ¶56.

At the time the subject merchandise was imported into the United States it did not contain functioning Video Basic Input/Output System ("VBIOS") software.  PSUMF ¶55. After importation of the subject merchandise, NVIDIA provided Atlas with a functioning VBIOS for the subject merchandise via electronic download from a private partner portal and Atlas installed that VBIOS onto each individual unit of the subject merchandise by downloading the VBIOS to a USB stick, plugging the USB stick into each GPU and then running a command to flash the VBIOS onto the GPU. PSUMF ¶¶56-57.

The term GPU is used in the electronics industry to refer to logic boards that are used to produce images and to logic boards that use the parallel processing feature of a graphics processor to carry out large numbers of arithmetic calculations for computational purposes other than producing images.   PSUMF ¶29.

The essential character of a GPU is derived from its ability to carry out a large number of arithmetical calculations in parallel. PSUMF ¶26.  The large number of CUDA cores present in the GA 100 graphics processor contained in the subject merchandise make the

subject merchandise capable of carrying out a large number of arithmetical calculations in parallel. PSUMF ¶27.

## IV.    RELEVANT LEGAL PROVISIONS

### HTSUS - ADDITIONAL U.S. RULES OF INTERPRETATION

1.   In the absence of special language or context which otherwise requires—

(a) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use;…

### HTSUS Section XVI Notes:

2. Subject to note 1 to this section, note 1 to chapter 84 and to note 1 to chapter 85, parts of machines (not being parts of the articles of heading 8484, 8544, 8545, 8546 or 8547) are to be classified according to the following rules:

(a) Parts which are goods included in any of the headings of chapter 84 or 85 (other than headings 8409, 8431, 8448, 8466, 8473, 8487, 8503, 8522, 8529, 8538 and 8548) are in all cases to be classified in their respective headings;

(b) Other parts, if suitable for use solely or principally with a particular kind of machine, or with a number of machines of the same heading (including a machine of heading 8479 or 8543) are to be classified with the machines of that kind or in heading 8409, 8431, 8448, 8466, 8473, 8503, 8522, 8529 or 8538 as appropriate. However, parts which are equally suitable for use principally with the goods of headings 8517 and 8525 to 8528 are to be classified in heading 8517, and parts which are suitable for use solely or principally with the goods of heading 8524 are to be classified in heading 8529;

(c) All other parts are to be classified in heading 8409, 8431, 8448, 8466, 8473, 8503, 8522, 8529 or 8538 as appropriate or, failing that, in heading 8487 or 8548.

### Additional U.S. Note

1. For the purposes of this section, the term "printed circuit assembly "means goods consisting of one or more printed circuits of heading 8534 with one or more active elements assembled thereon, with or without passive elements. For the purposes of this note," active elements" means diodes, transistors and similar semiconductor devices, whether or not photosensitive, of heading 8541, and integrated circuits of heading 8542.

**HTSUS Note 5(A) to Chapter 84**

For the purposes of heading 8471, the expression "automatic data processing machines" means machines capable of:

(a) Storing the processing program or programs and at least the data immediately necessary for the execution of the program;

(b) Being freely programmed in accordance with the requirements of the user;

(c) Performing arithmetical computations specified by the user; and

(d) Executing, without human intervention, a processing program which requires them to modify their execution, by logical decision during the processing run.

**HTSUS 8471.41.0150**

Automatic data processing machines and units thereof; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data, not elsewhere specified or included:

Other automatic data processing machines:
Comprising in the same housing at least a central processing unit and an input and output unit, whether or not combined...............................................................
With cathode-ray tube (CRT)..................................
Other........................................................................ Free

**HTSUS 8473.30.1180:**

Parts and accessories (other than covers, carrying cases and the like) suitable for use solely or principally with machines of headings 8470 to 8472:

    Parts and accessories of the machines of heading 8471:
        Not incorporating a cathode ray tube:
            Printed circuit assemblies:

                Other…………………………….……..Free

**Explanatory Note to 8473:**

Subject to the general provisions regarding the classification of parts (see the General Explanatory Note to Section XVI), this heading covers parts and accessories suitable for use solely or principally with the machines of headings 84.70 to 84.72.

The accessories covered by this heading are interchangeable parts or devices designed to adapt a machine for a particular operation, or to perform a particular service relative to the main function of the machine, or to increase its range of operations.

**Explanatory Notes for Chapter 85:**

This Chapter covers all electrical machinery and equipment, other than:

(a) Machinery and apparatus of a kind covered by Chapter 84, which remains classified there even if electric (see the General Explanatory Note to that Chapter).

**Exclusions from Section 301 Tariffs for goods classified under HTSUS 8473.30.1180 by virtue of HTSUS Chapter 99, Note 20(iii) and *Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 17380 (March 28, 2022):**

HTSUS Chapter 99 Notes:

2.  Unless the context requires otherwise, the general notes and rules of interpretation, the section notes, and the notes in chapters 1 through 98 apply to the provisions of this chapter.

HTSUS 2022 Revision 3 (3/31/2022) Chapter 99, Note 20(iii);

(iii) The U.S.Trade Representative determined to establish a process by which particular products classified in heading 9903.88.03 and provided for in U.S. notes 20(e) and 20(f) to this subchapter could be excluded from the additional duties imposed by heading 9903.88.03, and by which particular products classified in heading 9903.88.04 and provided for in U.S. note 20(g) to this subchapter could be excluded from the additional duties imposed by heading 9903.88.04. See 83 Fed. Reg. 47974 (September 21, 2018) and 84 Fed. Reg. 29576 (June 24, 2019). Pursuant to the product exclusion process, the U.S. Trade Representative has determined that, as provided in heading 9903.88.67, the additional duties provided for in heading 9903.88.03 or in heading 9903.88.04 shall not apply to the following particular products, which are provided for in the enumerated statistical reporting numbers:

****

(108) Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules") (described in statistical reporting number 8473.30.1180)

(109) Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules") (described in statistical reporting number 8473.30.1180)

(110) Printed circuit assemblies, constituting unfinished logic boards (described in statistical reporting number 8473.30.1180)

14

## V.    ARGUMENT

### A.  Jurisdiction and Standard of Review

Pursuant to 28 U.S.C. § 1581(a), the Court of International Trade has exclusive jurisdiction of this action contesting the denial of plaintiff's protest under section 515 of the Tariff Act of 1930, *as amended*, 19 U.S.C. §1515, as to the assessment of Section 301 tariffs on the subject merchandise.  The Court of International Trade makes its determinations in such actions based on the *de novo* record made before the court. 28 U.S.C. § 2640(a)(1).

While 28 U.S.C. § 2639(a)(1), provides that a classification decision by CBP is presumed to be correct, the statutory presumption of correctness applies only to factual issues. *See* Shamrock Bldg. Materials, Inc. v. United States, 2024 U.S. App. LEXIS 26748 (Fed. Cir. October 23, 2024, *citing*, Goodman Manufacturing, L.P. v. United States, 69 F.3d 505, 508 (Fed. Cir. 1995) (presumption "not relevant" where there is no factual dispute). "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same. A court may rely upon its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citation omitted).

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a). *See also* Starkist Co. v. United States, 29 F.4th 1359, 1364 (Fed. Cir 2022). To raise a genuine issue of material fact, a party cannot rest upon mere allegations or denials and must point to sufficient supporting evidence for the claimed factual dispute to require resolution of the differing versions of the truth at trial. Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248–49 (1986); Processed Plastics Co. v. United States, 473 F.3d 1164, 1170 (Fed.

Cir. 2006); Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 835–

36 (Fed. Cir. 1984).

### B.  The Subject Merchandise is Classified Under HTSUS 8473.30.1180

When Atlas entered the subject merchandise into the commerce of the United States,

Atlas classified the merchandise under subheading 8473.30.1180 of the Harmonized Tariff

Schedule of the United States ("HTSUS"), which covers, among other things, parts and

accessories of automated data processing ("ADP") machines.   United States Customs &

Border Protection ("CBP") did not alter this HTSUS classification at the time of liquidation or

in response to Atlas's protest against the assessments of Section 301 tariffs on the subject

merchandise. In Defendant's October 23, 2024 answer to Plaintiff's Third Amended

Complaint, the United States does not assert an alternative HTSUS classification for the

subject merchandise, but instead asks the Court to sustain CBP's determination that the

subject merchandise was classified under HTSUS 8473.30.1180 but not excluded from

assessments of Section 301 tariffs.  Therefore, the Court should summarily sustain the

classification of the subject merchandise under HTSUS 8473.30.1180.

### C.  The Subject Merchandise Is Excluded from Assessments of 301 Tariffs

#### a.  The Subject Merchandise Consists of Printed Circuit Board Assemblies Constituting Unfinished Logic Boards

The exclusionary language for logic boards covers: "Printed circuit assemblies,

constituting unfinished logic boards." Since the provisions of Chapter 99 of the HTSUS are to

be interpreted according to the general notes and rules of interpretation applicable to other

chapters of the HTSUS, this provision should be interpreted as an *eo nomine* tariff provision

because it describes the merchandise by name.  See Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed Cir. 1999), *citing*, Clarendon Marketing, Inc. v. United States, 144 F.3d 1464, 1467 (Fed. Cir. 1998).   "An *eo nomine* designation, with no terms of limitation, will ordinarily include all forms of the named article." *Id., quoting*, Hayes-Sammons Co. v. United States, 55 C.C.P.A. 69, 75 (1968).

Determining the meaning of a tariff term is a question of law. Baxter Healthcare Corp. of P.R. v. United States, 182 F.3d 1333, 1337 (Fed. Cir. 1999).  As to how the Court should address the meaning of a term in the HTSUS, the Federal Circuit in Carl Zeiss*, supra*, stated:

> …"Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same. *See* Simod Am. Corp. v. United States, 872 F.2d 1572, 1576 (Fed. Cir. 1989). A court may rely upon its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources. *See* Baxter, 182 F.3d at 1337. One who argues that a tariff term should not be given its common or dictionary meaning must prove that it has a different commercial meaning that is definite, uniform, and general throughout the trade. *See* Rohm & Haas Co. v. United States, 727 F.2d 1095, 1097 (Fed. Cir. 1984).

A logic board is defined by lexicographic authorities as: "An assembly of decision-making circuits on a printed-circuit mounting board."  *IEEE 100 The Authoritative Dictionary of IEEE Standards Terms* (Seventh Edition).   Motherboard Magazine answered the question of what is a logic board as follows:

> What is a logic board? | A logic board is a board containing a bunch of "logic gates." A logic board may also hold electronics other than logic gates. For example, a motherboard is a logic board. But it is not necessary that every logic board will be a motherboard. Because most add-on cards inserted into your computer (such as Graphics Cards, Network Cards) are also logic boards.

https://motherboardmag.medium.com/what-is-a-logic-board-edc9df2d6c7c  *See also* PSUMF

¶25. The CMP 170HX GPU falls within the definition of a logic board because it is a printed

circuit assembly containing a number of logic gates.

Given these undisputed facts, the parties are in agreement that the subject merchandise

consists of printed circuit board assemblies ("PCBAs") constituting logic boards.  PSUMF ¶¶

13-15, 24.

There is also no genuine issue of material fact as to the unfinished state of the subject

merchandise at the time of importation.  NVIDIA deliberately empowered the user/customers

of the CMP 170hx GPU to modify the configuration file of the subject merchandise to meet

their individual specifications.  PSUMF ¶ 52.   Users were able to modify the configuration

file of the subject merchandise to change, among other things, the power rating, clock speed,

and display configurations of the subject merchandise.  PSUMF ¶ 53.  The subject

merchandise was deliberately left in an unfinished state so it could be customized by the user.

Defendant has, in fact, admitted that "Atlas had to flash (i.e. install) a new VBIOS onto the

VRAM of the subject merchandise for it to function to Atlas' expected specifications."

PSUMF ¶ 56 (Ex. 25, Def. Admission 29).

In the case of Atlas, the subject merchandise was also unfinished because it did not

work at all in its condition as imported.  When the subject merchandise was received by Atlas

in Montana and Atlas tried to install the subject GPUs in its servers, Atlas discovered that the

video basic input/output software in the GPUs was not functional.   Two witnesses, Hayden

Gill and Lee Goodwyn, have provided uncontroverted, sworn testimony that the subject

merchandise was not operational in its condition as imported.  PSUMF ¶ 55.     The

Government's expert agreed under oath that there are no facts in the record of this case to

suggest that the testimony of Mr. Gill and Mr. Goodwyn regarding the lack of functionality is untrue.  *Id.*

After importation of the subject merchandise and discovery that the subject merchandise could not function at all, NVIDIA provided functioning VBIOS software to Atlas by allowing Atlas to download the VBIOS from a secure NVIDIA website. PSUMF ¶¶ 56-57.  When Atlas loaded the drivers on to the servers and loaded the functional VBIOS on to the individual subject GPUs, the GPUs began to function as intended. PSUMF ¶ 56.

The subject merchandise was also imported without the Linux drivers that are necessary to allow the CMP HX170 GPU to be used with an ADP machine. PSUMF ¶ 54. The subject merchandise was imported without the application software needed to engage in cryptocurrency mining or any other data processing task. PSUMF ¶ 44.   After importation of the subject merchandise, NVIDIA provided the needed Linux drivers by allowing Atlas to download the drivers from an NVIDIA website.  PSUMF ¶ 54.

In ruling NY C86235 (April 9, 1998), CBP addressed the question whether a laptop computer containing an unloaded BIOS chip was an "unfinished" device.  CBP stated:

> The BIOS chip contained in this otherwise complete laptop computer, contains a preparation program with a capacity of approximately 10K bytes in flash memory.  The capacity of the full BIOS instruction program will be around 500K bytes and will be loaded onto the BIOS chip after importation in a manufacturing facility.  The BIOS instructions will be loaded onto the chip by either downloading it to the laptop via local area network (LAN) or a floppy drive using a keyboard or mouse.  Finally, a test program will be run to ensure the full functionality of the laptop including the interaction with the operating system.
> ****
> … GRI2(a) provides that any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as presented, the incomplete or unfinished article has the essential character of the

> complete or unfinished article. The subject laptop computer is an incomplete or unfinished digital processing unit, needing only the introduction of the full BIOS instruction code. …

In HQ 962847(October 15, 1999), CBP considered whether a protest should be granted with respect to the question whether an Expendable Launch Vehicle Flight Computer (ELVFC) that lacked its application software at the time of importation was an unfinished navigational instrument. CBP stated:

> …The protestant maintains that when loaded with its application software, the ELVFC performs autopilot functions. However, despite incorporating firmware which protestant terms "low-level" and which implements the required data processing and control algorithms, the ELVFC in this case is imported minus its application software. It is, therefore, an incomplete or unfinished article. …

CBP ruled that the ELVFC should be classified as an incomplete or unfinished navigational instrument.

In HQ 957287 (August 9, 1995), CBP ruled that a notebook computer with non-operational BIOS chip was an unfinished ADP machine. In that case, the BIOS code was loaded onto the BIOS chip after importation via a floppy diskette.

These binding rulings demonstrate that CBP has uniformly treated electronic devices imported without functioning software needed for their operation as "unfinished" articles for tariff purposes. The undisputed facts in this case should lead the Court to the same conclusion.

CBPs treatment of electronic articles without essential software as unfinished is consistent with the electronic industry's treatment of software as a component of an electronic device. The *IEEE 100 The Authoritative Dictionary of IEEE Standards Terms* (Seventh Edition) defines component with regard to software as:

> Component:

\*\*\*\*\*

(5) (software) One of the parts that make up a system. *A component may be hardware or software* and may be subdivided into other components. …

Ex. 29, Appx at 1205 (emphasis added).  Similarly, *Barron's Dictionary of Computer and Internet Terms* defines component as "any part of a larger system, *either software or hardware.*" Ex. 30, Appx at 1205 (emphasis added).

Both CBP, in its binding rulings, and the electronics industry in general treat software as a component of an electronic device.  Thus, a device like the CMP 170HX GPU that lacked drivers, application software or a functioning VBIOS at the time of importation was missing essential components.  The subject merchandise was, therefore, unfinished.

The subject merchandise consists of unfinished logic boards because at the time of importation the subject merchandise lacked the functioning software needed for it to operate as intended by the user.  Moreover, the user was deliberately empowered to modify the subject merchandise to complete the unfinished merchandise by modifying the configuration file to meet each customer's individual specifications.

### b.  The Subject Merchandise Consists of Excluded GPUs

The exclusionary language for GPUs covers: "Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules")."  This language, interpreted in light of the general notes and rules of interpretation of the HTSUS, makes it clear that all GPUs are exempt from 301 Tariffs.

In marketing material, NVIDIA refers to the CMP 170HX as a GPU, *i.e.*, "the NVIDIA CMP GPU."  PSUMF ¶ 54.   Plaintiff's and Defendant's witnesses deposed in this matter agree that the subject merchandise is a kind of GPU.  *Id.*  The subject merchandise

embodies the essential character of a GPU, which is derived from its ability to carry out a large number of arithmetical calculations in parallel. PSUMF ¶ 26.    The subject merchandise contains many CUDA cores which are arithmetic logic units ("ALUs"), making the subject merchandise capable of carrying out a large number of arithmetical calculations in parallel. PSUMF ¶ 27.

Based on the foregoing evidence, there is no material dispute as to the fact that the subject merchandise consists of GPUs.  It is likewise indisputable that GPUs are within the scope of the exclusion by virtue of the explicit and unlimited parenthetical reference to GPUs in the exclusionary language.

In Hanser v. McDonough, 56 F.4th 967 (Fed. Cir. 2022), the Court of Appeals for the Federal Circuit described the correct approach to interpreting statutory language that includes parenthetical language.  The Court said:

> There is no general rule or presumption that a parenthetical is always definitional. Instead, as in many areas of law (and life), context is crucial. Hence, to determine whether a particular parenthetical provides a definition or is "merely an illustrative example," Novacor Chems., Inc. v. United States, 171 F.3d 1376,1381 (Fed. Cir. 1999), we must consider the specific language at issue in the statutory or regulatory context in which it appears and then draw the most sensible conclusion about its meaning. …

56 F.4th at 971 (citations omitted).

The explicit parenthetical reference to one and only one kind of article in the exclusionary language indicates the rational approach to the interpretation of this language would be to construe it as a definitional, *eo nomine* exclusion of GPUs.  As quoted above: "An *eo nomine* designation, with no terms of limitation, will ordinarily include all forms of the named article." Hayes-Sammons Co. v. United States, 55 C.C.P.A. 69, 75 (1968).

Even if one were to construe the parenthetical reference to GPUs as an illustrative example, it would mean that the named article and any similar articles would be excluded from assessments of 301 Tariffs.  Since there is no material dispute as to the fact that the NVIDIA CMP 170HX GPU is a GPU, it would still clearly fall within the meaning of the exclusionary language.

Should the Court construe the exclusionary language as a use provision, that analysis would also lead inevitably to the conclusion that the subject GPUs are excluded from assessments of 301 Tariffs.  Additional U.S. Rule of interpretation 1(a) provides that "a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use; … ."  The principal use of GPUs is to render images.  Thus, the 301 Tariff exclusion for GPUs covers all GPUs, including the subject merchandise, regardless of their actual use.

The fact that the subject merchandise does not have video outputs does not mean that it is not useful for rendering images onto computer screens.   The language of the GPU exclusion refers to "rendering images onto a computer screen," not video.

In electronic terms, rendering means:

> rendering (n)~ The creation of an image containing geometric models, using color and shading to give the image a realistic look. Usually part of a geometric modeling package such as a CAD program, rendering uses mathematics to describe the location of a light source in relation to the object and to calculate the way in which the light would create highlights, shading, and variations in color. The degree of realism can range from opaque, shaded polygons to images approximating photographs in their complexity.

Rigdon, *Dictionary of Computer and Internet Terms* (2016) (Ex. 28, Appx 1203.)

One of the intended uses of the subject merchandise was for rendering images. PSUMF ¶¶ 3, 22, 69. The subject merchandise is capable of accelerating the processing of graphic image files and transmitting those image files through the PCIe connector to the motherboard. PSUMF ¶ 18. The central processing unit ("CPU") on the motherboard is, in turn, able to use its built-in graphics display capabilities to display those image files on a computer screen. PSUMF ¶ 19. Thus, while the subject merchandise lacks an output port and connector for displaying video images on a computer screen, the subject merchandise consists of GPUs that can be used to accelerate the process of rendering non-video images onto computer screens, and then transferring those images to the CPU board which can display the images on a computer screen using the CPU's built-in graphics display capabilities.

### c. The Subject Merchandise Consists of Accelerator Modules

The accelerator module exclusion covers: "Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules")."

The undisputed evidence shows that the subject merchandise must be used with an ADP machine. NVIDIA, Atlas and the expert witnesses concurred that the subject merchandise must be connected to a motherboard containing a GPU in order to function. PSUMF ¶ 37.

The undisputed evidence shows that the subject merchandise can be used to accelerate many different kinds of computations, including high performance computing applications such as scientific computing and visualization applications. Significant speed-ups have been achieved by applying GPUs to data parallel computational problems, including radar signal processing, reinforcement learning (a type of artificial intelligence algorithm), EDA software

acceleration, wireless communication, gene sequencing, sensor tracking, hash functions, cryptography, graphics rendering, cloud computing, and the Internet of Things ("IOT")). PSUMF ¶¶ 3, 29, 30.  Notably, accelerating computations associated with rendering images was one of the intended uses of the subject merchandise.   PSUMF ¶¶ 3, 22, 27-31, 69.

As described above, the subject merchandise is capable of accelerating the processing of graphic image files and transmitting those image files through the PCIe connector to the motherboard. PSUMF ¶ 18.   The central processing unit ("CPU") on the motherboard is, in turn, able to use its built-in graphics display capabilities to display those image files on a computer screen. PSUMF ¶ 19.  The subject merchandise thus consists of printed circuit assemblies that can be used to accelerate the process of rendering images, enhancing the graphics performance of any ADP machine with which they are used. Therefore, the subject merchandise falls within the scope of the 301 Tariff exclusion for accelerators.

Like the GPU language discussed above, the language of the accelerator exclusion includes a parenthetical reference to a particular product, *i.e.*, "accelerator modules." Therefore, the provision should be construed as an *eo nomine* tariff provision. In keeping with the general principles of tariff classification as discussed above, the accelerator exclusion covers all forms of accelerator modules, regardless of their actual use.

To the extent the actual use of the subject merchandise may be material to this question, the undisputed material facts demonstrate that the Atlas servers are ADP machines. In the HTSUS, the expression "automatic data processing machines" means machines capable of:

    (a) Storing the processing program or programs and at least the data immediately necessary for the execution of the program;

(b) Being freely programmed in accordance with the requirements of the user;

(c) Performing arithmetical computations specified by the user; and

(d) Executing, without human intervention, a processing program which requires them to modify their execution, by logical decision during the processing run.

In its response to plaintiff's request for admissions, Defendant admitted that the Atlas servers satisfy three of the four criteria for determining whether a device is an ADP system. Defendant admitted that: 1) the device or system to which the subject merchandise is connected is capable of storing the processing program or programs and at least the data immediately necessary for the execution of the program. (Ex. 25, Def. Admission 18.); 2) that the device or system to which the subject merchandise is connected is capable of executing, without human intervention, a processing program. (Ex. 25, Def. Admission 19.); and 3) that the device or system to which the subject merchandise is connected is capable of performing arithmetical computations specified by the user. (Ex. 25, Def. Admission 20.).

As to the fourth and final requirement, free programmability, Defendant's expert admitted under oath during his deposition that the Atlas servers were capable of being programmed to perform other automatic data processing functions by deleting the LINUX OS entirely and installing a different operating system. (Ex. 12, Beckman Dep at Appx. 895:2-9.) *See also* PSUMF ¶¶ 38-43.  In addition, there is undisputed evidence that Atlas was free to program the servers equipped with subject merchandise to perform automatic data processing functions other than cryptocurrency mining by modifying the LINUX OS through the addition of LINUX/UBUNTU distributions containing such applications as word processing, email, internet search programs, *etc.* PSUMF ¶ 42.

26

The free programmability of the Atlas servers, and ADP systems generally, was best explained by Plaintiff's expert witness, Dr. Sunil Khatri at the conclusion of his deposition when he was asked whether the Atlas servers were freely programmable:

> BY MR. HORGAN:
> Q.     Dr. Khatri, just a few minutes ago you were testifying about whether the Atlas servers were programmable --
> A.   Yes.
> Q.   -- whether they were -- whether they constituted an ADP system, and one of those criteria is whether or not it was freely programmable. So my question is: Suppose you had a device that had all the physical components of the Atlas server; so it had its CPU; it had memory; ROM; I think the other devices, not including this GPU. But it had no operating system at all.  So there was no software on it. Would that be a programmable device?
> A.   Yes.
> Q.    Would it be freely programmable?
> A.     Yes, because it has the ability to be freely programmed.
> Q.    Notwithstanding whatever software is located --
> A.     Correct.
> Q.    -- or installed?
> A.    Adding software to it is the act of programming; but the device itself, the Atlas server, which is the CPU, the RAM, the ROM, the SSDs, the hard drives and such --
> Q.    Right.
> A.    -- that in and of itself is programmable because it has the ability to be programmed freely.
> Q.    And if you installed an operating system and then you installed Ubuntu on top of that operating system, could you delete all of that programming?
> A.   So if you install an operating system and then likeable to -- you could still remove the Ubuntu and then reprogram -- reinstall another operating system if you like.
> Q.   Right.

27

A.   You can remove an operating system, add
it back, remove an operating system, add another
operating system.  That's all freely possible
because the device itself is programmable.
Q.   Okay.  So is it your testimony that a
device is freely programmable based on the
components that it has rather than the software
that's already installed?
A.   Correct.  Based on its ability that it
has to be freely programmed, which comes from the
components that are on it.

In light of these indisputable facts, it is clear that the subject merchandise can be used to accelerate the image rendering process, thus enhancing the graphics performance of ADP systems.  Moreover, the record contains undisputed evidence that rendering images was one of the intended applications of the subject merchandise.  Therefore, the subject merchandise is clearly within the scope of the exclusionary language for accelerator modules: "Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules")."

## CONCLUSION

For the foregoing reasons, Atlas requests that the Court enter judgment holding that the subject merchandise is excluded from assessments of Section 301 tariffs.

Respectfully submitted,

 /s/ J. Kevin Horgan
J. Kevin Horgan
Merisa A. Horgan
DEKIEFFER & HORGAN, PLLC
1156 Fifteenth Street, N.W.
Washington, DC 20005

28

Tel: (202) 783-6900
Fax: (202) 783-6909
email: kevin.horgan@dhlaw.com

Dated: November 13, 2024       *Counsel to Plaintiff Atlas Power, LLC*

UNITED STATES COURT OF INTERNATIONAL TRADE

Before: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| ATLAS POWER LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 23-00084 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in reliance upon the word count feature of the word processing program used to prepare the instant Memorandum, I, J. Kevin Horgan, of deKieffer & Horgan, PLLC, who is responsible for the instant Memorandum, certify that it contains 7,538 words.

/s/ *J. Kevin Horgan*
J. Kevin Horgan
**deKieffer & Horgan, PLLC**
1156 Fifteenth St., N.W.
Suite 1101
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: khorgan@dhlaw.com
Date: November 13, 2024                 *Counsel to Atlas Power LLC*