UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN A. VADEN, JUDGE

| | | |
|---|---|---|
| ATLAS POWER LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No. 23-00084 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## **ORDER**

Upon consideration of defendant's cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment, and upon consideration of all other papers and proceedings had herein; it is hereby

ORDERED that defendant's cross-motion for summary judgment is granted;

ORDERED that plaintiff's motion for summary judgment is denied; and it is further

ORDERED that judgment is entered for defendant and this action is dismissed.

_____
STEPHEN A. VADEN, JUDGE

Dated: _____
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN A. VADEN, JUDGE

| | | |
|---|---|---|
| | : | |
| ATLAS POWER LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No. 23-00084 |
| | : | |
| UNITED STATES, | : | PUBLIC VERSION |
| | : | |
| Defendant. | : | |
| | : | |

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

*Of Counsel:*

SABAHAT CHAUDHARY
Attorney
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

January 17, 2025

MATHIAS RABINOVITCH
Trial Attorney
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-0484
*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ....................................................................................................... 2

    A.  The Product at Issue ................................................................................. 2

    B.  Administrative Background ....................................................................... 6

QUESTIONS PRESENTED ...................................................................................... 8

SUMMARY OF ARGUMENT ................................................................................. 9

ARGUMENT .......................................................................................................... 10

  I.    Legal Framework ....................................................................................... 10

    A.  Legal Standard for Summary Judgment ................................................. 10

    B.  Legal Standard for Classification ........................................................... 11

  II.   The CMP Boards Are Not Classified in Subheading 8473.30.11 and Instead Fall Within Subheading 8543.90.68 ................................................. 12

    A.  The CMP Boards Are Not Classified in Heading 8473 as Parts of ADP Machines .. 13

    B.  The CMP Boards Are Classified in Heading 8543 as Parts of Machines with Individual Functions Not Specified or Included Elsewhere ...................................... 17

  III.  Even If the CMP Boards Are Classified in Subheading 8471.30.11, the CMP Boards Are Not Covered by the Article Descriptions in the Exclusions Provided in U.S. Notes(ttt)(iii)(108), (109), or (110) .................................................................. 19

    A.  The CMP Boards Cannot Render Images onto a Computer Screen Nor Enhance Graphics Performance, as Required by U.S. Notes 20(ttt)(iii)(108) and (109) ......... 19

    B.  The CMP Boards Do Not Constitute "Unfinished Logic Boards" as Required by U.S. Note 20(ttt)(iii)(110) .......................................................................................... 25

  IV.  If the CMP Boards Fall within Subheading 8473.30.11, Regardless of the Applicability of the Exclusions, a Portion of the Entries of Merchandise Are Not Covered by the Retroactive Application of those Exclusions ............................ 33

CONCLUSION ....................................................................................................... 37

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).................................................................................................. 10

*Bausch & Lomb, Inc. v. United States*,
   148 F.3d 1363 (Fed. Cir. 1998)................................................................................ 11

*BenQ Am. Corp. v. United States*,
   646 F.3d 1371 (Fed. Cir. 2011)................................................................................ 11

*Carl Zeiss, Inc. v. United States*,
   195 F.3d 1375 (Fed. Cir. 1999)................................................................................ 12

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).................................................................................................. 10

*Clarendon Marketing, Inc. v. United States*,
   144 F.3d 1464 (Fed. Cir. 1998)................................................................................ 11

*Deburro v. Apple, Inc.*,
   No. 13-784, 2013 WL 5917665 (W.D. Tex. Oct. 31, 2013)..................................... 26

*Digidesign, Inc. v. United States*,
   44 F. Supp. 3d 1366 (Ct. Int'l Trade 2015) ............................................................. 16

*Hanser v. McDonough*,
   56 F.4th 967 (Fed. Cir. 2022) .................................................................................. 22

*Keystone Auto. Operations, Inc. v. United States*,
   No. 21-00215, 2024 WL 4432079 (Ct. Int'l Trade Oct. 7, 2024)............................ 11

*Maple Leaf Mktg., Inc. v. United States*,
   528 F. Supp. 3d 1365 (2021) .................................................................................... 11

*Marcus v. Apple Inc*,
   No. 14-03824, 2015 WL 151489 (N.D. Cal. Jan. 8, 2015)....................................... 26

*Millennium Lumber Distribution Ltd. v. United States*,
   558 F.3d 1326 (Fed. Cir. 2009)................................................................................ 12

*Minnetonka Brands, Inc. v. United States*,
   110 F. Supp. 2d 1020 (Ct. Int'l Trade 2000) ........................................................... 11

*N. Am. Processing Co. v. United States,*
236 F.3d 695 (Fed. Cir. 2001) .......................................................... 11

*Novacor Chemicals Inc. v. United States,*
171 F.3d 1376 (Fed. Cir. 1999) ........................................................ 22

*Optrex America, Inc. v. United States,*
427 F.Supp.2d 1177 ........................................................................ 15

*Optrex America, Inc. v. United States,*
475 F.3d 1367 (Fed. Cir. 2007) ........................................................ 14

*Porsche Motorsport N. Am., Inc. v. United States,*
554 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ................................... 33

*RKW Klerks Inc. v. United States,*
592 F. Supp. 3d 1349, 1354 (Ct. Int'l Trade 2022), *aff'd,*
94 F.4th 1374 (Fed. Cir. 2024) ........................................................ 11

*Samsung Int'l, Inc. v. United States,*
36 C.I.T. 1531, 1541 (2012), *aff'd,*
546 F. App'x 961 (Fed. Cir. 2013) ................................................... 27

*Sarne Handbags Corp. v. United States,*
100 F.Supp.2d 1126 (2000) ............................................................. 12

*Vitt v. Apple Computer, Inc.,*
469 F. App'x 605 (9th Cir. 2012) .................................................... 26

**<u>Harmonized Tariff Scheule of the United States (HTSUS)</u>**

General Rule of Interpretation 1 ............................................... 9, 11, 17

General Rule of Interpretation 2(a) ............................................... 29, 33

General Rule of Interpretation 6 ......................................................... 18

Explanatory Note (EN) 84.71 ................................................... 15, 16, 17

Explanatory Note (EN) 85.43 ............................................................. 18

Section XVI

U.S. Note 1, Section XVI ................................................................... 17

Chapter 84 ........................................................................................ 18

Note 5, Chapter 84 ................................................................................................... 13

Note 5(A), Chapter 84 ......................................................................................... 13, 14

Note 5(A)(i), Chapter 84 .......................................................................................... 14

Note 5(A) (ii), Chapter 84 ........................................................................................ 14

Note 5(A) (iii), Chapter 84 ....................................................................................... 14

Note 5(A) (iv), Chapter 84 ....................................................................................... 14

Note 5(B), Chapter 84 .............................................................................................. 13

Note 5(E), Chapter 84 ......................................................................................... 15, 16

Heading 8471 ................................................................................................ 13, 15, 17

    Subheading 8473.30.11 ................................................................................. *passim*

    Subheading 8473.30.1180 .............................................................................. *passim*

Chapter 85 .............................................................................................................. 18

    Heading 8534 ...................................................................................................... 17

    Subheading 8543.90.68 .................................................................................. *passim*

Section XXII

    Chapter 99 ........................................................................................................... 11

    Notes 20(ttt)(iii), Ch. 99 ..................................................................................... 7, 8

    Notes 20(ttt)(iii)(108), Ch. 99 ........................................................................ *passim*

    Notes 20(ttt)(iii)(109), Ch. 99 ........................................................................ *passim*

    Notes 20(ttt)(iii)(110), Ch. 99 ........................................................................ *passim*

    Subchapter III of Chapter 99 .............................................................................. 12

    Note 2, Subchapter III, Chapter 99 ..................................................................... 12

    Heading 9903

Subheading 9903.80.01 ................................................................... 12

Subheading 9903.88.03 ................................................................... 39

**Statutes**

19 U.S.C. § 81c ........................................................................... 34

Pub. L. 93-618 ............................................................................... 1

**Rules and Regulations**

USCIT R. 56(a) .......................................................................... 10

19 C.F.R. § 141.0a(f) ................................................................. 7, 34

19 C.F.R. § 146.41 ..................................................................... 34

19 C.F.R. § 146.41(d) .............................................................. 34, 35

19 C.F.R. § 146.41(e) .................................................................. 35

19 C.F.R. § 146.42 ..................................................................... 34

19 C.F.R. § 146.43 ..................................................................... 34

19 C.F.R. § 146.44 ..................................................................... 34

19 C.F.R. § 146.65 ..................................................................... 34

19 C.F.R. § 146.65(a) .............................................................. 34, 35

38 C.F.R. § 3.334(c) .................................................................... 22

**Other Legal Authorities**

*Electronic Notice of Liquidation*,
   81 Fed. Reg. 89,375 (Dec. 12, 2016) ............................................ 8

HQ 962847 (Oct 15, 1999) ....................................................... 32, 33

HQ 957287 (Aug 9, 1995) ....................................................... 32, 33

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices
   Relating to Technology Transfer, Intellectual Property, and Innovation*,
   83 Fed. Reg. 47,974 (September 21, 2018) ................................... 7, 36

*Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and Practices*
   *Related to Technology Transfer, Intellectual Property, and Innovation,*
   87 Fed. Reg. 17,380 (March 28, 2022) ................................................................ 7, 34

NY C86235 (Apr 9, 1998) ................................................................................ 33, 32

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| ATLAS POWER LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Court No. 23-00084 |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant. | : |
| | : |

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the United States Court of International Trade (USCIT), defendant, the United States (the Government), respectfully cross-moves this Court for an order: (1) denying plaintiff Atlas Power LLC (Atlas Power)'s motion for summary judgment; (2) granting our cross-motion for summary judgment; (3) entering judgment for the Government and dismissing this action; and (4) granting the Government such other and further relief as may be just and appropriate. As we demonstrate below, summary judgment in favor of the Government is appropriate because there are no genuine disputes of material fact, and the Government is entitled to judgment as a matter of law.

## PRELIMINARY STATEMENT

This case concerns the applicability of certain exclusions from duties imposed under Section 301 of the Trade Act of 1974, Pub. L. 93-618, 88 Stat. 1978 (1975) and classification of the Crypto Mining Processor (CMP) 170HX printed circuit board assemblies (the CMP Boards) manufactured by NVIDIA Corporation (NVIDIA) and imported by Atlas Power. Atlas Power entered the CMP Boards as articles of subheading 8473.30.80 and subject to Section 301 duties.

Subsequently, the United States Trade Representative (USTR) approved three retroactive exclusions from Section 301 duties for certain printed circuit assemblies.  At issue in this case is whether any of the three exclusions apply to the merchandise to exempt Atlas Power from the assessment of Section 301 duties.  As discussed below, Atlas Power has not demonstrated that the CMP Boards meet the terms of any of the three exclusions under consideration, and therefore, Section 301 duties apply to the imported merchandise.

## **BACKGROUND**

A.    The Product at Issue

The product at issue, the NVIDIA CMP 170HX, is a printed circuit assembly protected by an aluminum enclosure.  *See* Defendant's Statement of Undisputed Material Facts ("DSOF") ¶¶ 1, 2.  The CMP Board is comprised of an underlying printed circuit board assembly with a specialized cryptocurrency mining processing chip and other electronic components.  DSOF ¶ 3.  Affixed to the processing chip is a heatsink, which dissipates heat created by the processing chip.  DSOF ¶ 4.  The printed circuit assembly with the heatsink is then encased in an aluminum enclosure.  DSOF ¶ 2.  The CMP Board is also designed with open ends to allow air (from a fan) to flow across the surface of the board and dissipate the heat collected by the heatsink.  DSOF ¶ 5.  This design allows for multiple boards to be installed close together within one chassis.  DSOF ¶ 6.

The CMP Board was designed and dedicated for professional mining of cryptocurrency.[1]  DSOF ¶ 7.  In 2021, NVIDIA launched the CMP line of products, including the CMP Board at

---

[1]  Cryptocurrency mining is the process of validating transactions on a public ledger.  Each validation adds a new block on the ledger, and each block references the previous block, forming an unbroken chain called a blockchain.  Validating transactions requires a powerful machine that can solve a complex mathematical (cryptographic) algorithm.  When a "miner"

*(cont'd)*

issue, to provide a specific product that fits the needs of professional mining.  *See* Matt

Wuebbling, "GeForce Is Made for Gaming, CMP Is Made to Mine," NVIDIA Blog (Feb. 18,

2021), https://blogs.nvidia.com/blog/geforce-cmp/; *see also* DSOF ¶ 8.  At the time,

cryptocurrency miners were securing large supplies of available graphics processing units

(GPUs)[2] intended for video gamers.  *See* Kif Leswing, CNBC, "Nvidia sold $155 million in

crypto mining chips last quarter, but PC gaming remains its biggest market," CNBC (May 26,

2021), https://www.cnbc.com/2021/05/26/nvidia-pc-gaming-still-more-important-than-crypto-

for-revenue.html.  To save the supply of GPUs for gamers, NVIDIA created the CMP line of

products.  *Id.*  These CMP products were attractive to professional cryptocurrency miners

because it lowered the power cost (measured in wattage) of using the product and consequently

increased the value of the card's cryptocurrency mining operation.  *See* DSOF ¶ 9.

The physical characteristics of the printed circuit assembly of the CMP Board are as

follows.  The printed circuit assembly contains capacitors, resistors, and integrated circuits to

regulate the power supplied to the processing chip.  DSOF ¶ 10.  In addition, the CMP Board

contains the following components relevant to this action: a cryptocurrency mining processing

chip (CMP chip), a Video Basic Input/Output System (VBIOS) located on a memory chip, and a

Video Random Access Memory (VRAM).  DSOF ¶ 11.  The CMP chip is a silicon chip, or

---

solves this problem, it validates the transaction, which is then added to the blockchain as a new
block.  The miner is then rewarded with a cryptocurrency coin, incentivizing the user to validate
transactions on the cryptocurrency network.

[2]  The term "GPU" technically refers to the main integrated circuit within a printed circuit
board.  Colloquially, however, the term GPU is used to refer to the entire printed circuit
assembly (*i.e.*, the "board" or "card").  *See* "What is a GPU?," Intel,
https://www.intel.com/content/www/us/en/products/docs/processors/what-is-a-gpu.html (last
visited Jan. 1, 2025).

**THIS PAGE CONTAINS CONFIDENTIAL INFORMATION**

integrated circuit, that performs arithmetic and logic operations using computational "cores."
DSOF ¶ 12.  The VBIOS is a firmware that is permanently recorded on a memory chip.  DSOF ¶ 13.  The VBIOS contains a configuration file that identifies the card and regulates certain hardware functions, including the speed at which the processing unit will run.  DSOF ¶ 14.  The VRAM temporarily stores the computational results of the CMP chip before transferring it to another machine.  DSOF ¶ 15.  The CMP Board transmits that information using a peripheral component interconnect express (PCIe) interface on one side of the board, which protrudes from the aluminum case.  DSOF ¶ 16.  The PCIe allows the board to connect to a motherboard.  *Id.*[3]

The CMP Board was manufactured by NVIDIA with unique specifications that optimize its cryptocurrency mining performance.  *See* DSOF ¶¶ 7, 17-27.  First, the CMP Board is severely limited in its functions and capabilities and can [[                    ]].  DSOF ¶¶ 17, 18.    Primarily, the CMP Board cannot output a display image or render graphics.  DSOF ¶ 20.  NVIDIA [[                                                                                ]].  DSOF ¶ 20.  Second, the CMP Board does not have video/audio or encode/decode engines, features used to process images or graphics.  DSOF ¶ 21.  NVIDIA also limited the types of cores on the processing chip.  NVIDIA GPUs generally have three cores: a CUDA core, a ray tracing core, and a tensor core.  DSOF ¶ 22.  The CUDA cores are the computational unit that allows the CMP Board to execute mining quickly in parallel.  DSOF ¶ 23.  But the CMP lacks ray tracing cores, which is a computer graphics technique that simulates how light behaves in the real world to create more realistic images, and a tensor core, which are the processing units in the chips that are used to

---

[3]  An image and diagram of the printed circuit assembly of the CMP Board is provided as Defendant's Confidential Exhibit 4.

generate or run large language models or for other artificial intelligence uses.  DSOF ¶ 24.

Third, the size of the VRAM on the board is eight gigabytes, which is low compared to other

cards manufactured by NVIDIA, particularly those designed for artificial intelligence uses.

DSOF ¶ 25.  Finally, the underlying printed circuit board on which these components were

assembled was also designed for a cryptocurrency mining function.  Principally, the printed

circuit board does not contain an audio/video interface, such as a display port for HDMI, Video

Graphics Array (VGA), or DisplayPort connectors.  DSOF ¶ 26.  In other words, it does not have

a display output.  NVIDIA also limited the PCIe interface speed to four lanes because the

bandwidth of the PCIe is not important for cryptocurrency mining.  DSOF ¶ 27.

In sum, the CMP Board, which was advertised as incapable of doing graphics, also lacks

display outputs, has a lower peak core voltage and frequency, a smaller memory size, and a

reduced interconnect speed compared to NVIDIA's other line of products designed for video

gaming or other applications.  *See* DSOF ¶ 28; *see also* Matt Wuebbling, "GeForce Is Made for

Gaming, CMP Is Made to Mine," NVIDIA Blog (Feb. 18, 2021),

https://blogs.nvidia.com/blog/geforce-cmp.  The CMP Board was advertised as being able to

mine a certain cryptocurrency at a speed of 164 mega hash per second, commonly referred to as

the hash rate.  DSOF ¶ 29.  The hash rate is one of the most important specifications of the CMP

Board for professional miners.  DSOF ¶ 30.  The lack of ray tracing and tensor cores, the smaller

memory size, the slower PCIe lane speed, and lack of graphics processing reduce the total

wattage consumed by the card, lowering costs for use of the card, and increasing the value of the

card's cryptocurrency mining processing.  DSOF ¶¶ 9, 30.

The CMP Boards at issue were installed by Atlas Power on a machine that was designed

with the specific function of mining cryptocurrency.  DSOF ¶ 32.  Although the PCIe interface

5

allows the CMP Board to be connected to any motherboard with the appropriate firmware, software, or other tool to read the card, Atlas Power imported the CMP Board to connect to specifically-designed mining machines. These mining machines, which Atlas Power calls servers, are comprised of a chassis that contains a motherboard and power supply unit. DSOF ¶ 33. The motherboard on the mining machine is designed to hold ten or twelve CMP Boards. DSOF ¶ 34. The motherboard also included a Central Processing Unit (CPU), a solid-state hard drive, and Random Access Memory (RAM) cards. DSOF ¶ 35. Atlas Power purchased the mining machines from a supplier in China, which included on the hard drive of the machine a Linux operating system specifically designed by a third-party supplier, ElioVP, to run cryptocurrency mining operations. DSOF ¶ 36. The machines were installed in Atlas Power's warehouse in Montana or North Dakota. DSOF ¶ 37; Defendant's Exhibit 5 (showing the machines installed in the Atlas Power warehouse). Atlas Power's business was focused on mining cryptocurrency. DSOF ¶ 38.

      B.    <u>Administrative Background</u>

Atlas Power requested admission of 9,960 units of the CMP Boards into a Foreign Trade Zone (FTZ) as privileged foreign merchandise from October 6, 2021 through October 27, 2021. DSOF ¶ 39. The merchandise was admitted into an FTZ with privileged foreign status under FTZ Admission Nos. 0400010A1212029526 , 0400010A1212029542, and 0400010A1212029525 on October 6, October 15, and October 27, respectively. *Id.* The CMP Boards were subsequently entered for consumption under the duty-free subheading 8473.30.11, HTSUS, from October 18, 2021 through November 17, 2021, under cover of four entries: Entry Nos. 8GF-2000360-5, 8GF-2000378-7, 8GF-200380-3, and 8GF-2000387-5. PSOF ¶ 4; DRSOF ¶ 4. At the time of the FTZ admission and of entry, goods classified under subheading

8473.30.11, HTSUS, were duty-free under Column 1 of the HTSUS but subject to 25 percent *ad valorem* duties imposed pursuant to Section 301 of the Trade Act of 1974.  *See Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Relating to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (September 21, 2018).

On May 26, 2022, the USTR reinstated certain exclusions from Section 301 duties, which had previously been rescinded.  *See Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 17,380 (March 28, 2022); *see also* Note 20(ttt)(iii), Ch. 99, HTSUS.[4]  87 Fed. Reg. 17,380.  Following the reinstatement, Atlas Power filed Post-Summary Corrections (PSCs) for its entry summaries requesting the application of these exclusions from Section 301 duties to its imported merchandise.  Among the products retroactively excluded from Section 301 were:

> (108)  Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules") (described in statistical reporting number 8473.30.1180).
>
> (109)  Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules") (described in statistical reporting number 8473.30.1180).
>
> (110)  Printed circuit assemblies, constituting unfinished logic boards (described in statistical reporting number 8473.30.1180).

---

[4]  The USTR announced that "the reinstated exclusion will apply to good entered for consumption . . . on or after . . . October 12, 2021, that are not liquidated [or for which liquidation is not final]."  87 Fed. Reg. 17,380.  "Entered for consumption" means that an entry summary (rather than an entry) has been filed with CBP, including by electronic submission to Automated Commercial Environment (ACE).  *See* 19 C.F.R. § 141.0a(f).

*Id.* at Annex; *see also* Note 20(ttt)(iii), Ch. 99, HTSUS.  U.S. Customs and Border Protection (CBP) rejected Atlas Power's PSCs because Atlas Power did not demonstrate that the CMP Boards qualified for the exclusions.

On August 12, 2022, the entries auto-liquidated[5] at the classification and rate of duty asserted at the time of entry, *i.e.*, under subheading 8473.30.11, HTSUS with the assessment of Section 301 duties.  Atlas Power filed Protest No. 4101-22-102924 on October 26, 2022, requesting CBP to reliquidate the entries "using the section 301 exclusions HTS 9903.88.67 and refund the duty over-paid to the importer."  ECF No. 45-3 at 65.  CBP denied Atlas Power's protest on November 17, 2022 because "[b]ased [on] further research and product review[,] the Product NVIDIA CMP 170HX with GA100-105F does not operate like ADP GPU specifically for graphics/video."  ECF No. 45-3 at 66.

## QUESTIONS PRESENTED

(1)    Whether the CMP Boards are classified under subheading 8473.30.11, HTSUS, as parts of automatic data processing machines, or under subheading 8543.90.68, HTSUS, as parts of machines with individual functions not elsewhere specified or included, and not excluded from Section 301 duties pursuant to U.S. Notes 20(ttt)(iii)(108) through (110) as articles described in statistical reporting number 8473.30.1180.

(2)    If classified under subheading 8473.30.11, HTSUS, whether the CMP Boards are excluded from Section 301 duties pursuant to the article descriptions in U.S. Notes 20(ttt)(iii)(108) through (110).

---

[5] CBP has designed a functionality in its Automated Commercial Environment so that entries are set for automatic liquidation, whereby liquidation occurs 314 days after entry without CBP personnel intervention.  *See* Electronic Notice of Liquidation, 81 Fed. Reg. 89,375 (Dec. 12, 2016).

(3)     Whether the exclusions apply to certain shipments of Atlas Power's CMP Boards entered as privileged foreign merchandise and admitted before the retroactive effective date of the exclusions.

## SUMMARY OF ARGUMENT

The CMP Boards are not excluded from Section 301 duties pursuant to U.S. Note 20(ttt)(iii)(108) through (110).  First, under General Rule of Interpretation (GRI) 1, the CMP Boards are not described by statistical reporting number 8473.30.1180 because they are not parts or accessories of automatic data processing machines of subheading 8473.30.11, which provides for printed circuit assemblies of ADP machines.  The machines with which Atlas Power used the CMP Boards are not ADP machines because they are not freely programmable in accordance with the requirements of the user and perform a function other than data processing.  Thus, because the Atlas Power machines are not ADP machines, the CMP Boards are not parts or accessories thereof.   Instead, classification of the CMP Boards appropriately falls within subheading 8543.90.35, HTSUS, as parts of machines with individual functions not elsewhere specified or included, because the Atlas Power machines perform the singular function of cryptocurrency mining.

Second, even if the CMP Boards are described by statistical reporting number 8573.30.1180, the CMP Boards do not meet the terms of any of the three exclusions at issue in this action.  The CMP Boards are not printed circuit assemblies for rendering images onto computer screens because they physically and technically lack the capability to output any image, video, or other graphic onto a computer screen.  Nor can the CMP Boards enhance the graphics performance of ADP machines because the CMP Boards lack the capability to process any graphics.  Moreover, the CMP Boards are not "unfinished logic boards" as that term is used

in the tariff because they are not motherboards. Motherboards are printed circuit assemblies that contain the principal components of an electrical device, onto which other printed circuit assemblies (*i.e.*, boards) are inserted. The devices at issue are cryptocurrency mining boards, not motherboards. Moreover, even if the CMP Boards are "logic boards," they are not "unfinished" because they were imported as completed boards with all necessary components.

Finally, even if the terms of the exclusions applied to the CMP Boards, the retroactive application of the exclusions only cover a portion of Atlas Power's shipments. Atlas Power applied for and was granted admission into a foreign trade zone of its CMP Boards as privileged foreign merchandise. The rate of duty applicable to merchandise entered for consumption under privileged foreign status is the rate in effect on the date of filing of the application for privileged foreign status. Here, the date of that filing preceded the effective date of the retroactive exclusions for some of Atlas Power's shipments.

## ARGUMENT

### I.    Legal Framework

#### A.    Legal Standard for Summary Judgment

On a motion for summary judgment, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Celotex*, 477 U.S. at 322–23. The Court must view the evidence in the light most favorable to the non-movant and may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted); USCIT R. 56(a). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."

*Anderson*, 477 U.S. at 249.  In the absence of genuine factual issues, whether to grant summary judgment turns on the proper construction of the HTSUS, which is a question of law.  *Clarendon Marketing, Inc. v. United States*, 144 F.3d 1464, 1466 (Fed. Cir. 1998).

    B.  <u>Legal Standard for Classification</u>

"The [C]ourt's review of a classification dispute involves two steps.  First, it must determine the meaning of the relevant tariff provisions, which is a question of law."  *RKW Klerks Inc. v. United States*, 592 F. Supp. 3d 1349, 1354 (Ct. Int'l Trade 2022), *aff'd*, 94 F.4th 1374 (Fed. Cir. 2024) (citing *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998)).  "Second, it must determine whether the merchandise at issue falls within a particular tariff provision, as construed, which is a question of fact."  *Id.* (citations omitted).  When, as here, "no factual dispute exists regarding the merchandise, resolution of the classification turns solely on the first step," a "question of law" that the court determines *de novo*.  *Id.* (citations omitted).

The GRIs provide the analytical framework for the classification of goods under the HTSUS.  *BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011) (citing *N. Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001)).  GRI 1 instructs that classification be "determined according to the terms of the headings and any relative section or chapter notes" as HTSUS chapter and section notes are considered binding statutory law.  GRI 1; *Minnetonka Brands, Inc. v. United States*, 110 F. Supp. 2d 1020, 1025 (Ct. Int'l Trade 2000); *BenQ Am. Corp.*, 646 F.3d at 1376; *see also RKW*, 592 F. Supp. 3d at 1354–5 ("The HTSUS is designed so that most classification questions can be answered by GRI 1.") (citation omitted).

"Chapter 99 of the HTSUS includes U.S. Notes, which are enacted by Congress or proclaimed by the President."  *Keystone Auto. Operations, Inc. v. United States*, No. 21-00215,

2024 WL 4432079, at *4 (Ct. Int'l Trade Oct. 7, 2024) (citing *Maple Leaf Mktg., Inc. v. United States*, 528 F. Supp. 3d 1365, 1370 (2021) ("The President implemented the tariffs by modifying Subchapter III of Chapter 99 of the [HTSUS] to add a new note and a new tariff provision under the heading 9903.80.01.")).  "'Unless the context requires otherwise, the general notes and rules of interpretation, the section notes, and the [chapter notes]' apply to Chapter 99." *Id.* (citing U.S. Note 2, Subchapter III, Chapter 99, HTSUS).  "Generally, these Notes only relate to specific headings at the eight-digit level, so they are 'snot binding for determining prima facie classifiability,' but they are 'persuasive as to what Congress intended.'" *Id.* (citing *Sarne Handbags Corp. v. United States*, 100 F.Supp.2d 1126, 1134–35 (2000)).

HTSUS terms generally are construed "according to their common commercial meanings." *Millennium Lumber Distribution Ltd. v. United States*, 558 F.3d 1326, 1329 (Fed. Cir. 2009).  Courts "may rely upon its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources" in ascertaining common meaning. *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citations omitted).

## II.    The CMP Boards Are Not Classified in Subheading 8473.30.11 and Instead Fall Within Subheading 8543.90.68

Because the CMP Boards are not "described by statistical reporting number 8473.30.1180," as claimed by Atlas Power, the CMP Boards are not covered by the exclusions provided in Note 20(ttt)(iii)(108) through (110). *See* U.S. Notes 20(ttt)(iii)(108)–(110), Ch. 99, HTSUS.  As explained below, the CMP Boards do not fall within subheading 8473.30.11, HTSUS, as parts of ADP machines and are more appropriately classifiable in subheading 8543.90.68, HTSUS, as parts of machines with individual functions not elsewhere specified or included.

**A.  The CMP Boards Are Not Classified in Heading 8473 as Parts of ADP Machines**

Subheading 8473.30.11 provides for "Parts and accessories (other than covers, carrying cases and the like) suitable for use solely or principally with machines of headings 8470 to 8472 . . . Parts and accessories of the machines of heading 8471: . . . Printed circuit assemblies." Subheading 8473.30.11, HTSUS.  The machines of heading 8471, in turn, are "Automatic data processing machines and units thereof[.]"  Heading 8471, HTSUS.  Thus, to determine whether the CMP Boards are described by statistical reporting number (SRN) 8473.30.1180 and covered by the exclusion, the CMP Boards must first be classifiable under heading 8473.30.11, HTSUS as parts or accessories suitable for use solely or principally with an ADP machine of heading 8471, which they are not, as explained below.

An ADP machine is defined in Note 5(A) to Chapter 84, HTSUS (2021)[6] as machines capable of:

> (i) Storing the processing program or programs and at least the data immediately necessary for the execution of the program;
> (ii) Being freely programmed in accordance with the requirements of the user;
> (iii) Performing arithmetical computations specified by the user; and
> (iv) Executing, without human intervention, a processing program which requires them to modify their execution, by logical decision during the processing run.

Note 5, Ch. 84, HTSUS (2021).  Note 5(B) indicates that ADP machines "may be in the form of systems consisting of variable number of separate units." *Id.*  In addition, Note 5(E) excludes certain machines that incorporate or work in conjunction with an ADP from classification in heading 8471 if those machines "perform a specific function other than data processing." *Id.*

---

[6] Note 5 to Chapter 84 has been renumbered to Note 6. *See* Note 6, Ch. 84, HTSUS (2025).

Such machines are to be classified in the headings appropriate to their function or in residual headings.  *Id.*

The CMP Boards are not parts or accessories of ADP machines because the machines with which they are used, Atlas Power's mining machines, are not ADP machines.  Atlas Power's machines are not ADP machines because they are not capable of being freely programmed in accordance with the requirements of the user.  *See* Note 5(A)(ii).[7]  A freely programmable ADP machine is "one that applications can be written for, does not impose artificial limitations upon such applications, and will accept new applications that allow the user to manipulate the data as deemed necessary by the user."  *Optrex America, Inc. v. United States*, 475 F.3d 1367, 1370 (Fed. Cir. 2007).  The "user" is the "one who will be 'using' the device, not making it."  *Id.* at 1369.

The Atlas Power machines are not capable of being freely programmed in accordance with the requirements of the user because they operate using a pre-installed and custom-made operating system created by ElioVP that does not allow for general purpose computing tasks. DSOF ¶ 36.  The operating system is a Linux based distribution with "very focused functionality" for Atlas Power to monitor its mining, group its mining machines, and execute overclocking commands.  DSOF ¶ 36.  Unlike a Windows operating system, the ElioVP operating system had no graphical interface and operated through a terminal where a user would input commands.  DSOF ¶ 36.  The ElioVP system also only contained different cryptocurrency applications, such as "SG Miner" and "Team Red Miner," in addition to carrying the necessary drivers.  *See* DSOF ¶¶ 36, 47, 48.  These applications do not allow the user to manipulate any

---

[7]  We do not dispute that the Atlas Power machines meet Note 5(A)(i), (iii), and (iv).  *See* PSOF ¶¶ 38, 39, 40; DRSOF ¶¶ 38, 39, 40.

data, but merely allows the user to run cryptocurrency mining programs.  A user would then access, and monitor, the machines through the internet.  DSOF ¶ 49.  Accordingly, the machines were limited to the singular function of mining cryptocurrency.  *See* EN 84.71 (stating that "machines which operated only on fixed program, i.e., programs which cannot be modified by the user, are excluded even though the user may be able to choose between a number of such fixed programs").

Plaintiff argues that its machines are freely programmable because it contains hardware that could be altered such that a freely programmable operating system could be installed.  *See* Pl.'s Br. 26–28.  But plaintiff's hardware-approach to the "freely programmable" requirement is at odds with its argument that the software is a critical component of electronic device.  *Compare* Pl.'s Br. at 26–28 *with* Pl.'s Br. at 20–21.  In order for the device to be freely programmable as Note 5 requires, a different operating system would have to be installed, one that permits the end-user to run a variety of applications, including word processing, spreadsheet processing, and internet browsing, such as Microsoft Windows.  *See Optrex America, Inc. v. United States*, 427 F.Supp.2d 1177, 1191, 1197 (agreeing with Custom's view that an ADP machine "should be able to be programmed to do whatever the user wants it to do, within that machine's capabilities, *e.g.*, to do taxes, to prepare a spreadsheet or a financial report, to play video games or to do word processing.").  The Atlas Power mining machines operate on a pre-installed, specific Linux-based operating system designed solely to manage cryptocurrency mining operations.  DSOF ¶ 32.  A user would have little use of the Atlas Power machines with the installed CMP Boards other than to mine cryptocurrency.

Even assuming that the machines meet all four elements of Note (5)(A), they remain excluded from classification as ADP machines of heading 8471 by Note 5(E) because they do

not perform a data processing function.  Note 5(E) states that machines "working in conjunction with an automatic data processing machine and performing a specific function other than data processing are to be classified in the headings appropriate to their respective functions, or failing that, in residual headings."  Note 5(E), Ch. 84, HTSUS; *see also Digidesign, Inc. v. United States,* 44 F. Supp. 3d 1366, 1375 (Ct. Int'l Trade 2015).  The term "data processing" is not defined in the HTSUS.  However, "data processing" is defined in computing dictionaries as "preparing, storing, or manipulating information."  *See* data processing, Webster's New Computer Dictionary (9th ed. 2001) (Def. Ex. 16); *see also* data processing, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/data%20processing (last visited Jan. 17, 2025) ("[T]he converting of raw data to machine-readable form and its subsequent processing (such as storing, updating, rearranging, or printing out) by a computer.").  Moreover, the Explanatory Note (EN) to Heading 84.71 states that data processing is "the handling of information of all kinds, in pre-established logical sequences and for a specific purpose or purposes."  EN 84.71 (Def. Ex. 8).

The mining machines do not prepare, store, or manipulate information of all kinds. Rather, they perform a cryptocurrency mining function through a cryptographic algorithm, which is not a data processing function.[8]  The algorithm generates an alpha-numeric number, called the hash value, that is then compared against a "correct" hash value.  *See* Plaintiff's Interrogatory Responses (Def. Ex. 9) at 7–8; *see also supra* fn. 1.  The process is essentially "a guessing game" that requires a process of trial-and-error.  *See* Plaintiff's Statement of Material Facts (PSOF) Ex.

---

[8]  Cryptography is defined as "(1) the transformation of data to conceal its meaning." Cryptography, IBM Computer Dictionary (10th ed. 1994) (Def. Ex. 18).  Cryptographic algorithm is defined as "a set of rules that specify the mathematical steps required to encipher and decipher data."  Cryptographic algorithm, IBM Computer Dictionary (10th ed. 1994).

8 (Deposition of Hayden Gill ("Gill Dep.")) at 37:3-15, ECF No. 45-4.  The process is simply to generate a hash value.  The CMP Board can generate 164 million hashes per second (the hash rate).  *See* PSOF Ex. 15 (Product Description Sheet), ECF No. 45-5.  The process does not convert or store, or manipulate data.  The process is also limited only handling hash values and does not handle any other kind of data or information.  The machines thus do not manipulate data, nor collect, convert, or store data or information of "all kinds."  *See* EN 84.71.  Thus, the mining machines perform a function other than data processing.

Because the Atlas Power mining machines are not ADP machines of heading 8471, the CMP Boards are not parts of accessories of machines of heading 8471.  Accordingly, the CMP Boards are not described by SRN 8473.30.1180.  And because the exclusions at issue cover merchandise described by SRN 8473.30.1180, the CMP Boards are not covered by any of the three exclusions.

## B. The CMP Boards Are Classified in Heading 8543 as Parts of Machines with Individual Functions Not Specified or Included Elsewhere

By application of GRI 1, the CMP Boards are more appropriately classified in heading 8543 as parts of machines with individual functions, not elsewhere specified or included.  Specifically, the CMP Boards are classified under subheading 8543.90.68, HTSUS, which provides for "Electrical machines and apparatus, having individual functions, not specified or included elsewhere in this chapter; parts thereof . . . Parts: . . . Other: . . . Printed circuit assemblies: [9] . . . Other," duty free but subject to 25 percent *ad valorem* duties imposed under

---

[9]  The term "printed circuit assembly" means "goods consisting of one or more printed circuits of heading 8534 with one or more active elements assembled thereon, with or without passive elements."  U.S. Note 1, Section XVI, HTSUS.  An "active element" is defined as "diodes, transistors and similar semiconductor devices" of heading 8541 or "integrated circuits" of heading 8542.  *Id.*  The CMP Boards contain integrated circuits, such as the processing chip,

*(cont'd)*

Section 301.  *See* subheading 8543.90.68, HTSUS.  The Explanatory Note to Heading 8543

provides, in pertinent part:

> This heading covers all electrical appliances and apparatus, not
> falling in any other heading of this Chapter, nor covered more
> specifically by a heading of any other Chapter of the
> Nomenclature, nor excluded by the operation of a Legal Note to
> Section XVI or to this Chapter.  The principal electrical goods
> covered more specifically by other Chapters are electrical
> machinery of Chapter 84 and certain instruments and apparatus of
> Chapter 90.
>
> The electrical appliances and apparatus of this heading must have
> individual functions.  The introductory provisions of Explanatory
> Note to heading 84.79 concerning machines and mechanical
> appliances having individual functions apply, *mutatis mutandis*, to
> the appliances and apparatus of this heading.

*See* EN 85.43 (Def. Ex. 8).

The Atlas Power machines are "electrical machines" having an "individual function" that

is not "elsewhere specified or included" in the tariff schedule.  The Atlas Power machines

function using a motherboard with additional components, including the CMP Boards.  As

explained above, these electrical components are used and designed to generate a hash value and

compare that number against a target number, a process used for cryptocurrency mining.  This

cryptocurrency mining function is not specified by or included within any heading in Chapter 84

or 85, nor any other chapter of the tariff schedule.  Thus, the Atlas Power machines are electrical

machines with individual functions, not elsewhere specified or included.  By application of GRI

6, the correct subheading for the CMP Board is subheading 8543.90.68, which covers printed

circuit assemblies for machines of heading 8543, HTSUS.

---

as well as other semiconductor devices, and thus meet the definition of "printed circuit
assemblies" in the HTSUS.  *See* PSOF ¶ 13; Defendant's Response to Plaintiff's Statement of
Material Facts (DRSOF) ¶ 13.

The CMP Boards are thus a part of a machine that generates hash numbers for cryptocurrency mining, an individual function not elsewhere specified or included in the tariff schedule.  Accordingly, the CMP Boards are classified under subheading 8543.90.68 and are not described by statistical reporting number 8473.30.1180 and the exclusions to Section 301 duties do not apply.

**III.    Even If the CMP Boards Are Classified in Subheading 8473.30.11, the CMP Boards Are Not Covered by the Article Descriptions in the Exclusions Provided in U.S. Notes(ttt)(iii)(108), (109), or (110)**

The CMP Boards are not covered by the article descriptions in any of the three exclusions.  First, the CMP Boards do not, and cannot, render images onto a computer screen because that feature was not included by NVIDIA when it created the product.  Second, the CMP Boards do not enhance the graphics performance of an ADP machine because they do not handle any graphics function.  Finally, the CMP Boards are not unfinished logic boards because that tariff term refers to motherboards and the product is not a motherboard.  Moreover, the product is not an "unfinished" logic board of any kind.

**A.    The CMP Boards Cannot Render Images onto a Computer Screen Nor Enhance Graphics Performance, as Required by U.S. Notes 20(ttt)(iii)(108) and (109)**

The CMP Boards are not covered by the exclusions provided in Note 20(ttt)(iii)(108) (Exclusion 108) and Note 20(ttt)(iii)(109) (Exclusion 109), as claimed by Atlas Power, because the CMP Boards cannot render images onto a computer screen and cannot enhance graphics performance of an ADP machine.  Notes 20(ttt)(iii)(108) and (109) provide for, in full:

> (108)  Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules") (described in statistical reporting number 8473.30.1180).

> (109)  Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules") (described in statistical reporting number 8473.30.1180).

Notes 20(ttt)(iii)(108) & (109), Ch. 99, HTSUS.

Although the CMP Boards are printed circuit assemblies, they are not covered by Exclusions 108 and 109 because the CMP Boards were designed by NVIDIA specifically for cryptocurrency mining and made so they cannot render images onto computers screens or enhance the graphics performance of ADP machines.  Therefore, the CMP Boards do not satisfy the terms of the exclusions.

1.  The CMP Boards Cannot Render Images onto a Computer Screen

The CMP Boards are physically incapable of rendering images onto a computer screen. The term "render" means, as appropriate here, "4d. (computers) to cause (something, such as an image or text) to display (as on a screen); to process for display on a computer screen."  *See* render, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/render (last visited Jan. 17, 2025); *see also id.* (defining the intransitive verb "render" as "to display on a digital screen").  Technical lexicographic sources also define render as causing images or data to be represented on a digital display.  *See* render, The Computer Glossary, https://www.computerlanguage.com/results.php?definition=render (last visited Jan. 17, 2025) ("To convert any coded content to the required format for display or printing.");[10] *see also* render, Dictionary of Computer and Internet Terms (Vol. 1) ("To display a graphic image from a data file on an output device such as a video display or printer.") (PSOF Ex. 28).

As explained above, the CMP Board was designed and used specifically for cryptocurrency mining and does not create or display images onto a computer screen and was not

---

[10]  The Computer Glossary, first published in 1981, is "the longest-running tech reference on the market" but was converted from print media to digital publication after 2001.  *See* About This Encyclopedia, PCMag.com, https://www.pcmag.com/encyclopedia/term/about-this-encyclopedia (last accessed Jan. 17, 2025).  It is available directly at computerlanguage.com.

# THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

meant to perform this function.  NVIDIA wholly disabled any graphics function from the CMP card.  The modifications were two-fold.  First, the board itself physically contains no display output, such as an HDMI or Display Port.  *See* DSOF ¶ 26; PSOF Ex. 15 (Specification Sheet) (stating "Display Outputs: None").  Although the CMP Boards contain a PCIe slot to transmit data, it cannot render an image through that output.  *See* DSOF ¶ 27.  Second, the CMP chip itself has [[██████████████████████████████████]]  *See* DSOF ¶¶ 19–20.  NVIDIA [[██████████████████████████]] to remove the output capability.  *See* DSOF ¶ 20.  Thus, no image can be rendered on a computer screen by the CMP Boards.

Plaintiff is factually incorrect that "one of the intended uses of the [CMP Board] was for rendering images" and that the CMP Board is "capable of accelerating the processing of graphic image files and transmitting those files through the PCIe connector to the motherboard."  Pl.'s Br. at 24.  The manufacturer NVIDIA, through testimony of Yisheng Chen, senior product manager, testified that the CMP Board has no display output functionality, and no image generation can be transmitted through the PCIe connector.  *See* DSOF ¶¶ 19–21.  It thus simply cannot render an image.  Moreover, Atlas Power was informed during the purchasing process that the CMP Board was [[████████████████████]], which does not require image-rending.  *See* Email from NVIDIA to Atlas Power (Def. Conf. Ex. 10) at 1 (stating that the CMP Boards [[████████████████████████████████]]).

Additionally, Plaintiff's argument that the CMP Boards are GPUs, and thus meet the definition of "graphics processing modules" misses the mark.  *See* Pl.'s Br. at 21–24.  First, the parenthetical quoted term refers to "modules" not GPUs.  *See* Note 20(ttt)(iii)(108).  Second, the argument ignores the rest of the descriptive language in the exclusion, focusing entirely on the

term "graphics processing module" and extrapolating from that term a confusing *eo nomine* or principal use analysis.  Plaintiff then claims that GPUs are within the scope of the exclusion and therefore its merchandise meets the exclusion.  Plaintiff is wrong and has no basis for this reading because the classification of GPUs is not at issue here.

Moreover, its citation to *Hanser v. McDonough* to support this argument misguided.  56 F.4th 967, 970 (Fed. Cir. 2022).  In *Hanser*, the Court of Appeals for the Federal Circuit (CAFC) interpreted the following statutory sentence: "The provisions of paragraphs (a) and (b) of this section apply to ratings which have continued for long periods at the same level (5 years or more)."  *Hanser*, 56 F.4th at 970 (quoting 38 C.F.R. § 3.334(c)).  The CAFC interpreted the "5 years or more" language within the parenthetical as a definitional limitation of the term "long periods" to mean five years or more, and not an example of a long period.  *Id.* at 971.  Although the Court indicated that there is "no general rule or presumption that a parenthetical is always definitional," it cited *Novacor Chemicals Inc. v. United States*, 171 F.3d 1376, 1380-81 (Fed. Cir. 1999), for the proposition that "general principles of construction support the view that a parenthetical is the definition of the term which it follows." *Id.* at 971.  In both cases, however, the language in a parenthetical was viewed either as the definition or illustrative example of what preceded it.

Here, the opposite is true.  The term "graphics processing module" is itself the defined term for the language that precedes it, mainly, "printed circuit assemblies for rending images onto computer screens."  Unlike the parentheticals in *Hanser* and *Novacor*, the parenthetical term at issue here is in quotations.  This signals that the term in quotations is a shorthand or defined term for the description that preceded it.  Thus, within the exclusion, "graphics processing modules" *are* "printed circuit assemblies for rending images onto computer screens."

Any other interpretation would unduly expand the scope of the exclusion to cover more than what is being described by it. Because the CMP Boards are not for rendering images onto computers screens, they are not graphics processing modules as that term is defined in the exclusion.

> 2. The CMP Boards Do Not Enhance the Graphics Performance of an ADP Machine

Similarly, the CMP Boards also do not enhance the graphics performance of an ADP machine. As indicated above, in addition to removing any ports that would allow the board to transmit data to a computer screen in the form of an image, the chip itself is not enhancing the graphics performance of an ADP machine. The term "graphics" is defined as "[t]he computer's display system" or "[t]he creation and manipulation of picture images." *See* graphics, The Computer Glossary, https://www.computerlanguage.com/results.php?definition=graphics (last visited Jan. 17, 205) (nothing that "[a]ll graphics terms in [The Computer Glossary] refer to images and drawings created in the computer"). Common lexicographic sources define the term similarly. *See* graphics, Merriam-Webster, https://www.merriam-webster.com/dictionary/graphic ("3.a. plural in form but singular or plural in construction : the process whereby a computer displays graphics"); graphics, Cambridge Online Dictionary, ("IT (also 'computer graphics') pictures shown on a computer screen[.]"); graphics, Webster's New World Computer Dictionary (9th ed. 2001) ("[T]he creation, modification, and printing of pictures, as opposed to text.").

As discussed above, the CMP Board cannot execute any commands to create a display image. In addition to having no display output or functionality, the CMP board also lacks ray tracing ability, which is related to the graphics performance of a graphics card. *See* DSOF ¶ 24. The CMP Board also lacks a video/audio engine, another function of graphics processing. DSOF

¶ 21.  NVIDIA testified that [[█████████████████████████████]].  *See* DSOF ¶ 18; *see also* Def. Conf. Ex. 10.  The CMP Board cannot generate, manipulate, construct, or is otherwise involved in the graphics performance of another machine.  It is evident that the CMP Board does not process graphics, and therefore is not used to *enhance* the graphic function of an ADP machine.  Plaintiff's argument that the CMP Boards function as an accelerator of ADP machines, and specifically accelerates the graphics function, falls short and fails to recognize the language of the entire exclusion similar to its argument regarding Exclusion 108.  *See* Pl.'s Br. at 24–25.

Rather than enhance the graphics performance, the CMP Board performs a cryptocurrency mining function.  Because the CMP Board was designed and optimized specifically to mine cryptocurrency, it makes sense that NVIDIA created a product that does not work to enhance the graphics performance of an ADP machine.  Indeed, NVIDIA itself classifies its CMP cards under the product line for "Coin Mining" and through testimony stated that "CMP is just a category for crypto mining."  DSOF ¶ 18.  NVIDIA also designed the board with several limitations that would otherwise not be present in a board that enhances graphics performance.  For example, in creating the CMP Board, NVIDIA limited the PCIe lane speed, memory size, turned off certain engines, and designed the board to be passively cooled so that multiple cards can be used within one mining machine.  *See* DSOF ¶¶ 17–28.  All of these limitations assist the user of the CMP Board to gain better mining processing at lower wattages, reducing the cost of mining the cryptocurrency and increasing its efficiency.  *See* DSOF ¶ 9.

Plaintiff's claim that the CMP Board is capable of anything more than performing cryptocurrency mining calculations is contradicted by the record evidence.  NVIDIA stated that the CMP products [[███████████████████]].  *See* DSOF ¶ 18; *see also* Def.

Ex. 2 (Deposition of NVIDIA designee Yisheng Chen ("Chen Dep.")) at 35:13-18 (stating that

the CMP Board [[" ███████████████████████████ ]]).  The CMP Boards were

also only used by Atlas Power to mine cryptocurrency.  *See* DSOF ¶ 32.  Other tech enthusiasts

have obtained the CMP Board and were not able to perform any function other than

cryptocurrency mining.  *See, e.g.*, Linus Tech Tips, This $5000 Graphics Card Can't Game –

NVIDIA CMP 170HX Mining GPU, https://youtu.be/EcGkF9SBuSo (last visited Jan 17, 2025).

The CMP Board was designed to mine cryptocurrency, not render images or enhance

graphics performance.  Accordingly, the CMP Boards do not meet the terms of the exclusions in

Notes 20(ttt)(iii)(108) and (109) of Chapter 99, HTSUS.

### B.  The CMP Boards Do Not Constitute "Unfinished Logic Boards" as Required by U.S. Note 20(ttt)(iii)(110)

The CMP Boards are not covered by the exclusion provided in Note 20(ttt)(iii)(110)

(Exclusion 110), as claimed by Atlas Power, because the CMP Boards are not "unfinished logic

boards."  Note 20(ttt)(iii)(110) provides for, in full:

> (110)  Printed circuit assemblies, constituting unfinished logic
> boards (described in statistical reporting number 8473.30.1180).

Note 20(ttt)(iii)(110), Ch. 99, HTSUS.  As discussed below, the subject CMP Boards are not

"unfinished logic boards" as that term is used in Note 20(ttt)(iii)(110).

The term "unfinished logic board" refers to a motherboard (or mainboard) of an

electronic device that can accept additional electronic board or components.  Definitions of

"logic board" specifically refer to a motherboard.  Webster's New World Computer Dictionary

redirects the reader to the entry for "motherboard."  *See* logic board, Webster's New World

Computer Dictionary (9th Ed. 2001); *see also* logic board, The Computer Glossary,

https://www.computerlanguage.com/results.php?definition=logic+board (last visited Jan. 17,

2025) (defining a "logic board" as a "printed circuit board that contains logic circuits" but adds

that "Apple calls the motherboard in its computers the 'main logic board.' See logic chip, logic gate and motherboard."). Motherboard Magazine, cited by plaintiff, Pl.'s Br. at 17–18, provides more context to its definition of logic board. *See* MotherboardMag, What is a Logic Board?, https://motherboardmag.medium.com/what-is-a-logic-board-edc9df2d6c7c (last visited Jan. 17, 2025). Although the article states that "[t]echnically, a logic board is a board containing a bunch of 'logic gates[,]'" it adds that as applied to "general-purpose computers/laptops/PCs, Apple calls their mainboard a logic board but almost all the other computer manufacturers call them a motherboard. But both are the same."[11] *Id.*

Courts have also previously identified logic boards as motherboards, particularly for Apple products. *See Deburro v. Apple, Inc.*, No. 13-784, 2013 WL 5917665, at *1 (W.D. Tex. Oct. 31, 2013) ("Plaintiffs allege the laptops contain faulty motherboards, referred to by Apple as 'logic boards.' The logic board holds the bulk of the internal components of the computers, and contains various connection ports such as the standard Universal Serial Bus (USB) port."); *see also Marcus v. Apple Inc*, No. 14-03824, 2015 WL 151489, at *1 (N.D. Cal. Jan. 8, 2015); *Vitt v. Apple Computer, Inc.*, 469 F. App'x 605, 607 (9th Cir. 2012).

A motherboard is the "[m]ain printed circuit board in an electronic device which contains sockets that accept additional boards." *See* motherboard, The Computer Glossary, https://www.computerlanguage.com/results.php?definition=motherboard; *see also* McGraw–Hill Dictionary of Scientific and Technical Terms (6th ed. 2003) ("a common pathway over which information is transmitted between the hardware devices (the central processing unit, memory,

---

[11] The article also acknowledges that the difference between a logic board and a motherboard is "just a marketing strategy" and "[n]othing more," adding that the two terms are "more general terms and not specific to any PC manufacturer" and "just alternative names for the same general piece of equipment." *See* MotherboardMag, What is a Logic Board?, https://motherboardmag.medium.com/what-is-a-logic-board-edc9df2d6c7c.

and each of the peripheral control units) in a microcomputer.") (Def. Ex. 17); *see also* daughterboard, IBM Dictionary of Computing (10th ed. 1994) (providing a definition of "daughterboard" as "a board or card, containing circuits on microchips, that can be plugged into a motherboard.") (Def. Ex. 18).[12]

The term "unfinished" as it applies to "logic boards" refers to the fact that additional printed circuit assemblies or integrated circuits, such as a central processing unit, random access memory, hard drives, etc., must be connected to the logic board for the system to be complete. This is precisely the definition of motherboard. Unfinished logic boards are provided in the exclusion as classified under heading 8473.30.11, HTSUS which, as explained above, cover parts of ADP machines. It follows then that in the context of the tariff exclusion at issue, the term "unfinished logic board" refers to a motherboard, in which other printed circuit assemblies (or daughterboards) are to be connected.

Additional factors support this view. First, there is no other exclusion that covers motherboards, and such printed circuit assemblies were considered in both the implementation of the Section 301 tariffs and the resulting exclusions from such tariffs. *See, e.g.* USTR, 301 Committee, Section 301 Hearing Transcript on Proposed Tariffs: Day 2 at 258–59 (May 16, 2018) (Def. Ex. 12) (full hearing transcript available at https://ustr.gov/issue-areas/enforcement/section-301-investigations/record-section-301-investigation/section-301 (last visited Jan. 17, 2025)); USTR, Section 301 Hearing on Proposed Tariffs: Witness Testimony: Day 2 (testimony of Jordan Haas, Internet Association) (May 16, 2018) (Def. Ex. 13); *see also*

---

[12] The CIT has previously relied on definitions from the *IBM Dictionary of Computing*, the *McGraw–Hill Dictionary of Scientific and Technical Terms*, and *The Computer Glossary*. *See Samsung Int'l, Inc. v. United States*, 36 C.I.T. 1531, 1541 (2012), *aff'd*, 546 F. App'x 961 (Fed. Cir. 2013).

Michael Kan, GPU Pricing Relief? US Temporarily Lifts Trump-Era Tariffs on Graphics Cards, https://www.pcmag.com/news/gpu-pricing-relief-us-temporarily-lifts-trump-era-tariffs-on-graphics-cards (Mar. 24, 2022) (identifying graphics cards and motherboards as excluded from Section 301 duties).

Second, the exclusion request that resulted in this exclusion was requested by Apple, identifying the product as a "partially-completed main logic board."  *See* Exclusion Request No. USTR-2019-0005-1729 (Def. Ex. 14); *see also* Approval of USTR-2019-0005-1729 (Def. Ex. 15).  Although the exclusion applies to any merchandise that meets the terms of the exclusion, and a determination of what products meet the exclusion is not limited or governed by the exclusion request, the language used by Apple to describe the merchandise when seeking this exclusion sheds light on the proper definition of the term "unfinished logic board," since Apple uses the term logic board to refer to a motherboard.  Therefore, in context, the term "unfinished logic board" more appropriately refers to a motherboard.

Plaintiff's cited definition from the IEEE encompasses motherboards.  *See* Pl.'s Br. at 17. The IEEE provides a definition of "logic board (power systems communication)" as "[a]n assembly of decision-making circuits on a printed-circuit mounting board. See also: digital."  *See* PSOF Ex. 20; Def. Ex. 19.  But the IEEE Dictionary provides a "Power Engineering"[13] definition that, although it would cover the CMP Boards, applies more broadly to engineering

---

[13]  The IEEE dictionary definition, cited by plaintiff, includes in parenthesis the terms "power systems communication" and includes the abbreviation "(PE)" at the end of the definition.  The IEEE dictionary explains that descriptive categories follow the defined terms in parentheses, and that the categories "help elucidate the context of the definition."  *See IEEE 100* at vi (Def. Ex. 19).  Here, "PE" stands for the "Power Engineering" category.  *Id.*  The dictionary does contain a category for computer terms, denoted by the abbreviation "C," among other more appropriate categories for merchandise of the kind at issue.  *See id.* at vi–vii.  For example, the term motherboard is followed by the C category.  *Id.* at 709.

products and does not consider the full tariff term: unfinished logic boards.  Accordingly, it should not be relied upon to interpret the exclusion.  Moreover, the IEEE definition suggests that the term "logic board" is not traditionally used to refer to computing parts other than the use of the term to refer to a motherboard.

Here, the CMP Board is not an unfinished logic board, or motherboard, because it is not the main printed circuit assembly in an electronic device that contains sockets to accept additional boards.  Rather, it is a daughterboard that is plugged into a motherboard via the PCIe slot.  *See* PSOF ¶ 37; DRSOF ¶ 27; *see also* Chen Dep. 19:24-20:10, 26:4-7, 107:13-18.

But even if we were to accept that a CMP Board is a "logic board," the CMP Boards were complete, finished products at the time of importation and not "unfinished."  The term "unfinished" is defined by many lexicographic sources as "not finished" or "not completed." *See, e.g.*, unfinished, Cambridge Online Dictionary, https://dictionary.cambridge.org/dictionary/ english/unfinished (last visited Jan. 17, 2024); unfinished, The Britannica Dictionary, https://www.britannica.com/dictionary/unfinished (last visited Jan. 17, 2025); *see also* GRI 2(a) (referring to articles "incomplete" or "unfinished").  The term "finished," in turn, is defined as "ended or completed."  *See* finished, Collins Dictionary, https://www.collinsdictionary.com/us/ dictionary/english/finished (last visited Jan. 17, 2025); finished, Oxford English Dictionary, https://www.oed.com/dictionary/finished_adj (last visited Jan. 17, 2025) (". . . that has passed through the last process or stage of manufacture or elaboration.").  Another dictionary defines "finished" in Business English as a term "used to describe manufactured goods that are ready to be sold."  *See* finished, Cambridge Online Dictionary, https://dictionary.cambridge.org/us/ dictionary/english/finished (last visited Jan. 17, 2025).  The term "completed" is defined as "lacking no component part; full; whole; entire" or "having all necessary parts, elements, or

THIS PAGE CONTAINS CONFIDENTIAL INFORMATION

steps." *See* complete, Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/ english/complete (last visited Jan. 17, 2025). These dictionary definitions demonstrate that "unfinished" as it relates to a product or good means an article that is not lacking any part, item, or element.

The CMP Boards were completed and finished when imported into the United States. The CMP Boards contained all the necessary and intended components and parts. Atlas maintains that NVIDIA provided it with a VBIOS firmware, Pl.'s Br. at 18, but NVIDIA testified that the CMP Board already included a VBIOS, DSOF ¶ 11, and that Atlas Power did not perform any additional installation or modification of the CMP Board other than to update the VBIOS to obtain better performance. DSOF ¶ 46. The product specifications for the CMP Board identify a VBIOS as part of the board. PSOF Ex. 17, ECF No. 45-5 at 35. Moreover, the Bill of Materials (BOM) provided by NVIDIA, which identifies all components of the CMP Board as sold to Atlas Power, [[███████████████████████████████ ███████████████████]]. DSOF ¶ 10. NVIDIA [[███████████████████████ ████████████████████████████████████████████]]. DSOF ¶ 10. Thus, there is no evidence that the CMP Board lacked any part, item, or element. Accordingly, the CMP Boards were not "unfinished" when imported by Atlas Power.

Plaintiff hinges its argument that the CMP Boards were "in an unfinished state" on the fact that it needed both an (updated) VBIOS and a Linux driver to operate the CMP Board. *See* Pl.'s Br. at 18. Plaintiff's argument fails for three reasons. First, plaintiff's argument conflates "unfinished" with not functional or, at best, not optimally operational. Plaintiff provides no basis for this interpretation of the term. As a preliminary point, the claim that the CMP Board was not functional is not supported by the record evidence. That Atlas Power had to use the CMP Board

in conjunction with a Linux driver installed on its machines or required a VBIOS that permitted the device to reach the advertised clock speed (*i.e.*, the hash rate), *see* DSOF ¶ 44–45, does not mean that the CMP Boards were unfinished.  As explained above, standard lexicographic sources defined unfinished as lacking a part, item, or element.  This definition is consistent with the use of that term as it relates to electronic components.  Although firmware and software are parts of electronic devices, they are often updated to fix bugs, adapt to changing technologies, or to optimize the hardware.[14]   Accordingly, that Atlas Power required an updated VBIOS firmware does not render the CMP Boards unfinished.

Second, that a user is able to modify certain aspects of the CMP Board through the VBIOS, including its clock speed, does not render the CMP Board unfinished. Again, as a preliminary matter, the record does not support plaintiff's statement that NVIDIA permitted users to customize the configuration file in the VBIOS.  Indeed, the record demonstrates that a VBIOS with a new configuration file was provided by NVIDIA, and not customized or modified by Atlas Power.  *See* PSOF Ex. 23.  Instead, NVIDIA provided Atlas Power with an update to the VBIOS that allowed for a higher clock speed (overclocking) of the CMP Board.  DSOF ¶¶ 44–45.  Nevertheless, the ability to modify the speed at which the CMP Board can mine cryptocurrency does not mean that the CMP Board is not functioning, let alone missing any part, item, or element.

Third, plaintiff overlooks the difference between a VBIOS and a Linux driver.  The VBIOS is located on the CMP Board, on a dedicated memory chip near the processing unit.

---

[14]   The circumstance is akin to a smartphone user downloading the latest version of an application or operating software to optimize performance of the device.  It can hardly be said that the smartphone, before the update, was unfinished.

DSOF ¶ 11.  The Linux driver is a software that allows the Linux operating system to communicate with the CMP Board.  DSOF ¶ 41.  Linux drivers are installed within the operating system, which is installed on a hard drive or other storage device.  DSOF ¶ 42.  The Linux driver, which Atlas Power needed to download from the NVIDIA website prior to use, DSOF ¶ 40, is not a part of the CMP Board.  In addition, the Linux driver was not device-specific, but was generic and applied to a variety of NVIDIA products.  DSOF ¶ 43.  Thus, a driver is part of an operating system, and the same driver can be used with multiple devices.  It is illogical for a device to be missing a component, or be unfinished, when that component is not part of that device.  To conclude otherwise would also mean that many, if not all, printed circuit assemblies are "unfinished" because a user does not have the appropriate driver on their machines to operate that device.  Thus, that Atlas Power required a Linux driver to operate the CMP Boards has no bearing on whether the CMP Boards are "unfinished."

Finally, plaintiff cites NY C86235 (Apr. 9, 1998), HQ 962847 (Oct. 15, 1999), and HQ 957287 (Aug. 9, 1995) to argue that CBP has "uniformly treated electronic devices imported without functioning software needed as 'unfinished' articles[.]"  Pl. Br. at 20.  Plaintiff's citation to these rulings is unpersuasive.  In these rulings, CBP was considering the issue of essential character for incomplete or unfinished goods under GRI 2(a) and do not provide guidance as to the proper meaning of the term "unfinished" as it relates to logic boards.  Nor are CBP rulings binding on this court.  *See Porsche Motorsport N. Am., Inc. v. United States*, 554 F. Supp. 3d 1365, 1382 (Ct. Int'l Trade 2021) (internal quotations omitted); *see also id.* ("The party to whom a ruling letter is directed is the only party who may rely on it.  Parties litigating other transactions may only rely on the ruling if their merchandise is 'identical to the description set forth in the ruling letter.'") (citations omitted).

Even so, the rulings are consistent with a finding that the CMP Boards at issue are not unfinished.  In HQ 962847, CBP found that the Expendable Launch Vehicle Flight Computer (ELVFC) *lacked* application software necessary to render the merchandise a finished instrument for aeronautical navigation, but was still classified as such under GRI 2(a).  Further, in NY C86235, a laptop computer *lacked* a loaded BIOS instruction program (*i.e.*, the configuration file) and was considered unfinished for purposes of GRI 2(a).  As the Government argues here, the absence of a necessary component would make an article "unfinished" based on definitions of reliable lexicographic sources.  Further, in NY C86235, the laptop underwent processing at a manufacturing facility after importation, which is not the case for the CMP Boards at issue.  Rather, here, to obtain better mining performance for the CMP Boards, Atlas Power obtained an updated VBIOS from NVIDIA.  Finally, in HQ 957287, although the notebook computer there was described as containing a "non-operational flash BIOS chip," CBP found that the notebook computer was "an incomplete or unfinished digital processing unit" under GRI 2(a) not by reason of the BIOS chip, but because it "need[ed] only the keyboard, hard drive, and software." *See* HQ 957287.  Accordingly, the CBP rulings cited do not support plaintiff's argument.

## IV.   If the CMP Boards Fall Within Subheading 8473.30.11, Regardless of the Applicability of the Exclusions, a Portion of the Entres of Merchandise Are Not Covered by the Retroactive Application of those Exclusions

Even if the CMP Boards meet the terms of any of the three product exclusions, and are described by statistical reporting number 8473.30.1180, the effective duty rate for the CMP Boards in several of Atlas Power's shipments would still include the 25 percent *ad valorem* rate under Section 301 because the shipments predate the retroactive application of the exclusions.  Thus, for these products, the exclusions do not apply, and Section 301 duties should be assessed on the imported CMP Boards regardless of the applicability of the exclusions.

In reinstating the exclusions, the USTR announced that the product exclusions would "apply as of October 12, 2021 and extend through December 31, 2022." 87 Fed. Reg. 17,380. Specifically, the notice stated that "the reinstated exclusion will apply to goods entered for consumption . . . on or after . . . October 12, 2021, that are not liquidated [or for which liquidation is not final]." *Id.* "Entered for consumption" means that an entry summary (rather than an entry) has been filed with CBP, including by electronic submission to ACE. *See* 19 C.F.R. § 141.0a(f). Here, Atlas Power filed the entry summaries for its entries on October 18, November 12, and November 17, 2021.

However, the CMP Boards were first admitted to an FTZ in privileged foreign status. Merchandise admitted to an FTZ under privilege foreign status is "subject to tariff classification according to its character, condition and quantity, *at the rate of duty and tax in force on the date of filing*, in complete and proper form, the application for privileged status." 19 C.F.R. § 146.65(a) (emphasis added); *see* 19 C.F.R. § 146.41(d) (merchandise given privileged foreign status "will be subject to classification and valuation as provided in § 146.65"); *see also* 19 U.S.C. §81c, First Proviso ("*Provided,* That whenever the privilege shall be requested and there has been no manipulation or manufacture effecting a change in tariff classification, the appropriate customs officer shall take under supervision any lot or part of a lot of foreign merchandise in a zone, cause it to be appraised and taxes determined and duties liquidated thereon. Merchandise so taken under supervision . . . may be sent into customs territory upon the payment of such liquidated duties and determined taxes thereon.").

Products admitted to an FTZ are assigned a status designation affecting how the goods are treated for tariff purposes. *See* 19 C.F.R. §§ 146.41–44. The status as privileged foreign merchandise "cannot be abandoned and remains applicable to the merchandise. . ." 19 C.F.R. §

146.41(e).  The purpose of an admission of merchandise into an FTZ as privileged foreign

merchandise is to "lock in" the rate of duty at the time of filing the application for privileged

status regardless of any further processing in the zone or a change in the appliable duty rate.  *See*

CBP, About Foreign-Trade Zones and Contact Info, https://www.cbp.gov/border-security/ports-

entry/cargo-security/cargo-control/foreign-trade-zones/about (last modified Oct. 5, 2024);

National Association of Foreign-Trade Zones, Glossary: Frequently Used FTZ Terminology,

https://www.naftz.org/glossary (last visited Jan. 17, 2025) ("Foreign merchandise upon which

the duty and applicable taxes have been determined at the time that this status is approved.  The

determined duty rate and taxes are not subject to future fluctuation.").   Merchandise in

privileged foreign status is thus assessed duties and taxes at the rates in force on the date the

application for such status was filed with CBP.   This means that the effective tariff rate for that

date will apply.

Here, Atlas Power filed three sets of applications for FTZ admission and status as

privileged foreign merchandise for all of its CMP Boards on October 6, October 15, and October

27, 2021.  DSOF ¶ 39.  Specifically, on October 6, 2021, Atlas filed applications for and

received privileged foreign status on nine shipments (5,160 units) of the CMP Boards.[15]  *Id.*  The

other nine shipments were admitted, and received privileged foreign status, on October 15, 2021

(2,700 units) and October 27, 2021 (2,100 units).  *Id.*

The effective rates of duty applicable to privileged foreign status CMP Boards are those

in effect on October 6, October 15, and October 27.  *See* 19 C.F.R. § 146.65(a); 19 C.F.R. §

---

[15]  Put another way, all CMP Boards that entered under cover of Entry No. 8GF-2000360-5, the CMP Boards that entered under line 001 of Entry No. 8GF-200378-7, and the CMP Boards entered under line 002 of Entry No. 8GF-200387-5 were all admitted into the FTZ as privileged foreign merchandise on October 6, 2021.  *See* PSOF Ex. 1.

146.41(d).  Because the exclusions granted by the USTR were not retroactively in effect on

October 6, 2021, the 5,160 units of the CMP Boards admitted to the FTZ at that time are not

covered by the exclusions.  Therefore, the rate of duty for those CMP Boards admitted on

October 6 as privileged foreign merchandise is 25 percent *ad valorem* under subheading

9903.88.03 regardless of the applicability of the exclusions.  *See Notice of Modification of*

*Section 301 Action: China's Acts, Policies, and Practices Relating to Technology Transfer,*

*Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (September 21, 2018); Subheading

9903.88.03, HTSUS.

**CONCLUSION**

For these reasons, the Court should grant the Government's cross-motion for summary judgment, deny Atlas Power's motion for summary judgment, enter judgment in the Government's favor, and dismiss this action.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

Of Counsel:

SABAHAT CHAUDHARY
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

January 17, 2025

/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH
Trial Attorney
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-0484
Attorneys for Defendant

37

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN A. VADEN, JUDGE

|  |  |  |
|---|---|---|
| ATLAS POWER LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No. 23-00084 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## **CERTIFICATE OF COMPLIANCE**

I, MATHIAS RABINOVITCH, a trial attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the foregoing brief in support of defendant's cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment, relying upon the word count feature of the word processing program used to prepare the brief, certify that this brief complies with type-volume limitation under USCIT Standard Chamber Procedure 2(B) and contains 10,964 words.

/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH