UNITED STATES COURT OF INTERNATIONAL TRADE

Before: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| ATLAS POWER LLC<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | ) | Court No. 23-00084 |

**PLAINTIFF'S REPLY AND REPONSE TO**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

J. Kevin Horgan
Merisa A. Horgan
**deKieffer & Horgan, PLLC**
1015 Fifteenth Street, N.W.
Sixth Floor
Washington, D.C. 20005
Tel: (202) 783-6900
email: khorgan@dhlaw.com
*Counsel to Atlas Power LLC*

Dated: April 15, 2025

## TABLE OF CONTENTS

I. STATEMENT OF ISSUES ........ 1

II. ARGUMENT ........ 2

A. Standard of Review ........ 2

B. The Subject Merchandise is Classified Under HTSUS 8473.30.1180 ........ 4

a. The Subject Merchandise Was Not Principally Used as Parts of Atlas "Mining Machines" ........ 4

b. The Atlas Servers Are ADP Machines ........ 5

c. The Subject Merchandise Consists of GPUs ........ 10

d. The Subject Merchandise Consists of Accessories to ADPs ........ 13

C. The Subject Merchandise Is Excluded from Assessments of 301 Tariffs ........ 15

a. The Subject Merchandise Consists of Printed Circuit Board Assemblies Constituting Unfinished Logic Boards ........ 15

b. The Subject Merchandise Consists of Excluded GPUs or Excluded Accelerators ........ 16

D. Merchandise Covered by Entry No. 8GF-2000360-5 Entered the Commerce of the United States Prior to the Effective Date of the Section 301 Exclusions ........ 18

CONCLUSION ........ 18

# TABLE OF AUTHORITIES

**Cases**

Carl Zeiss, Inc. v. United States,
195 F.3d 1375 (Fed. Cir. 1999) ........ 10, 15

Cummins Inc. v. United States,
454 F.3d 1361(Fed Cir. 2006) ........ 3

Mead Corp. v. United States,
283 F.3d 1342 (Fed. Cir. 2002) ........ 3

Optrex America, Inc. v. United States,
475 F.3d 1367 (Fed. Cir. 2007) ........ 9

Skidmore v. Swift & Co.,
323 U.S. 134 (1944) ........ 3

United States v. Mead Corp.,
533 U.S. 218 (2001) ........ 3

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: STEPHEN A. VADEN, JUDGE

ATLAS POWER LLC,

Plaintiff,

v.

UNITED STATES,

Defendant.

Court No. 23-00084

**PLAINTIFF'S REPLY AND REPONSE TO CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Atlas Power LLC (Atlas) files this response to Defendant's cross-motion for summary judgment in this civil action contesting the denial of Plaintiff's protest as to the assessment of Section 301 tariffs on NVIDIA CMP 170HX graphics processing units ("GPUs") ("the subject merchandise") imported by Atlas in 2021.

## I. STATEMENT OF ISSUES

The issues presented by the parties cross-motions for summary judgment are: 1) whether the imported articles are classified under subheading 8473.30.1180 of the Harmonized Tariff Schedule of the United States ("HTSUS"), which covers parts and accessories of automated data processing ("ADP") machines; and 2) if the subject merchandise is classified under HTSUS 8473.30.1180, whether the subject merchandise is excluded from assessments of Section 301 tariffs as a matter of law by virtue of one of the following three exclusions:

> (108) Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules") (described in statistical reporting number 8473.30.1180)

> (109) Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules") (described in statistical reporting number 8473.30.1180)
>
> (110) Printed circuit assemblies, constituting unfinished logic boards (described in statistical reporting number 8473.30.1180)

## II. ARGUMENT

### A. Standard of Review

When Atlas entered the subject merchandise into the commerce of the United States, Atlas classified the merchandise under HTSUS subheading 8473.30.1180, which covers, among other things, parts and accessories of automated data processing ("ADP") machines. United States Customs & Border Protection ("CBP") did not alter this HTSUS classification at the time of liquidation or in response to Atlas's protest against the assessments of Section 301 tariffs on the subject merchandise. In its cross-motion for summary judgment, Defendant asserts for the first time that the subject merchandise is not lawfully classified under HTSUS 8473.30.1180 and should instead be classified under subheading 8543.90.35, HTSUS, as parts of machines with individual functions not elsewhere specified or included. The Government's cross-motion also presents for the first time a supposed explanation for why the subject merchandise does not qualify for one or more of the three Section 301 tariff exclusions applicable to certain merchandise classified under HTSUS 8473.30.1180. Years after the merchandise entered the commerce of the United States, and months after discovery closed in this action, the Government proffers for the first time a recently developed explanation for why CBP assessed 301 tariffs on plaintiff's merchandise.

In Cummins Inc. v. United States, 454 F.3d 1361(Fed Cir. 2006), the Court of Appeals for the Federal Circuit described the deference afforded to CBP decisions regarding classification issues as follows:

> Although our review is de novo, we accord deference to a Customs' classification ruling in proportion to its "power to persuade" under the principles of Skidmore v. Swift & Co., 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944). United States v. Mead Corp., 533 U.S. 218, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001); Mead Corp. v. United States, 283 F.3d 1342, 1345-46 (Fed. Cir. 2002) (citations omitted). In addition, "Customs' relative expertise in administering the tariff statute often lends further persuasiveness to a classification ruling, entitling the ruling to a greater measure of deference." Mead Corp., 283 F.3d at 1346.

454 F.3d at 1363-64. In this case, there is no CBP ruling to invite the Court's deference. Instead, the Government's position in this litigation asks the Court to ignore CBP's classification determination at the administrative level in favor of a *post hoc* rationalization developed by litigation counsel at a very late stage of the litigation. Moreover, the Government asks the Court to disregard binding administrative rulings as to the tariff classification of GPUs and what conditions establish that an electronic article is "unfinished" for tariff purposes in favor of litigation counsel's late-blooming ideas about how the subject merchandise should be classified and whether it qualifies for exclusion from 301 tariffs. It is CBP's binding administrative rulings cited by Atlas in its opening brief to which the Court should defer. It is those published administrative rulings that represent the official positions on these issues, not trial counsel's *post hoc* rationalizations.

**B.  The Subject Merchandise is Classified Under HTSUS 8473.30.1180**

    **a.  The Subject Merchandise Was Not Principally Used as Parts of Atlas "Mining Machines"**

The parties' cross-motions for summary judgment suggest two alternative tariff classifications for the subject merchandise:  HTSUS 8473.30.1180, which covers parts and accessories for ADP machines; or HTSUS 8543.90.35, which covers parts of machines with individual functions.

As provisions for parts and/or accessories, both of the alternative classifications suggested in this case must be applied in accordance with Additional U.S. Rule of Interpretation 1(c), which provides: "a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for "parts" or "parts and accessories" shall not prevail over a specific provision for such part or accessory;… ." Additional U.S. Rule of Interpretation 1(a), further provides "…a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use: … ."

The Government would have the Court ignore these fundamental principles of tariff classification and, instead, treat the competing parts provisions in this case as actual use provisions.  It would have the Court base its judgment on how Atlas actually used the subject merchandise instead of how CMP 170HX GPUs are principally used, *i.e.*, as parts of or accessories to ADP machines.

The facts alleged by the Government actually demonstrate beyond peradventure that the subject merchandise, NVIDIA CMP 170HX GPUs, is not solely or principally used as a part of a machine with an individual function. The Government argues that the server Atlas used with the CMP 170HX GPUs was a "mining machine" because Atlas installed on its servers a proprietary operating system ("OS") optimized for mining cryptocurrency. The total value of the subject merchandise purchased by Atlas was $23 million. See Plaintiff's Ex. 1, Appx 1- 62. But NVIDIA sold CMP 170HX GPUs worth approximately $550 million. *See* Plaintiff's Exhibit 31. So, 96% of the CMP 170HX GPUs sold by NVIDIA were used by customers who were not authorized to use Atlas's proprietary operating system. Based on these undisputable facts, it is impossible for the Court to conclude that CMP 170HX GPUs were solely or principally used as parts of Atlas's supposed "mining machines." Even if the Court were to accept the Government's unsupported claim that Atlas's servers were "mining machines," the Court could not conclude that this was the sole or principal use of the imported merchandise because 96% of the subject merchandise was used in other ways, *i.e.*, with ADP systems, as NVIDIA testified. *See* Plaintiff's Ex. 10 at Appx 552. The sole or principal use of the subject merchandise was as parts of or accessories to ADP systems. How Atlas actually used the merchandise it imported is irrelevant because it represents only a small fraction of the actual use of the subject merchandise

**b. The Atlas Servers Are ADP Machines**

To the extent it may be relevant, the undisputed facts establish that Atlas itself used the subject merchandise as parts of or accessories to ADP systems because the Atlas servers used with the subject merchandise meet the definition of an ADP device. The parties agree that for tariff classification purposes, ADP machines must be "capable of" the following:

> (i) Storing the processing program or programs and at least the data immediately necessary for the execution of the program;
> (ii) Being freely programmed in accordance with the requirements of the user;
> (iii) Performing arithmetical computations specified by the user; and
> (iv) Executing, without human intervention, a processing program which requires them to modify their execution, by logical decision during the processing run.

Note 5, Ch. 84, HTSUS (2021).

The Government concedes that the Atlas servers meet conditions (i) (iii) and (iv) of Note 5. The Government claims, however, that the Atlas servers were not "capable of … Being freely programmed in accordance with the requirements of the user." The Government's argument encourages the Court to ignore the words "capable of" that appear in Note 5 and assume that when an ADP machine has been programmed once to execute one program it is no longer "capable of" being programmed to perform additional tasks or "capable of" being reprogrammed to perform a different set of tasks entirely.

The Atlas servers were indisputably fully programmable in accordance with the requirements of the user because all of the witnesses who were asked testified that the proprietary OS Atlas installed on its servers could be removed and replaced in its entirety. Thus, regardless of how or when the Atlas servers were programmed with the Atlas proprietary OS, the servers themselves remained fully programmable because, at any time, the Atlas proprietary OS could be removed and replaced with a non-proprietary OS such as Windows, or it could be replaced with a new proprietary OS.

The Government's own expert witness testified under oath that the Atlas servers constituted an ADP machine during the following exchange between Plaintiff's counsel and the Government's expert:

> Q. This is not entirely hypothetical. I'm asking you whether the components included in the Atlas server are consistent with your description of what constitutes a modern data -- computer processing -- data processing machine. Just the components.
>
> A. The components as listed would constitute a -- a modern as outlined, yes. Yes. I would state that would be correct, the components as the -- as you have described them.

(Plaintiff's Ex. 12, Beckman Dep at Appx. 771:22-772:9.)

The Government's expert further testified under oath that the Linux OS on the Atlas servers could be removed and replaced with a new operating system if the servers were to be used for a different purpose.

> Here's a question. So if you had a CMP 170HX or several of them installed in one of Atlas's servers, right? And you wanted to use that server for a different purpose, could you remove the Linux operating system and install a new Linux or a new operating system of some kind?
>
> A. Yes.

(Plaintiff's Ex. 12, Beckman Dep at Appx. 896:2-9.)

In his sworn deposition, the Government's expert witness testified that adding CMP 170HX GPUs to a server would not prevent the server from performing other task in addition to cryptocurrency mining. The exchange was:

Q. In general, if you --
A. Mm-hmm.
Q. -- had a desktop computer --
A. Mm-hmm.
Q. And you added a CMP 170HX GPU to that computer as an accessory or as a component, would it prevent that laptop or desktop from performing other functions like running a spreadsheet or word processing or things like that?
A. No. I don't believe that the, uh, 170HX would preclude that.

(Plaintiff's Ex. 12, Beckman Dep at Appx. 898:6-17.)

These undisputed facts prove that the Atlas servers had all the components of an ADP system and that the Atlas server were at all times capable of being freely programmed in accordance with the requirements of the user.

The Government has also admitted that the subject NVIDIA CMP 170HX GPUs must be connected to a device containing a motherboard with a CPU in order to function. See Defendant's Response to Plaintiff's Statement of Undisputed Facts at ¶ 37. Thus, the subject merchandise was always used by Atlas and every other purchaser in conjunction with an ADP system. Therefore, it is appropriate for the Court to rule as a matter of law that the subject merchandise is properly classified as a part of or accessory to an ADP system under HTSUS 8473.30.1180.

The case law relied on by Defendant does not require otherwise. *Optrex America, Inc. v. United States*, 475 F.3d 1367, 1370 (Fed. Cir. 2007), addresses the general question of what constitutes an ADP System. There, the Court of Appeals stated that it agreed with CBP's belief that a freely programmable ADP machine is one that applications can be written for, does not impose artificial limitations upon such applications, and will accept new applications that allow the user to manipulate the data as deemed necessary by the user. 475 F.3d at 1370. Although the Government fails to mention it, the Court of Appeals also recognized that its ruling did not apply to computer servers, stating that the lower "court determined that the end use devices, ***with the possible exception of computer servers***, operate on fixed programs that the user cannot modify." 475 F.3d at 1370. (Empasis added.) *Optrex* does not support the Government's assertion that the Atlas servers are not programmable. Instead, it supports the conclusion that servers like those used by Atlas are programmable.

The undisputed facts set forth above demonstrate that the Atlas devices are servers that applications can be written for and that those servers will accept new applications, up to and including an entirely new operating system. The Government states at page 15 of its motion for summary judgment: "In order for the [Atlas]device to be freely programmable as Note 5 requires, a different operating system would have to be installed, one that permits the end-user to run a variety of applications, including word processing, spreadsheet processing, and internet browsing, such as Microsoft Windows." The undisputed facts show that the Atlas services were capable of accepting a new operating system like Windows. Even by the Government's own interpretation of Note 5, the Atlas servers were freely programmable.

**c. The Subject Merchandise Consists of GPUs**

In marketing material, NVIDIA refers to the CMP 170HX as a GPU, *i.e.*, "the NVIDIA CMP GPU." PSUMF ¶ 54. Plaintiff's and Defendant's witnesses deposed in this matter agree that the subject merchandise is a kind of GPU. *Id.* The subject merchandise embodies the essential character of a GPU, which is derived from its ability to carry out a large number of arithmetical calculations in parallel. PSUMF ¶ 26. The subject merchandise contains many CUDA cores, which are arithmetic logic units ("ALUs"), making the subject merchandise capable of carrying out a large number of arithmetical calculations in parallel. PSUMF ¶ 27. Based on the evidence compiled, there is no material dispute as to the fact that the subject merchandise consists of GPUs.

Defendant's opposition to this finding is based on its desire to have the Court adopt an anachronistic understanding of the term GPU that was not endorsed by any of the witnesses who testified under oath in this case.

Additional U.S. Rule of Interpretation 1(a), provides "…a tariff classification controlled by use (other than actual use) is to be determined in accordance with the *use in the United States at, or immediately prior to, the date of importation,* of goods of *that class or kind to which the imported goods belong*, and the controlling use is the principal use: … ." (Emphasis added.) Moreover, "HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citations omitted). These principles direct the Court to interpret the term "GPU" based on how the term was commercially understood at the time of importation of the subject merchandise.

The record is replete with evidence that at the time of importation of the subject merchandise the term GPU was used to refer to all graphic processor-based logic boards that used parallel processing to carry out a variety of tasks, including radar signal processing, reinforcement learning (a type of artificial intelligence algorithm), EDA software acceleration, wireless communication, gene sequencing, sensor tracking, hash functions, cryptography and cryptocurrency mining. See PSUMF ¶ 30-31 (Ex. 10, NVIDIA Dep. at Appx 607:2-10; Ex. 4, Khatri Expert Rpt at Appx 123, ¶ 62; Ex. 25, Def. Admission 28; Ex. 4, Khatri Expert Rpt at Appx 117, ¶ 31; Ex 10, NVIDIA Dep at Appx 600:12-18; Ex. 7, Beckman Expert Rebuttal Rpt at Appx 232; Ex. 12, Beckman Dep at Appx 805:22-806:19; Ex. 15, NVIDIA Product Description Sheet.)

The Government seeks to transport the Court back in time to when GPUs were only used for displaying graphics in video games. The Government proposes an anachronistic definition that is not consistent with the common and commercial understanding of the term GPU at the time when Atlas imported the subject merchandise.

In his sworn deposition, the Government's expert was asked whether he agreed with NVIDIA that the CMP 170HX was a GPU:

> Q. All right. Mr. Chen also testified at page 108, and I posed a question whether -- at beginning of line three, and I'm posing this as a question, "Is the CMP 170HX a GPU?" And he says, "Yes, it is a GPU." Do you agree with that? I'm asking you now, do you agree with that?
>
> A. Yeah. With his expertise, and I would say that the CMP 170HX would be a graphics processor unit. …

Plaintiff's Ex. 12, Appx at 789.

Later in his sworn deposition, the Government's expert witness is asked whether in his expert report he described the CMP 170HX as a "specialized GPU." He responded as follows:

- Q. In the third paragraph, first
- sentence. Your report states, "By contrast to
- the above components, NVIDIA CMP 170HX is a
- specialized GPU."

C. So according to your report, it's
D. a kind of a GPU?
E. A. Yeah. Mm-hmm.
F. Q. That's (inaudible). Yeah.
G. A. Mm-hmm.
H. Q. So then you would agree based --
I. A. (Inaudible) kind of --
J. Q. -- the CO is kind of a GPU?
K. A. Kind of a GPU --
L. THE REPORTER: Wait. Hold on.
M. So you'd agree based on -- is that what you
N. said?
O. MR. HORGAN: Me? Oh.
P. THE REPORTER: Yeah.
Q. MR. HORGAN: I said, you'd
R. agree based on your report at page 7.
S. THE REPORTER: Thank you.
T. A. That it's kind of GPU.

Plaintiff's Ex. 12, Appx at 805-806.

The Government expert's multiple admissions that the subject merchandise is a kind of GPU, along with the additional evidence submitted by Plaintiff's witnesses, is sufficient for the Court to find as a matter of law that the subject merchandise belongs to that class or kind of goods currently known in commerce as GPUs. The Government has admitted that CBP has never issued a ruling classifying GPU modules under the HTSUS as anything other than parts of ADP systems or devices. (Ex. 25, Def. Admission 24.) The Court should follow CBP's rulings and classify the subject CMP 170HX GPUs under HTSUS 8473.30.1180, as parts or accessories for ADP machines

**d. The Subject Merchandise Consists of Accessories to ADPs**

Even if the Court were to be unsure about whether the CMP 170HX GPU is a GPU, the subject merchandise would still be classifiable under HTSUS 8473.30.1180 as an accessory to an ADP system. The Explanatory Notes for Chapter 85 of the HTSUS state that Chapter 85 does not cover machinery and apparatus of a kind covered by Chapter 84. Thus, if the CMP 170HX GPU is an accessory to an ADP system or machine, it should not be classified in Chapter 85.

In HQ 962730 (April 15, 1999), CBP addressed whether a keyboard storage drawer as an accessory to an ADP system. CBP noted that Explanatory Note to 84.73 states in pertinent part:

> Subject to the general provisions regarding the classification of parts (see the General Explanatory Note to Section XVI), this heading covers parts and accessories suitable for use solely or principally with the machines of headings 84.69 to 84.72.
>
> ***The accessories covered by this heading are interchangeable parts or devices designed to adapt a machine for a particular operation, or to perform a***

> ***particular service relative to the main function of the machine, or to increase its range of operations.***
> * * * * * * * * * * *
> We note that the HTSUS does not contain a specific, uniform definition for the term "accessory." EN 84.73, above, defines "accessories" as "interchangeable parts or devices designed to adapt a machine for a particular operation, or to perform a particular service relative to the main function of the machine, or to increase its range of operations."
>
> In Headquarters Ruling Letter (HQ) 087704, dated September 27, 1990, we noted the absence of a definition of the term "accessory." We reached the following conclusion as to the meaning of the term "accessory" which we believe may be properly used as guidance in this instance:
>
>> An accessory is generally an article which is not necessary to enable the goods with which it is used to fulfill their intended function. ***An accessory must be identifiable as being intended solely or principally for use with a specific article. Accessories are of secondary or subordinate importance, not essential in and of themselves. They must, however, somehow contribute to the effectiveness of the principal article (e.g., facilitate the use or handling of the principal article, widen the range of its uses, or improve its operations.)***

HQ 962730 (April 15, 1999) (emphasis added). *See also* HQ 962652 (February 1, 2001)(x-ray accessory); HQ 087704 (September 27, 1990)(automobile reflector).

While connecting the CMP 170HX GPU to a CPU-enabled server allows the ADP system to mine faster, the CMP 170HX GPU is not essential to the operation of a CPU-enabled server. A server like the Atlas server is capable of mining cryptocurrency on its own without the addition of the CMP 170HX GPU. The CMP 170HX GPU is intended to enhance an ADP system's ability to mine cryptocurrency and is designed solely for use with a CPU-enabled ADP system. *See* PSUMF ¶ 49. The CMP 170HX GPU cannot mine cryptocurrency without being connected to a CPU. *See* PSUMF ¶ 37. Thus, the CMP GPU is clearly an accessory to an ADP system and is properly classified under HTSUS 8473.30.1180.

**C. The Subject Merchandise Is Excluded from Assessments of 301 Tariffs**

**a. The Subject Merchandise Consists of Printed Circuit Board Assemblies Constituting Unfinished Logic Boards**

Defendant and its expert witness have admitted that the subject merchandise consists of logic boards. See PSUMF ¶ 15. See also Ex. 25, Def. Admission 10; Ex. 4, Khatri Expert Rpt at Appx 118, 36-40; Ex. 20 IEEE Definition at Appx 1066; Ex. 21, CRS Semiconductors Report at Appx 1072-1073; Ex. 22, ITC Rpt on Taiwanese Semiconductor Industry at Appx 1106, 1121 n. 20; Ex. 12, Beckman Dep at Appx 814:14-19.) The Government attempts to circumscribe its admission by asking the Court to interpret the term logic board by reference to the exclusion application filed By Apple, Inc. *See* Defendant's Cross-Motion at 28.

This is precisely the interpretive approach that the United States Trade Representative ("USTR") warned parties not to use when administering the exclusion. USTR's letter conveying its exclusion determination states explicitly: "The scope of the exclusion is governed by the scope of the 10-digit HTSUS subheadings and product descriptions in the annex to the product exclusion notice, and not by the product descriptions set out in any particular request for exclusion." *See* Defendant's Exhibit 15. Thus, any reliance on how Apple alone uses the term logic board is not determinative of the scope of the 301 Tariff exclusion applicable to unfinished logic boards.

Like all HTSUS terms, the terms of a 301 tariff exclusion "are to be construed according to their common and commercial meanings, which are presumed to be the same." Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citations omitted). The Government and its expert have admitted that the subject merchandise consists of logic boards. *See* PSUMF ¶ 14-15. An idiosyncratic use of the term logic board by Apple Inc. does

not alter the fact that the term logic board in common and commercial use encompasses more than Apple's motherboards.

Just as the Government is asking the Court to ignore the USTR's admonitions regarding how to interpret Section 301 tariff exclusions, the Government asks the Court to ignore CBP's binding rulings regarding what constitutes an "unfinished" electronic article in favor of trial counsel's *post hoc* rationalization of CBP's decision to assess Section 301tariffs on the subject merchandise. The undisputed evidence shows that the subject in its condition as imported was inoperable, the subject merchandise did not meet customer specifications, the subject merchandise lacked functioning firmware, *i.e.*, a functioning VBIOS, and the subject merchandise lacked application software. Any one of these shortcoming is enough to render the subject merchandise unfinished as that term has previously been applied in the CBP the rulings cited in Plaintiff's motion for summary judgment. It is preposterous for the Government to suggest that an inoperable electronic device that did not meet customer specifications is finished in its condition as imported. The subject merchandise indisputably had to undergo post-importation processing in order to function as intended. *See* PSUMF at ¶¶ 54-57. *See also* Defendant's Statement of Undisputed Material Facts at ¶¶ 44, 45. CBP has issued multiple binding rulings finding that an electronic device that needs post-importation processing is unfinished. The Court should not be misled by trail counsel's *post hoc* wishful thinking.

**b. The Subject Merchandise Consists of Excluded GPUs or Excluded Accelerators**

On the question of whether the subject merchandise consists of excluded GPUs and/or excluded accelerators, the Government makes the same analytical mistake that it makes with

respect to the classification of GPUs under HTSUS 8473.30.1180. The Government asks the Court to disqualify the subject merchandise based on its actual use instead of asking the right question, which is whether the subject merchandise consists of articles that are included in a general class or kind of merchandise that is excluded from 301 Tariffs.

As discussed above, the sworn witnesses in this case, including the Government's expert, have testified that the subject merchandise consists of a kind of GPU. Therefore, for purposes of classification under HTSUS 8473.30.1180 and exclusion from Section 301 Tariffs, the imported merchandise must be accorded the same treatment as all GPUs, *i.e*, classified under HTSUS 8473.30.1180 and excluded from 301 Tariffs.[1]

No other importers are being required to demonstrate how they are actually using GPUs in order to have their merchandise classified under 8473.30.1180 and excluded from Section 301 Tariffs. The record in this case contains ample undisputed evidence showing that GPUs that have video outputs are being used for many purposes other than rendering images onto computer screens. *See* PSUMF ¶31.The uses include accelerating mathematical equations used in radar tracking, artificial intelligence, DNA analysis, cryptocurrency mining, *etc.* None of these GPUs are being classified somewhere other than HTSUS 8473.30.1180 or subjected to Section 301 Tariffs because they are actually being used for something other than rendering images on computer screens. All of these articles are included in the class or kind of merchandise commonly and commercially known as GPUs. Therefore, they must all be classified under HTSUS 8473.30.1180 and excluded from Section 301 Tariffs regardless of their actual use.

[1] Note that in electrical engineering the terms "unit" and "module are "interchangeable words." See Deposition of Sunil Khatri, Plaintiff's Exhibit 11, Appx 665 93:15 – Appx 666 95:25.

The same analysis supports the conclusion that the subject merchandise must be classified under HTSUS 8473.30.1180 and excluded Section 301 Tariffs regardless of their actual use because they are included in a class or kind of merchandise commonly and commercially known as GPUs and/or accelerators.

**D. Merchandise Covered by Entry No. 8GF-2000360-5 Entered the Commerce of the United States Prior to the Effective Date of the Section 301 Exclusions**

Plaintiff agrees with Defendant that the subject merchandise covered by Entry No. 8GF-2000360-5 was entered into the commerce of the United States prior to the effective date of the retroactive reinstatement of the 301 Tariff exclusions available with respect to merchandise classified under HTSUS 8473.30.1180. Therefore, plaintiff agrees to the dismissal of its claims with respect to Entry No. 8GF-2000360-5.

## CONCLUSION

For the foregoing reasons, Atlas requests that the Court enter summary judgment:

1) dismissing Plaintiff's claims as to merchandise covered by Entry No. 8GF-2000360-5; and

2) holding that the remainder of the subject merchandise is classified under HTSUS subheading 8473.30.1180; and

3) holding that the remainder of the subject merchandise is excluded from assessments of Section 301 Tariffs.

Respectfully submitted,

**/s/ J. Kevin Horgan**

J. Kevin Horgan
Merisa A. Horgan
**deKieffer & Horgan, PLLC**
1015 Fifteenth Street, N.W.
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: kevin.horgan@dhlaw.com
*Counsel to Plaintiff Atlas Power, LLC*

Dated: April 15, 2025

UNITED STATES COURT OF INTERNATIONAL TRADE

Before: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| ATLAS POWER LLC | ) | |
| Plaintiff, | ) | |
| v. | ) | Court No. 23-00084 |
| UNITED STATES, | ) | |
| Defendant. | ) | |

## CERTIFICATE OF COMPLIANCE

Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in reliance upon the word count feature of the word processing program used to prepare the instant Memorandum, I, J. Kevin Horgan, of deKieffer & Horgan, PLLC, who is responsible for the instant Memorandum, certify that it contains 4,778 words

/s/ *J. Kevin Horgan*

J. Kevin Horgan
**DEKIEFFER & HORGAN, PLLC**
1015 Fifteenth St., N.W.
Sixth Floor
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: khorgan@dhlaw.com
*Counsel to Atlas Power LLC*

Date: April 15, 2025