UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN A. VADEN, JUDGE

_____
                                          :
ATLAS POWER LLC,                          :
                                          :
                        Plaintiff,        :
                                          :
            v.                            :        Court No. 23-00084
                                          :
UNITED STATES,                            :
                                          :
                        Defendant.        :
_____   :

## DEFENDANT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

*Of Counsel:*

SABAHAT CHAUDHARY
Office of the Associate Chief Counsel
Trade & Finance
U.S. Customs and Border Protection

MATHIAS RABINOVITCH
Trial Attorney
U.S. Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-0484
*Attorneys for Defendant*

May 20, 2025

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 4

I.     This Court's Review Is *De Novo* and It Has an Independent Duty to Arrive at
       the Correct Result .................................................................................................... 4

II.    The CMP Boards Are Not Described in the Relevant Statistical Reporting Number
       Because They Are Not Parts or Accessories Suitable for Use Solely or Principally
       with Automatic Data Processing Machines ........................................................... 6

       A.     The CMP Boards Are Not "Suitable for Use Solely or Principally"
              with Automatic Data Processing Machines of Heading 8471 ............................ 7

       B.     Atlas Power's Machines Are Not Automatic Data Processing Machines .......... 10

III.   The CMP Boards Are Not Covered by the Terms of the Exclusions From
       Section 301 Duties ................................................................................................ 13

       A.     The CMP Boards Are Not "Unfinished Logic Boards" ..................................... 13

       B.     The CMP Boards Do Not Render Images onto a Computer Screen nor Enhance
              the Graphics Performance of Automatic Data Processing Machines ................. 16

IV.    The Merchandise Admitted before the Effective Date of the Exclusion Includes
       More Than Those in Entry No. 8GF-2000360-5 ................................................ 18

CONCLUSION ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. United States*,
375 F. Supp. 3d 1288 (Ct. Int'l Trade 2019),
*aff'd*, 964 F.3d 1087 (Fed. Cir. 2020) ....................................................................... 8, 12

*Bausch & Lomb, Inc. v. United States*,
957 F. Supp. 281 (Ct. Int'l Trade 1997),
*aff'd*, 148 F.3d 1363 (Fed. Cir. 1998) ............................................................................ 4

*Blue Sky Color of Imagination, LLC v. United States*,
698 F. Supp. 3d 1243 (Ct. Int'l Trade 2024) .............................................................. 13

*Brother Int'l Corp. v. United States*,
248 F. Supp. 3d 1224 (Ct. Int'l Trade 2002) ................................................................ 8

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) ...................................................................................................... 4

*CamelBak Prods., LLC v. United States*,
649 F.3d 1361 (Fed. Cir. 2011) ..................................................................................... 4

*FANUC Robotics Am., Inc. v. United States*,
393 F. Supp. 3d 1254 (Ct. Int'l Trade 2019) ................................................................ 8

*Irwin Indus. Tool Co. v. United States*,
920 F.3d 1356 (Fed. Cir. 2019) ................................................................................... 17

*Jarvis Clark Co. v. United States*,
733 F.2d 873 (Fed. Cir. 1984) ....................................................................................... 5

*Kahlen v. United States*,
2 Ct. Cust. App. 206 (1911) ........................................................................................... 7

*Keer, Maurer Co. v. United States*,
46 C.C.P.A. 110 (1959) ............................................................................................ 7, 10

*Keystone Automotive Operations, Inc. v. United States*,
732 F. Supp. 3d 1339 (Ct. Int'l Trade 2024) ..................................................... 4, 13, 17

*Marubeni Am. Corp. v. United States*,
35 F.3d 530 (Fed. Cir. 1994) ....................................................................................... 13

*ME Global, Inc. v. United States*,
633 F. Supp. 3d 1349 (Ct. Int'l Trade 2023) ................................................................ 6

*Mitsubishi Power Americas, Inc. v. United States*,
Court No. 21-00573, 2025 WL 1233625 (Ct. Int'l Trade Apr. 29, 2025) ........................ 6, 13, 15

*Nidec Corp. v. United States*,
861 F. Supp. 136, (Ct. Int'l Trade 1994),
*aff'd*, 68 F.3d 1333 (Fed. Cir. 2007) ................................................................... 8

*Optrex Am., Inc. v. United States*,
427 F. Supp. 2d 1177 (Ct. Int'l Trade 2006),
*aff'd*, 475 F.3d 1367 (Fed. Cir. 2007) ................................................................. 8, 11

*Peerless Clothing Int'l, Inc. v. United States*,
602 F. Supp. 2d 1309 (Ct. Int'l Trade 2009) .......................................................... 4

*Quantified Operations Ltd., et al. v. United States*,
Court No. 22-00178 (Ct. Int'l Trade) ................................................................. 5, 6

*QMS, Inc. v. United States*,
19 C.I.T. 551 (1995) ........................................................................................ 8

*Roche Vitamins, Inc. v. United States*,
791 F. Supp. 2d 1315 (Ct. Int'l Trade 2011) ........................................................ 4, 5

*Rollerblade, Inc. v. United States*,
116 F. Supp. 2d 1247 (Ct. Int'l Trade 2000) ......................................................... 12

*Selectile Co. v. United States*,
68 Cust. Ct. 176 (1972) .................................................................................... 7

*Sharp Microelectronics Tech., Inc. v. United States*,
932 F. Supp. 1499 (Ct. Int'l Trade 1996),
*aff'd*, 122 F.3d 1446 (Fed. Cir. 1997) .................................................................. 8

*W.R. Filbin & Co. v. United States*,
744 F. Supp. 289 (Ct. Int'l Trade 1990),
*aff'd*, 945 F.2d 390 (Fed. Cir. 1991) .................................................................... 7

**Harmonized Tariff Schedule Of The United States**

Chapter 84

Heading 8473 ........................................................................................ 5, 12

Subheading 8473.30.11 ........................................................................ *passim*

Subheading 8473.30.1180 ...................................................................................... *passim*

Explanatory Note 84.71(I)(A) ................................................................................ 11, 12

Note 5 ................................................................................................................ 10, 11, 12

Chapter 85

  Heading 8543 ................................................................................................................ 10

    Subheading 8543.90.68 ........................................................................................... 6, 7

Chapter 99

  Heading 9903

    Subheading 9903.88.03 ............................................................................................ 19

Note 20 (ttt)(iii)(108) ......................................................................................... *passim*

Note 20 (ttt)(iii)(109) ......................................................................................... *passim*

Note 20 (ttt)(iii)(110) ......................................................................................... *passim*

**Statutes**

19 U.S.C. § 1515 ..................................................................................................... 4

28 U.S.C. § 1581(a) ................................................................................................ 4

28 U.S.C. § 2640 ..................................................................................................... 4

28 U.S.C. § 2640(a) ................................................................................................ 4

28 U.S.C. § 2640(a)(1) ........................................................................................... 4

Section 301 of the Trade Act of 1974, Pub. L. 93-618, 99 Stat. 1978 (1975) .............................. 1

**Other Authorities**

HQ 964880 (Dec. 21, 2001) ................................................................................... 11

*Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,*
87 Fed. Reg. 17,380 (Mar. 28, 2022) ...................................................................... 3

*Notice of Modification of Section 301 Action: China's Acts. Policies, and Practices Relating to Technology Transfer, Intellectual Property, and Innovation*,
83 Fed. Reg. 47,974 (Sept. 21, 2018) ..................................................................... 3, 19

*Application*, *PCMag.com*,
https://www.pcmag.com/encyclopedia/term/application ........................................... 11

*Accessory*, *Merriam-Webster.com*,
https://www.merriam-webster.com/dictionary/accessory ........................................... 12

*Overclock*, *Merriam-Webster.com*,
https://www.merriam-webster.com/dictionary/overclock ........................................... 16

*Overclock*, *PCMag.com*,
https://www.pcmag.com/encyclopedia/term/overclock ............................................... 16

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN A. VADEN, JUDGE

_____
                                     :

ATLAS POWER LLC,                     :
                                     :
                      Plaintiff,        :
                                     :
                    v.              :     Court No. 23-00084
                                     :
UNITED STATES,                   :
                                     :
                    Defendant.     :
_____:

### DEFENDANT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant, the United States (the Government), submits this reply memorandum in opposition to plaintiff's, Atlas Power LLC (Atlas Power), motion for summary judgment and in further support of our cross-motion for summary judgment.

### INTRODUCTION

As more fully set forth in our cross-motion for summary judgment, this action concerns U.S. Customs and Border Protection (CBP)'s denial of Atlas Power's protest seeking the retroactive application of certain exclusions from 25 percent *ad valorem* duties imposed pursuant to Section 301 of the Trade Act of 1974, Pub. L. 93-618, 88 Stat. 1978 (1975) on its imported printed circuit assemblies. The imported printed circuit assemblies contain Cryptocurrency Mining Processors (CMPs) (the "CMP Boards") and are not subject to the exclusions.

We briefly highlight a few facts regarding the imported CMP Boards.[1] In early 2021, NVIDIA Corporation ("NVIDIA") manufactured the CMP Boards to fill a growing demand for

---

[1] A more fulsome discussion of the facts is set forth in our cross-motion for summary judgment.

cryptocurrency mining hardware.  *See* Def.'s Cross-Mot. for Summ. J. and Resp. in Opp. to Pl.'s

Mot. for Summ. J. ("Gov. Br.") at 2–3, ECF Nos. 48, 49 (Jan. 17, 2025); *see also* 2023 NVIDIA

Corporation Annual Review at 17–18, available at

https://s201.q4cdn.com/141608511/files/doc_financials/2023/ar/2023-Annual-Report-1.pdf (last

visited May 20, 2025) (NVIDIA "provided CMP products in an effort to address demand from

gamers and direct miners to CMP.").  NVIDIA designed the CMP Boards to be dedicated for

cryptocurrency mining.  *See* Def.'s Statement of Undisputed Material Facts ("DSOF") ¶ 7, ECF

Nos. 48-1, 49-1 (Jan. 17, 2025); *see also* Matt Wuebbling, "GeForce Is Made for Gaming, CMP

Is Made to Mine," NVIDIA Blog (Feb. 18, 2021), https://blogs.nvidia.com/blog/geforce-cmp/

(last visited May 20, 2025) ("CMP products — which don't do graphics — are sold through

authorized partners and optimized for the best mining performance and efficiency. . . . With

CMP, we can help miners build the most efficient data centers[.]").  In designing the CMP

Boards, NVIDIA tailored the product such that it would mine cryptocurrency quickly with low

energy use, thus reducing the cost to mine cryptocurrency and increasing the value of the mining

operation.  *See* DSOF ¶ 9.  To do so, NVIDIA excluded features from the CMP Boards that

would have otherwise increased its power consumption, including the ability to render images or

process graphics.  *See* DSOF ¶¶ 17–28, 31.  This made the product attractive to professional

cryptocurrency miners, such as Atlas Power.  *See* PSOF Ex 3; DSOF ¶ 29–30.

Atlas Power imported 9,960 units of the CMP Boards and admitted the merchandise into

a Foreign Trade Zone (FTZ).  DSOF ¶ 39.  Atlas Power then entered the merchandise into the

commerce of the United States and classified its products under subheading 8473.30.11 of the

Harmonized Tariff Schedule of the United States (HTSUS), which at the time was subject to

Section 301 duties.  *See* Pl.'s Statement of Material Facts ("PSOF") ¶ 5–6, ECF No. 45-2 (Nov.

13, 2024); *see also Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Relating to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (Sept. 21, 2018). Before liquidation of Atlas Power's entries of the CMP Boards, Atlas Power requested that CBP apply retroactive Section 301 exclusions that were reinstated by the U.S. Trade Representative (USTR). PSOF ¶ 7. Atlas Power sought relief from Section 301 duties based on any one of three reinstated exclusions:

> (108) Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules") (described in statistical reporting number 8473.30.1180).

> (109) Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules") (described in statistical reporting number 8473.30.1180).

> (110) Printed circuit assemblies, constituting unfinished logic boards (described in statistical reporting number 8473.30.1180).

Notes 20(ttt)(iii)(108)–(110), Ch. 99, HTSUS; *see also Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 17,380 (Mar. 28, 2022). CBP denied the request and liquidated the entries as entered by Atlas Power. PSOF ¶ 8.

As discussed below, Atlas Power is not entitled to an exclusion from Section 301 duties because the CMP Boards are not described in statistical reporting number 8473.30.1180. Even if the CMP Boards were described in that statistical reporting number, the CMP Boards are not covered by the product description in any of the three exclusions above. Finally, certain units of the CMP Boards admitted to the FTZ on October 6, 2021 are not covered by any of the exclusions because they were admitted as privileged foreign merchandise before the retroactive effective date of the exclusions.

## ARGUMENT

**I.    This Court's Review Is *De Novo* and It Has an Independent Duty to Arrive at the Correct Result**

As a preliminary matter, plaintiff misstates the standard of review when it asserts that this Court is somehow constrained in evaluating the correctness of the classification of its merchandise. *See* Pl.'s Reply and Resp. to Cross-Mot. For Summ. J. ("Pl. Resp. Br.") at 2–3, ECF No. 55 (Apr. 15, 2025). This case is before the court pursuant to 28 U.S.C. § 1581(a), following the denial of a protest under 19 U.S.C. § 1515. *See* Third Amend. Compl. ¶¶ 1, 5, ECF No. 39 (Sept. 26, 2024). In cases brought under section 1581(a), this Court will "make its determination upon the basis of the record made before [it]." 28 U.S.C. § 2640(a)(1). Such reviews are performed *de novo*, and, in cases involving classification under the HTSUS, the Court applies the General Rules of Interpretation (GRIs) and the Additional Rules of Interpretation (ARIs) to determine the correct tariff provision and any applicable Chapter 99 exclusion. *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011); *Bausch & Lomb, Inc. v. United States*, 957 F. Supp. 281, 284 (Ct. Int'l Trade 1997), *aff'd*, 148 F.3d 1363 (Fed. Cir. 1998); *Keystone Automotive Operations, Inc. v. United States*, 732 F. Supp. 3d 1339, 1346 (Ct. Int'l Trade 2024). This *de novo* review applies to both findings of fact and conclusions of law.[2] *See Peerless Clothing Int'l, Inc. v. United States*, 602 F. Supp. 2d 1309, 1315 (Ct. Int'l Trade 2009) (citing 28 U.S.C. § 2640(a)); *accord Roche Vitamins, Inc. v. United*

---

[2]  This is in contrast to other standards of review in 28 U.S.C. § 2640, many of which set forth reviews of agency action based on the record before the agency. In those cases, where the Court reviews agency *decision-making*, counsel may not provide *post hoc* rationalizations in lieu of an agency's stated reasons to defend the agency action. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962) (stating that "courts may not accept appellate counsel's *post hoc* rationalizations for agency action" and that an agency decision must be upheld "on the same basis articulated in the order by the agency itself").

*States*, 791 F. Supp. 2d 1315, 1319 (Ct. Int'l Trade 2011).  It is therefore the Court's independent duty to arrive at "the correct result, by whatever procedure is best suited to the case at hand." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).

At issue in this case is whether the imported CMP Boards satisfy one of three reinstated exclusions to be exempt from Section 301 duties.  The merchandise is exempt from Section 301 duties if it satisfies the terms of the product description in one of the three exclusions and is described in statistical reporting number (SRN) 8473.30.8011.  But to be described in SRN 8473.30.1180, the merchandise must also be correctly classified under the appropriate heading (8473) and subheading (8473.30.11), meaning that the underlying primary classification must also be correct.  Thus, regardless of CBP's classification upon liquidation, the Court must independently determine whether the merchandise is correctly classified under subheading 8473.80.11, and further described in SRN 8473.30.1180, in addition to determining whether the CMP Boards meet the product description in the exclusions.  *See Jarvis Clark*, 733 F.3d at 878; *see also* Notes 20(ttt)(iii)(108)–(110), Ch. 99, HTSUS.  If the merchandise is not classified in subheading 8473.30.11, HTSUS, and thus not covered by an exclusion from Section 301 duties, the Court has an independent duty to determine if the merchandise is still subject to Section 301 duties under the correct classification.  *See Jarvis Clark*, 733 F.3d at 878.

Accordingly, in this *de novo* review, the Government is not bound to defend an incorrect classification by CBP.[3]  *See id.* at 876 (rejecting a requirement that the court "affirm an incorrect government decision"); *see also Order* at 6, *Quantified Operations Ltd., et al., v. United States*,

---

[3] Deference is also inapplicable here.  As plaintiff itself acknowledges, there is no CBP ruling in this case to which the Court could defer.  *See* Pl. Resp. Br. at 3.  Therefore, plaintiff's citation to *Cummins*, and to *Mead* and *Skidmore*, misses the mark.  No deference is required here, nor was any deference sought by the Government.

No. 22-00178, ECF No. 38 (Ct. Int'l Trade May 5, 2025) ("[B]ecause this Court reviews classification decisions de novo, Customs sometimes changes its classification position when a case arrives before the Court.").  Indeed, it is not unusual for the Government's classification position to change following close consideration of the merchandise.  *See, e.g.*, *Mitsubishi Power Americas, Inc. v. United States*, No. 21-00573, 2025 WL 1233625 at *4 (Ct. Int'l Trade Apr. 29, 2025) ("The government appears to retreat from Customs' original classification of the [subject merchandise.] . . . Like Customs' original classification, this subsection would make the [merchandise] subject to additional duties under Section 301[.]"); *ME Global, Inc. v. United States*, 633 F. Supp. 3d 1349, 1357 (Ct. Int'l Trade 2023) ("While Customs classified, at entry, the subject rods under HTSUS heading 7228.30.80 . . . it now argues [in litigation] that the rods should be classified under HTSUS chapter 72, heading 7228, subheading 7228.40.00[.]").

Here, we contend that the primary classification is incorrect as discussed in our cross-motion for summary judgment.  *See* Gov. Br. 12–19.  Because the CMP Boards are not described in the SRN identified in the exclusions at issue, the underlying classification is also incorrect and the merchandise should instead fall under subheading 8543.90.68, HTSUS, as parts of machines with individual functions.  Atlas Power did not address the merits of this classification nor dispute that the CMP Boards are classified in subheading 8543.90.68 if they are not classified in subheading 8473.30.11.  *See* Pl. Resp. Br. 4.

## II.    The CMP Boards Are Not Described in the Relevant Statistical Reporting Number Because They Are Not Parts or Accessories Suitable for Use Solely or Principally with Automatic Data Processing Machines

In order for any of the three exclusions to apply, the CMP Boards must be classified in subheading 8473.30.11, HTSUS, and further described in statistical reporting number 8473.30.1180, HTSUS Annotated.  Subheading 8473.30.11 covers "Parts and accessories (other

than covers, carrying cases and the like) suitable for use solely or principally with machines of headings 8470 to 8472: . . . Parts and accessories of the machines of heading 8471 [(automatic data processing (ADP) machines)]: . . . printed circuit assemblies." Subheading 8473.30.11, HTSUS. The statistical suffix "80" is a basket category at the ten-digit level for printed circuit assemblies "other" than memory modules. *See* SRN 8473.30.1180, HTSUS Annotated. For the CMP Boards to fall under subheading 8473.30.11, therefore, it must be a part or accessory suitable for use solely or principally with ADP machines.

As discussed further below, the CMP Boards are not classified in subheading 8473.30.11 because, although a part of a machine, the CMP Boards are not suitable for use solely or principally with an ADP machine. Because the CMP Boards are not classified under subheading 8473.30.11, they are not "described in statistical reporting number 8473.30.1180" as required by all three exclusions in Notes 20(ttt)(iii)(108) through (110). Rather, the CMP Boards are classified as parts of machines with individual functions of subheading 8543.90.68, HTSUS. *See* Gov. Br. 17–19.

### A. The CMP Boards Are Not "Suitable for Use Solely or Principally" with Automatic Data Processing Machines of Heading 8471

The term "'suitable for use' as applied in the Customs law means 'actually, practically, and commercially fit' for such use." *W.R. Filbin & Co. v. United States*, 744 F. Supp. 289, 291 (Ct. Int'l Trade 1990), *aff'd*, 945 F.2d 390 (Fed. Cir. 1991) (citing *Kahlen v. United States,* 2 Ct. Cust. App. 206, 208 (1911); *Keer, Maurer Co. v. United States*, 46 C.C.P.A. 110 (1959)); *see also Selectile Co. v. United States*, 68 Cust. Ct. 176, 177 (1972). "Such suitability does not require that the merchandise be chiefly used for the stated purpose, but it does require more than evidence of a casual, incidental, exceptional, or possible use. There must be a substantial actual use." *Keer, Maurer Co.*, 46 C.C.P.A at 114 (internal citations and quotations omitted).

Several factors demonstrate that the CMP Boards are suitable for use solely or principally with mining machines and not ADP machines.  *See* Gov. Br. 13–17.  First, the CMP Boards are known as—and to the extent applicable, belong to a class or kind of merchandise[4] known as—Cryptocurrency Mining Processors.  *See* DSOF ¶¶ 11, 18.  As indicated in our cross-motion, the CMP Boards manufactured by NVIDIA belong to NVIDIA's category of merchandise for "coin mining" or "crypto mining," *see* Gov. Br. 24 and DSOF ¶ 18, and CMP itself stands for "Crypto Currency Mining Processor."  DSOF ¶ 11 (citing Deposition of NVIDIA designee Yishang Chen ("Chen Dep.") at 24:12-13).  Further, in its 2023 Annual Report, cited by plaintiff, NVIDIA indicates that its CMP revenue is separate from its four other large revenue sources, wherein NVIDIA may be selling parts suitable for use solely or principally with ADP machines: Data Center, Gaming, Professional Visualization, and Automotive.  *See* Pl. Ex. 31.  NVIDIA's categorization of its own merchandise demonstrates that the CMP Boards are actually, practically, and commercially fit for mining machines, not ADP machines.

Second, the CMP Boards were "designed" and "dedicated" for professional mining of cryptocurrency.  DSOF ¶ 7 (citing PSOF Ex. 15 (outlining the specification of the CMP 170HX)).  Unlike other printed circuit assemblies for use with ADP machines, the CMP Boards were dedicated for professional mining through several features and limitations built into the

---

[4]  Many cases determining whether merchandise falls under heading 8473 have not invoked a "class or kind" analysis under ARI 1(a).  *See generally FANUC Robotics Am., Inc. v. United States*, 393 F. Supp. 3d 1254 (Ct. Int'l Trade 2019); *Apple Inc. v. United States*, 375 F. Supp. 3d 1288 (Ct. Int'l Trade 2019), *aff'd*, 964 F.3d 1087 (Fed. Cir. 2020); *Optrex Am., Inc. v. United States*, 427 F. Supp. 2d 1177 (Ct. Int'l Trade 2006), *aff'd*, 475 F.3d 1367 (Fed. Cir. 2007); *Brother Int'l Corp. v. United States*, 248 F. Supp. 3d 1224 (Ct. Int'l Trade 2002); *QMS, Inc. v. United States*, 19 C.I.T. 551 (1995); *Nidec Corp. v. United States*, 861 F. Supp. 136, (Ct. Int'l Trade 1994), *aff'd*, 68 F.3d 1333 (Fed. Cir. 1995).  *But see Sharp Microelectronics Tech., Inc. v. United States*, 932 F. Supp. 1499, 1505 (Ct. Int'l Trade 1996), *aff'd*, 122 F.3d 1446 (Fed. Cir. 1997).

CMP Boards.  DSOF ¶ 7, 17, 18; *see also* Gov. Br. 24–25.  The CMP Boards have no display outputs, low peak core voltage and frequency, small memory size, and low interconnect speed. DSOF ¶ 28.  Moreover, the CMP Boards are configured for multiple boards to be installed closely together in a specialized motherboard and cooled passively using an external fan within one chassis, *see* DSOF ¶ 6 and PSOF Ex. 5 (Dr. Beckmann Expert Report) at 5, which is common in commercial mining operations.  *See, e.g.,* Pl. Ex. 13.  The CMP Boards utilize the same parallel computing power of a traditional graphics processing unit (GPU) to efficiently (*i.e.,* with low energy use) mine cryptocurrency.[5]  Such limitations render the CMP Boards practically and commercially fit for use in cryptocurrency mining machines.

Finally, not only were the CMP Boards limited to cryptocurrency mining, but they were sold specifically to professional miners by private sale.  *See* PSOF Ex. 10 (Chen Dep. 62:7–9 (stating that the CMP Boards were not a "retail" card available to the public); Chen Dep. 28:25–29:3 (stating that the CMP Boards were sold for "crypto currency mining.")).  NVIDIA's sales of the CMP Boards were to those customers that actually, and professionally, mine cryptocurrency.

In response, plaintiff argues that the sole or principal use of the subject merchandise was as parts of or accessories to an ADP system.  *See* Pl. Resp. Br. 4–5.  But plaintiff provides no explanation, or evidence, aside from a reference to NVIDIA's 2023 Annual Report, as to how the CMP boards are "suitable for use principally" used with ADP machines, rather than mining ones.

---

[5]  Plaintiff argues that the CMP Boards are GPUs, or a kind of GPU, and thus belong to a class or kind of merchandise currently known in commerce as GPUs.  But any "class or kind" of merchandise classified in subheading 8473.11.30 cannot simply be defined as (all) GPUs.  Foe example, NVIDIA itself has been manufacturing GPUs for use in automobiles to handle advanced driver-assistance systems and infotainment.  *See* Computing in Tomorrow's Automobiles, NVISION, https://www.nvidia.com/content/nvision2008/tech_presentations/ automotive_track/nvision08-gpu_computing_in_tomorrows_automobiles.pdf (last visited May 20, 2025); *see also See* Pl. Ex. 31.  Such "GPUs" installed in vehicles are not suitable for use principally or solely with ADP machines, but with automobiles.

*See id.* at 5; Pl. Ex. 31.  Besides, NVIDIA's 2023 Annual Report does not further plaintiff's argument.  Plaintiff claims that only four percent of NVIDIA's sales were to Atlas Power, but the NVIDIA Annual Review does not identify any details for its sales of its other CMP products.  Thus the Court cannot conclude, based on the 2023 Annual Report, that the other 96 percent of revenue corresponds to sales of the merchandise representing a "substantial actual use" with an ADP machine.  *Keer, Maurer Co.*, 46 C.C.P.A at 114.  Rather, as discussed above, the evidence shows that CMP Boards were sold to professional miners using mining machines.  At best, plaintiff has merely identified a casual, incidental, exceptional, or possible use with ADP machines in claiming that CMP Boards could be connected to the motherboard of an ADP machine.  *See* Pl. Resp. Br. 8.  But based on the factors above, the CMP Boards, and cryptocurrency mining processors generally, are actually, practically, and commercially fit for use principally with mining machines, *i.e.*, machines with individual functions of heading 8543, and not ADP machines.

> **B.    Atlas Power's Machines Are Not Automatic Data Processing Machines**

Contrary to plaintiff's argument, as further evidence that the CMP Boards are not suitable for use solely or principally with ADP machines, Atlas Power itself used the CMP Boards in machines that are not ADP machines.  *See* Pl. Resp. Br. 5–13.  As we explained in our cross-motion, *see* Gov. Br. 13–17, the Atlas Power machines were not "freely programmed in accordance with the requirements of the user" and thus do not meet the requirement of ADP machines.  *See* Note 5, Ch. 99, HTSUS (renumbered to Note 6).  Plaintiff claims that its mining machines contain all of the components that are also present on ADP machines, arguing for a hardware-specific approach to reviewing the freely programmable prong of Note 5 to Chapter

84, HTSUS.  *See* Pl. Resp. Br. 5–9.[6]  *Id.*  But the term "capable of being freely programmed"
refers to the level of customization made available to the user within the operating system, and
does not merely consider the components forming part of the machine.

In *Optrex*, for example, the court noted that a freely programmable ADP machine "is one
that applications can be written for, does not impose artificial limitations upon such applications,
and will *accept new applications* that allow the user to manipulate the data as deemed necessary
by the user."  *Optrex Am., Inc. v. United States*, 475 F.3d 1367, 1370 (Fed. Cir. 2007) (emphasis
in original) (citing HQ 964880 (Dec. 21, 2001) and Explanatory Note 84.71(I)(A)).  This Court
provided examples of such applications: those for tax preparation, spreadsheet reports, word
processing, or video games.  *See Optrex Am., Inc. v. United States*, 427 F. Supp. 2d 1177, 1191,
1196 (Ct. Int'l Trade 2006) ("Customs interprets [the] term ['program'] as referring to an
'application-type' program that has been written to do a specific function.").  An "application" is
a "software that is used for business or entertainment[, *i.e.*,] spreadsheets such as Excel [or]
media players such as iTunes."  *Application*, PCMag.com, https://www.pcmag.com/
encyclopedia/term/application (last visited May 20, 2025).  "However, the term specifically
excludes essential control software such as the operating system."  *Id.*  Therefore, the term
"freely programmed" refers to the ability to accept and use a variety of *application software*, not
system control software.

---

[6] Plaintiff's arguments are entirely inconsistent.  On the one hand, plaintiff asks the court
to ignore any operating system software on its mining machines to determine whether such
machines are "freely programmable" under Note 5 to Chapter 84.  On the other hand, as
discussed further below, plaintiff asks the Court to consider software to determine whether the
merchandise is "unfinished" for purposes of Note 20(ttt)(iii)(110) to Chapter 99.  Either a
machine of Chapter 84 is considered with its software, or it is not.  Plaintiff cannot have it both
ways.

Thus, that a new operating system, or "system control software," could be installed on the hardware of the machines does not render the Atlas Power mining machines freely programmable under Note 5. In this case, the operating system present on the mining machines was designed with "very focused functionality" to run only fixed cryptocurrency mining applications. DSOF ¶ 32, 36; *see also* EN 84.71(I)(A) ("[M]achines which operate only on fixed programs, that is programs which cannot be modified by the user, are excluded even though the user may be able to choose between a number of such fixed programs."). Atlas Power never used the machines with the CMP Boards for any other function. DSOF ¶ 32.

Finally, contrary to plaintiff's arguments, the CMP Boards are not "accessories" suitable for use solely or principally with ADP machines. *See* Pl. Resp. Br. 13–14. This Court defined an accessory in heading 8473 as "something that relates directly to and serves a secondary or subordinate function to the item accessorized." *Apple Inc. v. United States*, 375 F. Supp. 3d 1288, 1300 (Ct. Int'l Trade 2019), *aff'd*, 964 F.3d 1087 (Fed. Cir. 2020) (citing dictionary definitions and *Rollerblade, Inc. v. United States*, 116 F. Supp. 2d 1247, 1253 (Ct. Int'l Trade 2000); *see also* accessory, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/accessory (last visited May 20, 2025) ("[A]n object or device that is not essential in itself but adds to the beauty, convenience, or effectiveness of something else . . . a thing of secondary or lesser importance."). Here, the CMP Boards, although relating directly to the mining machines, are not serving a secondary or subordinate function. The CMP Boards are the components which actually mine the cryptocurrency for the machine. The metric used to determine the effectiveness of cryptocurrency mining is the hash rate, which is the most important function of the mining machines and is provided by the CMP Board. *See* DSOF ¶ 30.

Thus, the CMP Boards perform the primary—and only—function of such machines. *See* DSOF ¶ 32, 36, 38, 47.

Accordingly, the CMP Boards are not described in statistical reporting number 8473.30.1180, HTSUS.

**III.    <u>The CMP Boards Are Not Covered by the Terms of the Exclusions from Section 301 Duties</u>**

Even if the subject CMP Boards were described in statistical reporting number 8473.30.8011, which they are not, the CMP Boards also do not meet the product descriptions in any of the three exclusions at issue. Determining whether a product is covered by the terms of an exclusion in Chapter 99 begins, as it must, with the meaning of the terms of the exclusion. *See Keystone Automotive Operations*, 732 F. Supp. 3d at 1346 (applying the GRIs and ARIs to review whether merchandise was covered by the language of a Section 301 exclusion). When identifying what a tariff term means, the Court looks to its use "as part of the 'common core language of trade.'" *Mitsubishi Power*, 2025 WL 1233625 at *3 (citing *Blue Sky Color of Imagination, LLC v. United States*, 698 F. Supp. 3d 1243, 1248 (Ct. Int'l Trade 2024)); *see also Marubeni Am. Corp. v. United States*, 35 F.3d 530, 533 (Fed. Cir. 1994) ("The [Harmonized Tariff] System provides a common core language for trade"). Here, the three proposed exclusions cover "unfinished logic boards," "printed circuit assemblies for rendering images onto computer screens," and "printed circuit assemblies to enhance the graphics performance of automatic dated processing machines." As discussed below, plaintiff fails to demonstrate that its merchandise meets the product description for any of these exclusions.

**A.    The CMP Boards Are Not "Unfinished Logic Boards"**

In its response brief, plaintiff argues that the Government asks the Court to interpret the product description for "unfinished logic boards" by reference only to the exclusion request. *See*

Pl. Resp. Br. 15; Note 20(ttt)(iii)(110), Ch. 99, HTSUS.  Plaintiff misconstrues our position.  In our cross-motion, we argued that the term "unfinished logic board" must be read to describe a product used in the commerce of the United States.  We explained that the term "logic board" can be defined broadly in electrical engineering terms to refer to a printed circuit board assembly with a series of logic gates and also to a computer's main board, or motherboard.  *See* Gov. Br. 25–26 (citing dictionary definitions).  The lexicographic sources cited by the Government indicated that, as applied to general purpose computing, a "logic board" refers to a motherboard.  *Id.* at 26.  We then explained that, coupled with the term "unfinished," the product exclusion in Note 20(ttt)(iii)(110) best describes a motherboard because such boards are printed circuit assemblies that host integrated circuits or other printed circuit assemblies—referred to as daughterboards—for the product to be used as intended, *i.e.*, as a "completed" logic board.  *Id.* at 27.

For additional context, we noted, *inter alia*, that Apple uses the term "logic board" to refer to a main board or motherboard, and that Apple had sought the exclusion.  *Id.* at 28.  As we acknowledged in our cross-motion, the scope of the exclusion is covered by the product descriptions for a particular exclusion, and not those set out in any particular request for an exclusion.  *Id.*  But the language of the request uses the same language as that of the exclusion, *i.e.*, "logic board."  *See* Gov. Ex. 14.  In making this observation, the Government does not seek to look to one description over another but rather to provide context for the use of the term "logic board"—a term that carries more than one meaning.  Thus, contrary to plaintiff's argument, the Government did not ask the Court to ignore the proper interpretative mechanism for Section 301 exclusions.

Plaintiff then argues, again, that the CMP Boards are "unfinished" logic boards because "in its condition as imported" the merchandise was "inoperable," "did not meet customer specifications," "lacked a functioning VBIOS," and "lacked application software." *See* Pl. Resp. Br. 16. Plaintiff's argument fails on all points. First, Plaintiff equates the term "unfinished" with "inoperable" or "not functioning." Plaintiff again provides no basis for this conclusion and failed to address the Government's interpretation of the term "unfinished," based on authoritative and reliable lexicographic sources, as meaning that the product lacks any part, item, or element. *See* Gov. Br. 29–30.[7] As we explained in our cross-motion, at the time of importation, the CMP Boards contained all necessary and intended components—including a Video Basic Input/Output System (VBIOS), which was listed in the bill of materials and confirmed by NVIDIA to be contained within the CMP Boards at the time of exportation—and was thus not lacking any part, item, or element. As indicated above, the Court "looks to identify what [a] tariff term would mean if used as part of the 'common core language of trade.'" *Mitsubishi Power*, 2025 WL 1233625, at * 3. It is illogical that, in commerce or in trade, an HTSUS term refers to a product that is not operable or not functioning, despite it containing all the necessary parts and components intended by the manufacturer. Moreover, the record does not support the claim that the merchandise was inoperable. It instead only speaks to a situation where Atlas Power could not operate the CMP Board.

Second, contrary to plaintiff's claim, Atlas Power was able to operate the CMP Boards with the original VBIOS. DSOF ¶ 44. Atlas Power just did not reach the advertised mining

---

[7] In our cross-motion, we inadvertently indicated that "'unfinished' as it relates to a product or good means an article that is not [sic] lacking any part, item, or element" when intending to mean that such unfinished products *are* lacking any part, item or element. *See* Gov. Br. 30.

speed and thus sought an updated VBIOS. But the fact that the CMP Boards *did* use the included VBIOS when the merchandise was mining demonstrates that the CMP Boards did not lack a functioning VBIOS. Regardless, even if the VBIOS was not functioning, the CMP Boards did contain a VBIOS and was thus not unfinished.

Third, plaintiff has not explained what "customer specifications" were not met such that the merchandise was unfinished. As NVIDIA testified, Atlas Power sought to "overclock" the CMP Boards to reach higher mining speeds. *See* DSOF ¶ 44–45. Overclocking is the process of speeding up a processor beyond the manufacturer's recommendation. *See* overclock, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/overclock (last visited May 20, 2025); overclock, PCMag.com, https://www.pcmag.com/encyclopedia/term/overclock (last visited May 20, 2025). Based on NVIDIA's testimony, therefore, the merchandise was already reaching the manufacturer's recommended speed and was thus operable and functioning at the time of importation.

Finally, contrary to plaintiff's claim and as we explained in our cross-motion, Gov. Br. 31–32, the CMP Boards do not host any "application software"—meaning that the CMP Boards cannot lack any such software to be unfinished. The application software (*i.e.*, the Linux driver) was installed on Atlas Power's mining machines, not on the CMP Boards.

Accordingly, the CMP Boards at the time of importation were not "unfinished logic boards" and are not covered by the exclusion in Note 20(ttt)(iii)(110).

**B.    The CMP Boards Do Not Render Images onto a Computer Screen nor Enhance the Graphics Performance of Automatic Data Processing Machines**

The CMP Boards are also not covered by the two other exclusions, which cover "printed circuit assemblies for rendering images onto computer screens" and "printed circuit assemblies

to enhance the graphics performance of [ADP] machines." *See* Notes 20(ttt)(iii)(108)–(109), Ch. 99, HTSUS. As we explained in our cross-motion, the CMP Boards perform neither of those functions. *See* Gov. Br. 20–25. The CMP Boards are physically incapable of rendering an image on a computer screen and do not enhance any "graphics" for ADP machines. *Id.* In its response, plaintiff fails to explain how its merchandise meets the product description for these exclusions. Instead, plaintiff again argues that the CMP Boards are "a kind of" GPU, and because the exclusions cover "all GPUs," its merchandise is excluded from Section 301 tariffs. *See* Pl. Resp. Br. 17.

First, plaintiff provides no basis for its argument and does not even specify which of the two exclusions it claims covers GPUs. Plaintiff essentially claims that all GPUs, even products repurposed from a GPU, are excluded from Section 301 generally without any substantiation. *See* Pl. Resp. Br. 16–17. Yet the correct interpretation of the tariff must begin with the "proper meaning of the relevant provisions." *See Irwin Indus. Tool Co. v. United States*, 920 F.3d 1356, 1359 (Fed. Cir. 2019) ("The first step [of a classification determination] is the interpretation of the proper meaning of the relevant tariff provisions."); *see also generally Keystone Automotive Operations, Inc*, 732 F. Supp. 3d 1339 (applying traditional tariff interpretive tools to the review of a Section 301 exclusion). Thus, the "right" question is not whether the CMP Boards "are articles that are included in a general class or kind of merchandise that is excluded from 301 Tariffs," *see* Pl. Resp. Br. 17, but rather whether the CMP Boards meet the *terms* of the exclusions. Plaintiff has not shown how the CMP Boards meet those terms here. The USTR did not promulgate any exclusion for "all kinds of GPUs." Rather, the excluded printed circuit assemblies are described based on their ability to either render images or enhance graphics. The CMP Boards are incapable of doing either. *See* Gov. Br. 19–25.

Moreover, contrary to plaintiff's argument, the Government is not asking the court "to disqualify the subject merchandise based on its actual use." *See* Pl. Resp. Br. 17. Indeed, throughout its brief, the Government focused not on how the merchandise was actually used, but on the physical characteristics and specifications of the CMP Boards. *See* Gov. Br. at 19–25. As we explained in our cross-motion, the CMP Boards are physically incapable of rendering an image or enhancing graphics processing, as it has no display output, lacks ray tracing abilities, has no video/audio engines, and cannot otherwise generate, manipulate, construct, or transmit an image or graphics. *See* Gov. Br. 21, 23–24. All of these elements demonstrate that the CMP Boards cannot render images onto a computer screen nor enhance the graphics performance of an ADP machine.

Accordingly, the CMP Boards are not covered by the exclusions in Notes 20(ttt)(iii)(108) or (109).

## IV. <u>The Merchandise Admitted before the Effective Date of the Exclusion Includes More Than Those in Entry No. 8GF-2000360-5</u>

Plaintiff concedes that "the subject merchandise covered by Entry No. 8GF-2000360-5 was entered into the commerce of the United States prior to the effective date of the retroactive . . . exclusions." Pl. Resp. Br. 18. However, there are more units of CMP Boards than those contained in Entry No. 8GF-2000360-5 that were admitted prior to the effective date of the exclusion and should not be considered by the Court here.

Plaintiff misapprehends the applicable law concerning admissions of merchandise into Foreign Trade Zones as it relates to the effective date of the exclusions. As we indicated in our cross-motion, Atlas Power admitted 5,160 units of the CMP Boards on October 6, 2021 as privileged foreign merchandise under Admission No. 0400010A1212029526. *See* Gov. Ex. 7 at 1 (first spreadsheet), ECF No. 49-9 (Jan. 17, 2025); Gov. Ex. 6 at 2–11, ECF No. 49-8 (Jan. 17,

2025).  These 5,160 units were then entered for consumption under line 001 of Entry No. 8GF-200360-5 (3,045 units), as well as under line 001 of Entry No 8GF-2000378-7 (2,052 units) and line 002 of Entry No. 8GF-2000384-5 (63 units).  *See* Gov. Ex. 7 at 2 (second spreadsheet); *see also* Protest and Entries, ECF No. 15-1 at 75–78 (Entry No. 8GF-2000360-5), 94–96 (Entry No. 8GF-2000378-7), 132–34 (Entry No. 8GF-2000384-5) (June 28, 2023).  When admitting this merchandise into an FTZ as privileged foreign merchandise on October 6, 2021, Atlas Power "locked in" the duty rate applicable on that date.  Thus, the duty rate applicable to these CMP Boards—the rate in effect, even retroactively, on October 6, 2021—includes the Section 301 duties on merchandise of subheading 8473.30.11, HTSUS.  *See* 83 Fed. Reg. 47,974; Subheading 9903.88.03, HTSUS.

Therefore, even if the CMP Boards meet the product description for any of the exclusions and are described in statistical reporting number 8473.30.1180, the CMP Boards in Entry No. 8GF-200360-5, as well as the CMP Boards on line 001 of Entry No. 8GF-2000378-7 and line 002 of Entry No. 8GF-2000384-5 are still subject to the 25 percent *ad valorem* rate under Section 301 because the October 6, 2021 admissions of these CMP Boards into an FTZ as privileged foreign merchandise predate the effective date of the retroactive application of the exclusions.  Thus, the Court should dismiss plaintiff's claims as to these 5,160 units of CMP Boards.

## **CONCLUSION**

For the reasons above, and those set forth in our cross-motion for summary judgment, we respectfully request that this Court grant our cross-motion for summary judgment and dismiss this action.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

*Of Counsel:*                                        /s/ Mathias Rabinovitch
                                                     MATHIAS RABINOVITCH
SABAHAT CHAUDHARY                                    Trial Attorney
Office of the Associate Chief Counsel                U.S. Department of Justice, Civil Division
Trade & Finance                                      Commercial Litigation Branch
U.S. Customs and Border Protection                   26 Federal Plaza, Room 346
                                                     New York, New York 10278
                                                     (212) 264-0484
May 20, 2025                                          *Attorneys for Defendant*

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| _____ : | |
| ATLAS POWER LLC, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Court No. 23-00084 |
| : | |
| UNITED STATES, : | |
| : | |
| Defendant. : | |
| _____ : | |

## **CERTIFICATE OF COMPLIANCE**

I, MATHIAS RABINOVITCH, a trial attorney in the Office of the Assistant Attorney

General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is

responsible for the foregoing reply brief in support of defendant's cross-motion for summary

judgment, relying upon the word count feature of the word processing program used to prepare

the brief, certify that this brief complies with type-volume limitation under USCIT Standard

Chamber Procedure 2(B) and contains 6,024 words.

/s/ Mathias Rabinovitch
MATHIAS RABINOVITCH