Slip Op. 26-4

## UNITED STATES COURT OF INTERNATIONAL TRADE

ATLAS POWER LLC,

      Plaintiff,

v.

UNITED STATES,

      Defendant.

Before: Lisa W. Wang, Judge

Court No. 23-00084

### Opinion and Order

[Granting in part and denying in part Plaintiff's motion for summary judgment and granting in part and denying in part Defendant's cross motion for summary judgment.]

Dated:    January 27, 2026

J. Kevin Horgan, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiff Atlas Power LLC. With him on the brief was Merisa A. Horgan.

Mathias Rabinovitch, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, of New York, NY, argued for Defendant United States. With him on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Aimee Lee, Assistant Director. Of Counsel on the brief was Sabahat Chaudhary, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Wang, Judge: Before the court are cross motions for summary judgment. Pl.'s

Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 45; Def.'s Cross Mot. for Summ. J. and Resp.

in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 49. Plaintiff Atlas Power LLC

("Plaintiff" or "Atlas") challenges U.S. Customs and Border Protection's ("Customs")

denial of its protest against the assessment of duties imposed under section 301 of the

Trade Act of 1974 ("section 301 duties") on NVIDIA Crypto Mining Processor ("CMP")

170HX printed circuit assemblies ("imported merchandise" or "CMP Boards"), which

were imported by Plaintiff from October 5, 2021, through November 1, 2021. Third Am.

Compl. ¶ 1, ECF No. 39; see Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. § 301,

1978, 2041 (1974) (codified as amended at 19 U.S.C. § 2411). Plaintiff argues that the

imported merchandise was properly classified by Customs under subheading

8473.30.1180 of the Harmonized Tariff Schedule of the United States ("HTSUS") and

meets the definitions of the exclusions from the assessment of section 301 duties

provided in U.S. Notes 20(ttt)(iii)(108) through (110). Pl.'s Mot. at 16; see also HTSUS

8473.30.1180 (2021). The United States ("Defendant" or "government") cross moves for

summary judgment, arguing that the imported merchandise is properly classified under

HTSUS subheading 8543.90.68 and, alternatively, even if the imported merchandise is

properly classified under HTSUS subheading 8473.30.1180, it does not meet the

definitions of the exclusions provided for in U.S. Notes 20(ttt)(iii)(108) through (110).[1]

Def.'s Mot. at 9; see also HTSUS 8543.90.68 (2021).

        For the following reasons, the court finds that the imported merchandise is:

(1) properly classified under HTSUS subheading 8473.30.1180; and (2) does not meet

---

[1] Defendant further claims that even if the CMP Boards fall within HTSUS subheading
8473.30.1180, a portion of the entries of imported merchandise are not covered by the
retroactive application of the exclusions from section 301 duties. Def.'s Mot. at 10.

Because the court concludes that the imported merchandise does not meet the
definitions of the exclusions set forth in U.S. Notes 20(ttt)(iii)(108) through (110) to be
excluded from the assessment of section 301 duties, it need not consider the effective
date of the retroactive exclusions.

the definitions of the exclusions provided in U.S. Notes 20(ttt)(iii)(108) through (110) as

articles excluded from section 301 duties.

## BACKGROUND

### I.    Procedural Background

Plaintiff entered four shipments of the imported merchandise from the People's

Republic of China ("PRC") into a foreign trade zone as privileged foreign merchandise in

October and November of 2021. Summons, ECF No.1. Plaintiff subsequently entered

the merchandise for consumption under cover of: (1) entry number 8GF-2000360-5 on

October 5, 2021; (2) entry number 8GF-2000378-7 on November 1, 2021; (3) entry

number 8GF-2000380-3 on November 12, 2021; and (4) entry number 8GF-2000384-5

on November 17, 2021. Id. On August 12, 2022, the entries auto liquidated at the

classification and rate of duty asserted at the time of entry under HTSUS subheading

8473.30.1180, which provides for "Parts and accessories (other than covers, carrying

cases and the like) suitable for use solely or principally with machines of headings 8470

to 8472 … parts and accessories of the machines of heading 8471 [i.e., automatic data

processing machines]." Third Am. Compl. ¶ 12.

At the time of entry, PRC-origin merchandise classified under HTSUS

subheading 8473.30.1180 was subject to section 301 duties of 25 percent ad valorem.

See Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices

Relating to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg.

47,974, 47,975 (USTR Sept. 21, 2018). On March 28, 2022, the Office of the United

States Trade Representative ("USTR") reinstated certain exclusions from section 301

duties that had previously been rescinded, making them retroactive to October 12,

2021. See Notice of Reinstatement of Certain Exclusions: China's Acts, Policies, and

Practices Related to Technology Transfer, Intellectual Property, and Innovation, 87 Fed.

Reg. 17,380, 17,382 (USTR Mar. 28, 2022) ("Reinstatement Notice").[2]

    Plaintiff filed a timely protest[3] concerning the imported merchandise on October

26, 2022, which Customs denied on November 21, 2022. Third Am. Compl. ¶ 14. In its

protest decision, Customs did not alter the tariff classification of the imported

merchandise under HTSUS subheading 8473.30.1180 and found that the CMP Boards

did not meet the descriptions for the exclusions from the assessment of section 301

duties. Pl.'s Ex. In Supp. of Mot. for Summ. J., Ex. 2, ECF No. 45-3 at 1, Appx000063

("Atlas Protest Decision").

    On April 19, 2023, Plaintiff commenced this action. Summons. Plaintiff filed a

motion for summary judgment on November 12, 2024. Pl.'s Mot. Defendant filed a cross

motion for summary judgment and response to Plaintiff's motion for summary judgment

on January 17, 2025. Def.'s Mot. On April 15, 2025, Plaintiff filed a reply in support of its

motion for summary judgment and a response to Defendant's cross motion for summary

judgment. Pl.'s Reply in Supp. of Mot. for Summ. J. & Resp. to Def.'s Cross Mot. for

Summ. J. ("Pl.'s Reply Br."), ECF No. 55. On May 20, 2025, Defendant filed a reply in

---

[2] The USTR announced that "the reinstated exclusions will apply to goods entered for consumption ... on or after ... October 12, 2021, that are not liquidated [or for which liquidation is not final]." Reinstatement Notice, 87 Fed. Reg. at 17,380 (USTR Mar. 28, 2022).

[3] In its protest, Plaintiff asserted that the imported merchandise was excluded from the assessment of section 301 duties as a result of the retroactive nature of the announced exclusions. Third Am. Compl. ¶ 14.

support of its cross motion for summary judgment. Def.'s Reply in Supp. of Cross Mot.

for Summ. J. ("Def.'s Reply Br."), ECF No. 58. On June 4, 2025, the court granted

Plaintiff's motion for leave to file a sur-reply and accepted Defendant's response to

Plaintiff's motion for leave to file a sur-reply. Pl.'s Mot. for Leave to File Sur-Reply, ECF

No. 59; Def.'s Resp. to Mot. for Leave to File Sur-reply, ECF No. 60. On June 4, 2025,

Plaintiff filed a sur-reply in further support of its argument. Pl.'s Sur-reply, ECF No. 62.

## II.    Description of the Imported Merchandise

The imported merchandise is the NVIDIA CMP 170HX, a printed circuit board

assembly ("PCA") incorporating: (1) a GA-100-105F-A1 graphics processing unit

("GPU")[4]; (2) eight gigabytes of onboard memory ("VRAM"); (3) eight megabits of

---

[4] A GPU is a specialized chip incorporated into a PCA that, when connected to a motherboard with a central processing unit ("CPU"), performs certain computations and tasks faster and more efficiently than a CPU alone. Pl.'s Ex. In Supp. of Mot. for Summ. J., Ex. 15, ECF No. 45-5 at 1, Appx001004 ("NVIDIA CMP 170HX Product Description Sheet"); see also What is a GPU?, Intel, https://www.intel.com/content/www/us/en/products/docs/processors/what-is-a-gpu.html (last visited Jan. 5, 2026).

The parties also use the term "GPU" to refer to the entire PCA, including the graphics processing chip and all other electrical and housing components incorporated onto the PCA. Def.'s Mot. at 3, n. 2; Pl.'s Mot. at 2–4.

For the purposes of this opinion, the term "GPU" hereinafter refers to a graphics processing chip or chipset that is mounted onto a PCA (i.e., the GA-100-105F-A1 GPU is incorporated onto the PCA of the CMP 170HX).

The term "graphics card" hereinafter refers to the fully assembled add-on peripheral card, including the PCA, the GPU, all other assembled components thereof, including any onboard memory, passive cooling system, power connectors, input and output interfaces, and any external enclosure or housing thereof. NVIDIA CMP 170HX Product Description Sheet at 1, Appx001004; Pl.'s Ex. In Supp. of Mot. for Summ. J., Ex. 4, ECF

electrically erasable programmable read-only memory ("EEPROM"); and (4) all other

electronic components such as capacitors, resistors, and other ancillary components;

which are (5) encased in a protective aluminum enclosure with connection ports for

power and extruding data transmission connectors. Pl.'s Ex. In Supp. of Mot. for Summ.

J., Ex. 7, ECF No. 45-4 at 10, Appx000235 ("Expert Rep. of Dr. Gerhard Beckmann");

Pl.'s Ex. In Supp. of Mot. for Summ. J., Ex. 10, ECF No. 45-4 at 18:13–19, Appx000510

("Dep. of NVIDIA Designee Yisheng Chen").

 Cryptocurrency miners[5] use the imported merchandise for cryptocurrency mining

because the GPUs on the CMP Boards are equipped with numerous arithmetic logic

units that can carry out the mathematical computations necessary for cryptocurrency

mining in parallel. Third Am. Compl. ¶ 8.

---

No. 45-3 at ¶¶ 31–35, Appx000117 ("Atlas Expert Rep. of Dr. Sunil P. Khatri"); Expert
Rep. of Dr. Gerhard Beckmann at 7, Appx000232.

[5] Cryptocurrency mining involves validating cryptocurrency transactions on a blockchain
network and adding them to a distributed ledger. Each validation adds a new block on
the ledger, and each block references the previous block, forming a blockchain.
Validating transactions requires a powerful machine that can solve a complex
mathematical (cryptographic) algorithm. When a "miner" solves this problem, it validates
the transaction, which is then added to the blockchain as a new block, and the miner is
then rewarded with a cryptocurrency coin. Mining Explained: A Detailed Guide on How
Cryptocurrency Mining Works, Freeman Law, https://freemanlaw.com/mining-explained-
a-detailed-guide-on-how-cryptocurrency-mining-works/ (last visited Jan. 5, 2026); see
also Def.'s Mot. at 2, n. 1.

In 2021, Plaintiff "was the largest GPU-based cryptocurrency miner in North America."
Pl.'s Statement of Material Facts Not In Disp. ("PSUMF") ¶ 2, ECF No. 45-2; Def.'s
Resp. to Pl.'s Statement of Material Facts Not In Disp. ("Def.'s Resp. to PSUMF") ¶ 2,
ECF No. 49-1.

The merchandise was structurally optimized for mining cryptocurrency and does not incorporate a CPU or have a display output. PSUMF ¶¶ 17, 36; Def.'s Resp. to PSUMF ¶¶ 17, 36. The CMP Board must be connected to an automatic data processing ("ADP") device or system containing a CPU to function. PSUMF ¶ 37; Def.'s Resp. to PSUMF ¶ 37. The CMP Board connects to the motherboard[6] and CPU via a peripheral component interconnect express ("PCIe") data link interface slot.[7] Connecting the imported merchandise to an ADP machine does not prevent the ADP machine from running other data processing applications. Dep. of NVIDIA Designee Yisheng Chen at 109:8–11, Appx000601.

After importation, Plaintiff installed certain software drivers for use with a Linux-based operating system onto its servers. PSUMF ¶ 56; Def.'s Statement of Material Facts Not In Disp. ("DSUMF") ¶ 40, ECF No. 45-2. The operating system was specifically designed by a third-party supplier, Elio VP, to run cryptocurrency mining operations. PSUMF ¶ 68; DSUMF ¶ 36.

---

[6] The motherboard is the main printed circuit board in a computer, and includes a CPU socket, RAM slots, expansion slots (including PCIe slots), and various input/output ports. It acts as the central backbone connecting all parts of a computer, allowing communication between the CPU, memory, and peripherals. Expert Rep. of Dr. Gerhard Beckmann at 5, Appx000230.

[7] PCIe is a standardized connection structure that provides the exchange of data and power between a motherboard-mounted CPU and peripheral hardware such as graphics cards or network communications devices that expand the functionality or capabilities of a CPU. Definition - Peripheral Component Interconnect Express (PCIe, PCI-E), TechTarget, https://www.techtarget.com/searchdatacenter/definition/PCI-Express (last visited Jan. 5. 2026); What is PCIe and How Does It Work?, Lenovo, https://www.lenovo.com/us/en/glossary/what-is-pcie/index.html (last visited Jan 5. 2026).

During production, the CMP Board's EEPROM was programmed with video basic input/output system ("VBIOS") firmware, which was installed prior to entry into the United States. Dep. of NVIDIA Designee Yisheng Chen at 55:3–4, Appx000547; Pl.'s Ex. In Supp. of Mot. for Summ. J., Ex. 12, ECF No. 45-4 at 193:20–24, Appx000918 ("Dep. of Dr. Gerhard Beckmann"). VBIOS firmware is designed to allow a motherboard with a CPU and operating system to initialize the CMP Board in the operating system. Dep. of NVIDIA Designee Yisheng Chen at 53:11–54:11, Appxs000545–000546.

At the time of importation, the CMP Board's VBIOS firmware did not function at the speed expected by Plaintiff. Pl.'s Ex. In Supp. of Mot. For Summ. J., Ex. 8, ECF No. 45-4 at 117:8–21, Appx000360 ("Dep. of Hayden Gill"). Based on Plaintiff's request, NVIDIA provided Atlas with updated VBIOS firmware via electronic download, allowing the CMP Boards to function at the speed preferred by Plaintiff. PSUMF ¶ 55; DSUMF ¶ 44. After importation, Atlas downloaded the updated VBIOS firmware and installed it onto each individual CMP Board. PSUMF ¶ 55; DSUMF ¶ 44.

### III.    Section 301 of the Trade Act of 1974

Section 301 of the Trade Act of 1974 authorizes the USTR to impose duties to protect U.S. interests when foreign trade partners violate trade agreements or otherwise take actions adverse to U.S. trade interests. See Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. § 301, 1978, 2041; ARP Materials, Inc. v. United States, 520 F. Supp. 3d 1341, 1347 (CIT 2021). Section 301 duties are assessed after Customs classifies imported merchandise under applicable HTSUS subheadings. See, e.g., Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer,

Intellectual Property, and Innovation, 84 Fed. Reg. 37,381 (USTR July 31, 2019)

("Exclusion Notice").

Pursuant to its authority under section 301, in 2017, the USTR undertook an

investigation of certain trade practices in the PRC. Initiation of Section 301

Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and

Practices Related to Technology Transfer, Intellectual Property, and Innovation, 82 Fed.

Reg. 40,213 (USTR Aug. 24, 2017). After determining that the PRC's conduct was

actionable under the statute, the USTR proposed an additional 25 percent ad valorem

duty on various products imported from the PRC. Notice of Determination and Request

for Public Comment Concerning Proposed Determination of Action Pursuant to Section

301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual

Property, and Innovation, 83 Fed. Reg. 14,906, 14,907 (USTR Apr. 6, 2018). Following

its notice of proposed action, the USTR imposed section 301 duties on certain

additional goods from the PRC by adding new subheadings into the relevant HTSUS

subheadings, including on the imported merchandise. Notice of Action Pursuant to

Section 301: China's Acts, Policies, and Practices Related to Technology Transfer,

Intellectual Property, and Innovation, 83 Fed. Reg. 40,823, 40,825 (USTR Aug. 16,

2018) ("Action Notice").

In March 2022, prior to liquidation of the imported merchandise, the USTR

retroactively reinstated certain exclusions from the section 301 duties imposed in 2018.

Specifically, the list of excluded products set forth in HTSUS subheading 9903.88.56

included:

(108) Printed circuit assemblies for rendering images onto computer screens ("graphics processing modules") (described in statistical reporting number 8473.30.1180);

(109) Printed circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ("accelerator modules") (described in statistical reporting number 8473.30.1180); and

(110) Printed circuit assemblies, constituting unfinished logic boards (described in statistical reporting number 8473.30.1180).

U.S. Notes 20(ttt)(iii)(108)–(110), Ch. 99, HTSUS; see Reinstatement Notice, 87 Fed. Reg. at 17,380 (USTR Mar. 28, 2022).

The USTR's retroactive exclusions were not self-executing, meaning that an importer seeking a refund of section 301 duties must have first filed a protest to Customs' liquidation classifying the imports as subject to the section 301 duties. See, e.g., CSMS No. 3919565 – Guidance: Seventh Round of Products Excluded from Section 301 Duties (Tranche 2), U.S. Customs & Border Prot. (2019); ARP Materials, 520 F. Supp. 3d at 1350. The 2018 announcement of section 301 duties specified that importers could request an exclusion of specific products classified within an affected tariff heading from the collection of such duties. Specifically, importers seeking exclusions should identify "the particular product in terms of the physical characteristics ... that distinguish it from other products within the covered 8-digit subheading." Action Notice, 83 Fed. Reg. at 47,236–37 (USTR Aug. 16, 2018); ARP Materials, 520 F. Supp. 3d at 1348–1349.

The USTR would "not consider [exclusion] requests that identif[ied] the product at issue in terms of the identity of the producer, importer, ultimate consumer, actual use or chief use, or trademark or tradenames." ARP Materials, 520 F. Supp. 3d at 1348–1349.

Rather, the exclusions were "product-specific," meaning that the grant of an exclusion in response to one importer's application would apply to like products imported by other entities. Id. at 1349; Exclusion Notice, 84 Fed. Reg. at 37,382 (USTR July 31, 2019).

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction over this action. 28 U.S.C. § 1581(a) ("The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.").

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." CIT R. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Specifically, "[i]n a tariff classification dispute, summary judgment is appropriate only when 'there is no genuine dispute as to the nature of the merchandise and the classification determination turns on the proper meaning and scope of the relevant tariff provisions.'" Second Nature Designs Ltd. v. United States, 660 F. Supp. 3d 1352, 1373 (CIT 2023) (quoting Deckers Outdoor Corp. v. United States, 714 F.3d 1363, 1371 (Fed. Cir. 2013)); Tyco Fire Prods. L.P. v. United States, 918 F. Supp. 2d 1334, 1339 (CIT 2013) (quoting Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998)) ("Where tariff classification is at issue, 'summary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is.'").

Faced with cross motions for summary judgment, the court will "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Second Nature Designs, 660 F. Supp. 3d at 1381 (quoting Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Plexus Corp. v. United States, 489 F. Supp. 3d 1379, 1388 (CIT 2020) (quoting Am. Fiber & Finishing, Inc. v. United States, 121 F. Supp. 3d 1273, 1279 (CIT 2015)) ("[E]ach party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts.").

## I.    Judicial Review in Tariff Classification Cases

The court must "reach a correct result" in a tariff classification dispute. Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984). The court "must consider whether the government's classification is correct, both independently and in comparison with the importer's alternative." Id. While the court affords deference to Customs' classification rulings relative to their "power to persuade," it has "an independent responsibility to decide the legal issue of the proper meaning and scope of the HTSUS terms." ME Global, Inc. v. United States, 633 F. Supp. 3d 1349, 1356 (CIT 2023); see also United States v. Mead Corp., 533 U.S. 218, 235 (2001) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)); see also Warner-Lambert Co. v. United States, 407 F.3d 1207, 1209 (Fed. Cir. 2005).

The plaintiff bears the burden of establishing that Customs' classification of the imported merchandise was incorrect:

> Specifically, the importer must produce evidence (the burden of production portion of the burden of proof) that demonstrates by a preponderance (the burden of persuasion portion of the burden of proof) that Customs' classification decision is incorrect. The presumption of correctness certainly carries force on any factual components of a classification decision, such as whether the subject imports fall within the scope of the tariff provision, because <u>facts</u> must be proven via <u>evidence</u>.

<u>Universal Elecs., Inc. v. United States</u>, 112 F.3d 488, 492 (Fed. Cir. 1997) (emphases in

original); <u>see also</u> <u>Jarvis Clark</u>, 733 F.2d at 878.

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has

explained:

> First, we ascertain the meaning of the terms within the relevant tariff provision and, second, we determine whether the merchandise fits within those terms. The first step presents a question of law that we review de novo, whereas the second involves a question of fact that we review for clear error. When, as here, no genuine dispute exists as to the nature of the subject merchandise, the two-step inquiry "collapses into a question of law [that] we review de novo."

<u>Well Luck Co. v. United States</u>, 887 F.3d 1106, 1110 (Fed. Cir. 2018) (citations

omitted). Where "there is no factual dispute regarding the merchandise, its structure and

use, the resolution of the classification issue turns on the first step, determining the

proper meaning and scope of the relevant tariff provisions." <u>Faus Group, Inc. v. United</u>

<u>States</u>, 581 F.3d 1369, 1372 (Fed. Cir. 2009).

The General Rules of Interpretation ("GRIs") "govern the classification of goods

within the HTSUS." <u>Well Luck</u>, 887 F.3d at 1111. In order "[t]o determine the meaning of

an HTSUS provision, the court applies the GRIs in numerical order, beginning with GRI

1 and reaching subsequent GRIs if analysis under the preceding GRI does not yield

proper classification of the subject merchandise." <u>Amcor Flexibles Kreuzlingen AG v.</u>

<u>United States</u>, 560 F. Supp. 3d 1326, 1330 (CIT 2022). Under GRI 1, "classification

shall be determined according to the terms of the headings and any relative section or

chapter notes." GRI 1; see also Orlando Food Corp. v. United States, 140 F.3d 1437,

1440 (Fed. Cir. 1998).

HTSUS terms "shall be considered to be statutory provisions of law for all

purposes." Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418,

§ 1204(c)(1), 102 Stat. 1107, 1149; Libas, Ltd. v. United States, 193 F.3d 1361, 1364

(Fed. Cir. 1999) ("[The] HTSUS is indeed a statute but is not published physically in the

United States Code."). When "a tariff term is not defined in either the HTSUS or its

legislative history, the term's correct meaning is its common or dictionary meaning in the

absence of evidence to the contrary." Russell Stadelman & Co. v. United States, 242

F.3d 1044, 1048 (Fed. Cir. 2001); see also Carl Zeiss, Inc. v. United States, 195 F.3d

1375, 1379 (Fed. Cir. 1999) ("Absent contrary legislative intent, HTSUS terms are to be

construed according to their common and commercial meanings, which are presumed

to be the same.").

The court may interpret the terms of a tariff provision by "rely[ing] upon its own

understanding of the terms used and may consult lexicographic and scientific

authorities, dictionaries, and other reliable information sources." Carl Zeiss, 195 F.3d at

1379. The court may also consult Explanatory Notes ("ENs") published by the World

Customs Organization "[f]or additional guidance on the scope and meaning of tariff

headings and chapter and section notes." DIS Vintage LLC v. United States, 456 F.

Supp. 3d 1323, 1329 (CIT 2020). ENs are "not binding law," but they are "generally

Court No. 23-00084                                                                    Page 15

indicative of the proper interpretation of a tariff provision." Id. (quoting Agfa Corp. v.

United States, 520 F.3d 1326, 1329 (Fed. Cir. 2008)).

## DISCUSSION

Here, there is no material issue in dispute as to the nature of the imported

merchandise. See Well Luck, 887 F.3d at 1110; Faus Group, 581 F.3d at 1372. The

parties disagree as to: (1) the proper classification of the imported merchandise; and (2)

the applicability of certain exclusions granted by the USTR from section 301 duties to

the imported merchandise. The court addresses each in turn.

### I.    The Imported Merchandise is Properly Classified Under HTSUS Subheading 8473.30.1180

At the time of importation, Customs classified the imported merchandise under

HTSUS subheading 8473.30.1180, dutiable at a rate of 25 percent ad valorem, which

covers, among other things, parts and accessories of ADP machines. Pl.'s Mot. at 2;

Def.'s Mot. at 8; HTSUS 8473.30.1180 (2021) ("8473: Parts and accessories (other than

covers, carrying cases and the like) suitable for use solely or principally with machines

of headings 8470 to 8472: Parts and accessories of the machines of heading 8471: Not

incorporating a cathode ray tube: Printed circuit assemblies: Other.").

Plaintiff maintains that Customs' classification is correct[8]; that is, the CMP

Boards were properly classified under HTSUS subheading 8473.30.1180 as "parts or

---

[8] Plaintiff misconstrues the court's responsibility with respect to the correct classification of the imported merchandise. Specifically, Plaintiff argues that the court "should summarily sustain the classification of the subject merchandise under HTSUS subheading 8473.30.1180" because Defendant failed to assert an alternative classification "at the time of liquidation or in response to Atlas's protest against the assessment of Section 301 duties on the subject merchandise." Pl.'s Mot. at 16.

accessories" of ADP machines. Pl.'s Mot. at 13. Plaintiff argues that the imported

merchandise is properly classified under HTSUS subheading 8473.30.1180 because it

is parts and accessories suitable for use solely or principally with Plaintiff's servers,

which are ADP machines. Pl.'s Reply Br. at 4–14. Defendant disagrees. Def.'s Mot. at

14.

 Before this court, Defendant asserts that the imported merchandise is properly

classified under HTSUS subheading 8543.90.68. Def.'s Mot. at 12–18; see also HTSUS

8543.90.68 (2021) ("Electrical machines and apparatus, having individual functions, not

specified or included elsewhere in this chapter; parts thereof … Parts: … Other: Printed

circuit assemblies: … Other.").

 After independently considering other tariff classifications, see Jarvis Clark, 733

F.2d at 878, and finding no other alternatives, the court concludes that the imported

merchandise would be properly classified under HTSUS subheading 8473.30.1180 if it

satisfies the following requirements: (1) the merchandise constitutes a "part" or an

"accessory"; (2) of an ADP machine; and (3) is "solely or principally" used for such a

machine. See HTSUS 8473.30.1180 (2021). The court agrees with Defendant that if all

three requirements are not satisfied, the imported merchandise would be classified

---

Regardless of Defendant's position with respect to the classification of imported
merchandise, the court has an independent duty to arrive at "the correct result, by
whatever procedure is best suited at hand." Jarvis Clark, 733 F.2d at 876–878. To reach
such a result, the court "must consider whether the government's classification is
correct, both independently and in comparison with the importer's alternative." Id. at
878. As such, the court cannot summarily sustain any classification proffered by the
parties.

under HTSUS subheading 8543.90.68, which is a residual provision for parts of electrical machines that are "not specified or included elsewhere" in the chapter. HTSUS 8543.90.68 (2021).

      With respect to the first requirement, neither the HSTUS nor the ENs define the term "part" or "accessory." As such, the court turns to the dictionary or common meaning of the words. <u>Russell Stadelman & Co.</u>, 242 F.3d at 1048. The dictionary meaning of "part" is "a constituent member of a machine or other apparatus." <u>Part</u>, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/part (last visited Jan. 5, 2026). Similarly, "accessory" is defined as "an object or device that is not essential in itself but adds to the beauty, convenience, or effectiveness of something else." <u>Accessory</u>, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/accessory (last visited Jan. 5, 2026).

      The CMP Boards at issue cannot perform computational tasks independently and must be connected to a machine with a CPU in order to function. PSUMF ¶ 37; Def.'s Resp. to PSUMF ¶ 37. Because the CMP Boards cannot function independently of such a machine, they would not be considered either "machines of heading 8471" (i.e., ADPs) or independent electrical machines and apparatus, but rather are a "part" of such devices. Once connected, the CMP Boards add to the effectiveness of the machine. <u>See</u> Third Am. Compl. ¶ 8. As such, the CMP Board may also be considered an "accessory" of the machine.

      Having found that the merchandise is a part or accessory of a machine, the court now turns to whether the Atlas servers would fall under HTSUS heading 8471

("automatic data processing machines and units thereof"). HTSUS 8471 (2021). Note

5(A) to Chapter 84, HTSUS defines ADP machines as "digital machines" capable of:

> (i) storing the processing program or programs and at least the data immediately necessary for execution of the program;
> (ii) being freely programmed in accordance with the requirements of the user;
> (iii) performing arithmetical computations specified by the user; and
> (iv) executing, without human intervention, a processing program which requires them to modify their execution, by logical decision during the processing run.

Note 5(A), Ch. 84, HTSUS (2021).

The parties dispute whether Plaintiff's servers constitute ADP machines because

of their ability (or inability) to be "freely programmed in accordance with the

requirements of the user."[9] Def.'s Mot. at 14; Pl.'s Reply Br. at 6. The Federal Circuit

has explained that "a freely programmable ADP machine is one that applications can be

written for, does not impose artificial limitations upon such applications, and will accept

new applications that allow the user to manipulate the data as deemed necessary by

the user." Optrex Am., Inc. v. United States, 475 F.3d 1367, 1370 (Fed. Cir. 2007)

(emphasis in original).

Defendant argues that the "pre-installed and custom-made" Linux operating

system running on Plaintiff's servers "[did] not allow for general purpose computing

tasks" and "[did] not allow the user to manipulate any data." Def.'s Reply Br. at 14–15.

_____

[9] The parties do not dispute, and the court agrees, that Plaintiff's servers meet the requirements of Note 5(A)(i), (iii), and (iv) to Chapter 84, HTSUS.

Rather, "the machines were limited to the singular function of mining cryptocurrency." <u>Id</u>. at 15.

However, Defendant's own expert witness contradicts this assertion. Specifically, the government's expert explained that a user, like Plaintiff, "could remove the Linux operating system and install a new Linux or a new operating system of some kind" should it want its servers to perform another function. Dep. of Dr. Gerhard Beckmann at 173:2–17, Appx000898. Adding the CMP Boards to a CPU would not prevent the CPU "from performing other functions like running a spreadsheet or word processing or things like that." <u>Id</u>. at 117:10–17, Appx000898.

When Plaintiff was dissatisfied with the speed of its VBIOS firmware, the manufacturer provided updated firmware to program or modify its speed. PSUMF ¶¶ 56–57; DSUMF ¶¶ 44–46. Further, in addition to the manufacturer, Plaintiff's third-party supplier of the CMP Boards, ElioVP, was able to program a Linux-based operating system for Plaintiff's servers to optimize Plaintiff's cryptocurrency mining requirements. Dep. of Hayden Gill at 71:1–71:12, Appx000314. Such record evidence establishes that Plaintiff's servers are capable of accepting new applications that allow the user to manipulate the data as deemed necessary by the user, and such servers do not impose artificial limitations upon such applications. <u>See</u> <u>Optrex Am.</u>, 475 F.3d at 1370.

Having found that the CMP Boards are "parts" suitable for use with "machines of heading 8471" (i.e., ADPs), the final issue is whether the CMP Boards are "solely or principally" used for such machines. By its plain language, HTSUS subheading 8473.30.1180 is a "use" provision. <u>Schlumberger Tech. Corp. v. United States</u>, 845 F.3d

1158, 1164 (Fed. Cir. 2017) (explaining that "[a]n eo nomine provision 'describes an

article by a specific name,' whereas a use provision describes articles according to their

principal or actual use."); see also Primal Lite, Inc. v. United States, 182 F.3d 1362,

1364 (Fed. Cir. 1999). The Federal Circuit has explained that "principal use" is defined

as the use "which exceeds any other single use." Aromont USA, Inc. v. United States,

671 F.3d 1310, 1312 (Fed. Cir. 2012) (emphasis in original).

     The record demonstrates that the CMP Boards were designed for professional

mining of cryptocurrency and must be incorporated onto an ADP machine in order to

function. Dep. of Hayden Gill at 166:7–10, Appx000409; Atlas Expert Rep. of Dr. Sunil

P. Khatri at ¶ 25, Appx000115; NVIDIA CMP 170HX Product Description Sheet at 1,

Appx001004. In other words, the CMP Boards operate only as subordinate peripheral

components controlled by the CPU-based system. Disconnected from a motherboard's

PCIe slot, the CMP Boards have no independent functionality or usefulness. See

PSUMF ¶ 37; Def.'s Resp. to PSUMF ¶ 37. As such, their principal use, which exceeds

any other single use, is with ADP machines.

     The court finds that the CMP Boards are properly classified under HTSUS

subheading 8473.30.1180. HTSUS subheading 8543.90.68 does not apply, as it is a

residual provision covering machines "not specified or included elsewhere." Rollerblade,

Inc. v. United States, 116 F. Supp. 2d 1247, 1251 (CIT 2000), aff'd, 282 F.3d 1349 (Fed.

Cir. 2002) ("[c]lassification of imported merchandise in a basket provision is only

appropriate if there is no tariff category that covers the merchandise more specifically.").

## II.    The Imported Merchandise Does Not Qualify for an Exclusion from Section 301 Duties

Having found that the imported merchandise is properly classified under HTSUS subheading 8473.30.1180, the court must now decide whether such merchandise falls within the description of one of the exclusions set forth in U.S. Notes 20(ttt)(iii)(108) through (110) as articles excluded from section 301 duties.

The USTR's notice announcing the exclusions does not provide guidance on the interpretative tools that should be used in determining the meaning of its terms. Reinstatement Notice, 87 Fed. Reg. 17,380 (USTR Mar. 28, 2022). The parties also do not provide alternative interpretative tools. As such, the court finds that "there is no basis to depart from the standard rules of tariff interpretation for the Section 301 exclusion provisions." Keystone Auto. Operations, Inc. v. United States, 781 F. Supp. 3d 1362, 1373 (CIT 2025); see also Well Luck, 887 F.3d at 1110–1111.

### A.    Graphics-Related Exclusions

U.S. Note 20(ttt)(iii)(108) covers "[p]rinted circuit assemblies for rendering images onto computer screens ('graphics processing modules') (described in statistical reporting number 8473.30.1180)." Further, U.S. Note 20(ttt)(iii)(109) covers "[p]rinted circuit assemblies to enhance the graphics performance of automatic data processing (ADP) machines ('accelerator modules') (described in statistical reporting number 8473.30.1180)."

The government argues that the imported merchandise cannot be excluded from the assessment of section 301 duties under U.S. Note 20(ttt)(iii)(108) because the CMP Boards are "physically incapable of rendering images onto a computer screen." Def.'s

Court No. 23-00084                                                                Page 22

Mot. at 20. Similarly, the government argues that the imported merchandise cannot be

excluded from the assessment of duties under U.S. Note 20(ttt)(iii)(109) as it does not

enhance the graphics performance of ADP machines because it "cannot generate,

manipulate, construct, [and is not ] … otherwise involved in the graphics performance of

another machine." Def.'s Mot. at 24.

Plaintiff contends that the imported merchandise falls within the scope of U.S.

Note 20(ttt)(iii)(108) because the note's parenthetical reference to "graphics processing

modules" should be construed broadly to encompass all GPUs. Pl.'s Mot. at 22.

Similarly, Plaintiff argues that the imported merchandise should be covered by U.S.

Note 20(ttt)(iii)(109) because it is "capable of accelerating the processing of graphic

image files and transmitting those image files through the PCIe connector to the

motherboard." Pl.'s Mot. at 25. In the alternative, Plaintiff argues that the parenthetical

reference to "accelerator modules" in the text of the exclusion should be construed as

an eo nomine tariff provision, which would exclude all forms of accelerator modules

from the assessment of section 301 duties, regardless of their actual use. Id. at 22–25

(citing Hanser v. McDonough, 56 F.4th 967 (Fed. Cir. 2022)).

Key to both U.S. Notes 20(ttt)(iii)(108) and (109) are the terms "images" and

"graphics." U.S. Note 20(ttt)(iii)(108) ("[p]rinted circuit assemblies for rendering

images"); U.S. Note 20(ttt)(iii)(109) (PCAs "to enhance the graphics performance" of

ADPs). Using the interpretative tools provided in tariff classification cases, the court

finds that "terms are to be construed according to their common and commercial

meanings, which are presumed to be the same." Carl Zeiss, 195 F.3d at 1379. The

common industry meaning of "graphics" is "[t]he computer's display system" or "[t]he

creation and manipulation of picture images." See Graphics, Computer Glossary,

https://www.computerlanguage.com/results.php?definition=graphics (last visited Jan. 5,

2026). Similarly, the term "image" is "[a] picture; graphic; photo." See Image,

ComputerLanguage.com,

https://www.computerlanguage.com/results.php?definition=image (last visited Jan. 5,

2026). Industry definitions use the terms interchangeably, and include "picture" to

convey the requirement that graphics and images are visual representations.[10]

 Thus, for an exclusion of a PCA which "renders" images onto computer screens

to apply, that PCA must cause a picture, graphic, or photo to display on such screens.[11]

Similarly, for an exclusion of a PCA to enhance the graphics performance of an ADP

machine to apply, that PCA must enhance the performance of the creation and

manipulation of picture images on an ADP machine, rather than enhance the

performance of an ADP machine generally.

 Fundamental to the standard interpretative tools for tariff classifications, including

as applied to section 301 exclusions, is the notion that "[w]hen interpreting HTSUS

provisions, [courts] must strive to give effect to every word in the statutory text." Deckers

---

[10] See Picture, Dictionary.com, https://www.dictionary.com/browse/picture (last visited Jan. 5, 2026) (defining "picture" as "a visual representation of a person, object, or scene" and "any visible image, however produced.").

[11] See Render, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/render (last visited Jan. 5, 2026) (defining "render" in the context of computers as "to cause (something, such as an image or text) to display (as on a screen): to process for display on a computer screen.").

Outdoor, 714 F.3d at 1371. In other words, "courts should construe the provisions of the

tariff code in a way that avoids rendering terms redundant, meaningless, or inoperative."

ME Global, 633 F. Supp. 3d at 1368.

Here, the plain language of U.S. Notes 20(ttt)(iii)(108) and (109) requires a

graphics-related function to qualify for the exclusions. The CMP Boards do not meet

such a requirement.

Plaintiff has offered no evidence that the imported merchandise is used to render

or process graphics. Rather, the record demonstrates that the CMP Boards lack the

capability to render images on a computer screen because graphics rendering features

were explicitly disabled. As Plaintiff's expert witness, Dr. Khatri, explained:

> The deposition testimony of [the CMP Board's manufacturer, NVIDIA]
> indicates that the CMP 170HX GPU card was designed specifically for
> operations other than graphics rendering – for coin mining, in particular. In
> fact graphics rendering features were explicitly disabled in this card.

Atlas Expert Rep. of Dr. Sunil P. Khatri at ¶ 60, Appx000122 (citing Dep. of NVIDIA

Designee Yisheng Chen at 44:23–45:14, Appxs000536–000537); see also Matt

Wuebbling, GeForce Is Made for Gaming, CMP Is Made to Mine, NVIDIA Blog (Feb. 18,

2021), https://blogs.nvidia.com/blog/geforce-cmp (last visited Jan. 5, 2026).

Dr. Khatri further clarified that the CMP Boards were "designed specifically for …

coin mining" because:

> …[I]n the manufacturing process NVIDIA "re-purposed" GPUs that were
> capable of generating graphics by intentionally omitting (and permanently
> disabling) certain components and features. For example, the output
> display was disabled. Also, NVIDIA limited the PCIe speed on the CMP
> products and also the number of PCIe lanes to 4, because PCIe lane speed
> and bandwidth is not important for crypto mining, thus saving power and

> energy. 3D rendering capabilities were removed, since crypto mining does
> not require this functionality. The video/audio engine was also removed.

Atlas Expert Rep. of Dr. Sunil P. Khatri at ¶ 46, Appx000120 (emphasis added); NVIDIA

CMP 170HX Product Description Sheet at 1, Appx001004 (stating "Display Outputs:

None" and specifying that the CMP 170HX does not have capabilities for graphics

processing or rendering such as tensor processing, ray tracing, a video/audio engine, or

a video encode/decode engine). As the NVIDIA representative, Mr. Chen, described of

the CMP Boards, "we removed that graphics output function, so there's no display."

Dep. of NVIDIA Designee Yisheng Chen at 108:7–9, Appx000600.

  The evidence of the manufacturer's limitations to the output display of the GPU

and the removal of the video engine demonstrate that the CMP Boards do not render

images or graphics for display, as required by U.S. Note 20(ttt)(iii)(108). The CMP

Boards also do not fall under the exclusion provided by U.S. Note 20(ttt)(iii)(109)

because they cannot enhance the performance of a function (i.e., the processing of

graphics) that was "intentionally" omitted by the manufacturer.

  Plaintiff's arguments regarding a proposed eo nomine interpretation of "graphics

processing modules" and "accelerator modules" likewise fail because they improperly

divorce the parenthetical from the operative language of the exclusion. Plaintiff's

reliance on <u>Hanser</u> is misplaced. As the Federal Circuit explained in that case, "[t]here

is no general rule or presumption that a parenthetical is always definitional. Instead, as

in many areas of law (and life), context is crucial." <u>Hanser</u>, 56 F.4th at 971. Here, if the

court were to find that the parenthetical reference to "graphics processing modules" in

U.S. Note 20(ttt)(iii)(108) covers all GPUs, or that the parenthetical reference to

"accelerator modules" in U.S. Note 20(ttt)(iii)(109) covers all accelerator modules

regardless of use, it would render redundant and meaningless the limiting phrases of:

(1) "for rendering images onto computer screens" in U.S. Note 20(ttt)(iii)(108); and (2)

"to enhance the graphics performance" of an ADP machine in U.S. Note 20(ttt)(iii)(109).

Instead, and giving meaning to the limiting phrases of the notes, the court finds that the

parenthetical references are "illustrative examples" of the preceding description, and not

a standalone definitional category. See Novacor Chemicals Inc. v. United States, 171

F.3d 1376, 1380–81 (Fed. Cir. 1999).

     As the CMP Boards are not capable of rendering images onto computer screens,

they do not satisfy the express terms of U.S. Note 20(ttt)(iii)(108) and therefore are not

excluded from the assessment of section 301 duties pursuant to this note. Similarly, as

the CMP Boards do not enhance the graphics performance of ADP machines, they are

not excluded from the assessment of section 301 duties under U.S. Note 20(ttt)(iii)(109).

     **B.   Unfinished Logic Boards**

     The exclusion found in U.S. Note 20(ttt)(iii)(110) covers "[p]rinted circuit

assemblies, constituting unfinished logic boards (described in statistical reporting

number 8473.30.1180)." For the imported merchandise to fall under this exclusion, the

court must find that it is: (1) a logic board; and (2) that it was unfinished at the time of

importation.

     The parties disagree as to both issues. Defendant argues that the imported

merchandise does not qualify for this exclusion because the CMP Boards: (1) are not

logic boards, but rather each CMP Board is "a daughterboard that is plugged into a

motherboard via the PCIe slot"; and (2) are "complete, finished products at the time of

importation and not 'unfinished.'" Def.'s Mot. at 25–33. Plaintiff asserts that the CMP

Boards are logic boards and were "unfinished" because the imported "merchandise was

deliberately left in an unfinished state so it could be customized by the user." Pl.'s Mot.

at 18. Instead, per Plaintiff, at the time of importation, the CMP Boards did not contain

drivers and lacked a functioning VBIOS, which meant that the imported "merchandise

was not operational in its condition as imported." Id. at 18–21. It was only after the

manufacturer provided Plaintiff with functioning VBIOS firmware that the imported

merchandise could "function as intended." Id. at 19.

        1.     Whether the Imported Merchandise are "Logic Boards"

The term "logic board" is undefined in USTR's notice and the notes.

Reinstatement Notice, 87 Fed. Reg. 17,380 (USTR Mar. 28, 2022). Industry dictionaries

define a "logic board" as "[a]n assembly of decision-making circuits on a printed-circuit

mounting board." Logic Board, IEEE Standards Ass'n, The Authoritative Dictionary of

IEEE Standards Terms at 637 (7th ed. 2000). The CMP Boards fall within the common

and commercial meaning of "logic boards" because they are PCAs that contain "an

assembly of decision-making circuits" and are an "add-on card" that must be connected

to an ADP device or system containing a CPU in order to function. PSUMF ¶ 37; Def.'s

Resp. to PSUMF ¶ 37.

        2.     Whether the Imported Merchandise are "Unfinished" Logic
              Boards

Given that the CMP Boards fall within the definition of a logic board, the next

question is whether the imported merchandise were "unfinished" logic boards at the

time of importation.

The USTR notice and referenced provisions of the HTSUS do not provide a

definition of the term "unfinished." Reinstatement Notice, 87 Fed. Reg. 17,380 (USTR

Mar. 28, 2022). Further, dictionary definitions of "unfinished" are tautological. See, e.g.,

Unfinished, Merriam-Webster Dictionary, https://www.merriam-

webster.com/dictionary/unfinished (defining unfinished as "not finished") (last visited

Jan. 5, 2026). As such, the court looks to the "common" meaning of "unfinished." See

Russell Stadelman & Co., 242 F.3d at 1048; Carl Zeiss, 195 F.3d at 1379.

In standard tariff classification analyses, the court has turned to the GRIs to

determine whether merchandise classifiable under the relevant heading are

"incomplete" or "unfinished." See Pomeroy Collection, Ltd. v. United States, 559 F.

Supp. 2d 1374, 1386–87 (CIT 2008) (finding that "incomplete" candle lamps were

classifiable as part of "complete, fully assembled candle lamps" if they have "the

essential character of a complete candle lamp.") (citing GRI 2(a), "[a]ny reference in a

heading to an article shall be taken to include a reference to that article incomplete …

provided that, as presented, the incomplete … article has the essential character of the

complete … article."). Here, for purposes of an exclusion under U.S. Note

20(ttt)(iii)(110), the court finds that "unfinished" has the common meaning of lacking the

"essential character" of the complete or finished article.

The "essential character" of a complete or finished CMP Board: (1) contains all

the physical components of the product; and (2) is usable for cryptocurrency mining if

used according to the manufacturer's instructions.[12] At the time of importation, Plaintiff's CMP Boards contained all of the necessary hardware and firmware components, particularly a VBIOS installed onto the EEPROM, necessary for functionality with an ADP machine. Expert Rep. of Dr. Gerhard Beckmann at 10–12, Appxs000235–000237. Further, the VBIOS installed at the time of importation was able to be used by the Plaintiff with its ADP machines, meaning that the CMP Boards were functional when connected to such machines. Dep. of Hayden Gill at 90:6–13, Appx000333; Expert Rep. of Dr. Gerhard Beckmann at 12, Appx000237. As such, Plaintiff's CMP Boards contained the essential character of the article at issue.

Plaintiff argues that the imported merchandise was "unfinished" because it was "not functional" at the time of importation. Pl.'s Mot. at 18–21. Plaintiff contends that the CMP Board's VBIOS firmware was not to its preferred specifications, and as such, was not functional. Id. at 18. The manufacturer, however, explained that Plaintiff sought updated VBIOS firmware to improve mining performance, not to enable functionality. Specifically, NVIDIA representative, Yisheng Chen, explained that Plaintiff sought

---

[12] As a physical product, finished or completed CMP Boards contain the GPU, VRAM, EEPROM, the other electronic components such as capacitors, resistors, and other ancillary components that enable the product's functionality, as well as the protective aluminum enclosure with connection ports for power and extruding data transmission connectors. Expert Rep. of Dr. Gerhard Beckmann at 10, Appx000235; Dep. of NVIDIA Designee Yisheng Chen at 18:13–19, Appx000510. As an accessory, the CMP Boards do not function on their own, but must be connected to an ADP machine in order to function. PSUMF ¶ 37; Def.'s Resp. to PSUMF ¶ 37.

Court No. 23-00084                                                                Page 30

updated VBIOS firmware to "overclock"[13] the CMP Boards to reach higher mining

speeds. Dep. of NVIDIA Designee Yisheng Chen at 111:2–10, Appx000603. The lack of

updated firmware that would enable the user to obtain usage of the imported

merchandise beyond the manufacturer's original specifications does not render it

"unfinished."

    Further, Plaintiff's argument that the imported merchandise was unfinished

because it "was also imported without the Linux drivers that are necessary to allow the

[imported merchandise] to be used with an ADP machine" is misplaced. Pl.'s Mot. at 19.

The CMP Boards themselves do not host any device drivers or application software.

Dep. of NVIDIA Designee Yisheng Chen at 62:10–24, Appx000554. Such drivers and

software must be installed on the ADP machine itself, not on the imported merchandise,

which are parts suitable for use principally with ADP machines. Dep. of Hayden Gill at

71:13–19, Appx000314; Atlas Expert Report of Dr. Sunil P. Khatri at ¶ 19, Appx000212.

    Plaintiff's CMP Boards are not "unfinished" logic boards, and as such, do not fall

within the description of the exclusion found in U.S. Note 20(ttt)(iii)(110). The imported

merchandise is not excluded from the assessment of section 301 duties under this

exclusion.

_____

[13] "Overclocking" means to speed up a processor "beyond the manufacturer's recommendations". See Overclock, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/overclock (last visited Jan. 5, 2026).

### III.    The Effective Date of the Retroactive Exclusions

As the court has concluded that the imported merchandise does not fall within the descriptions of the exclusions set forth in U.S. Notes 20(ttt)(iii)(108) through (110), it need not consider the effective date of the retroactive exclusions.

### CONCLUSION

In conclusion, the court finds that the imported merchandise is properly classified under HTSUS subheading 8473.30.1180. The imported merchandise is not excluded from the assessment of section 301 duties because it does not meet the description of the exclusions set forth in U.S. Notes 20(ttt)(iii)(108) through (110).

For the foregoing reasons, Plaintiff's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**, and Defendant's cross motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. Judgment shall be entered accordingly.


/s/      Lisa W. Wang
Lisa W. Wang, Judge

Dated:    January 27, 2026
            New York, New York